

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| J.L. and F.L., *individually and on behalf of* A.L., and A.L., *individually*, | Civil Action No. 20-cv- |
| Plaintiffs, | **20    1416** |
| v. | |
| Lower Merion School District, | **COMPLAINT**  FILED |
| Defendant. | MAR 13 2020 |

J.L. and F.L. ("Parents") individually and on behalf of A.L. ("Student") and A.L. on his own behalf (together "Plaintiffs") bring this complaint against Lower Merion School District (the "District" or "Defendant") and in support thereof aver as follows:

**I.    OVERVIEW.**

1.    This complaint arises from the District's failure to provide a free appropriate public education ("FAPE") for Student in violation of the Individuals with Disabilities Education Act ("IDEA"), Section 504 of the Rehabilitation Act ("Section 504") and state law and the District's intentional discrimination against Student in violation of Section 504 and the Americans with Disabilities Act ("ADA").

2.    Student is a young adult and a nonspeaker. As a rising 11th grader, he learned to communicate using a letterboard and communication support person ("letterboard"). Student points with his index finger to letters on a laminate alphabet board held by a communication support person. Communicating with his letterboard, he expresses his thoughts, desires, likes, dislikes, wants and needs. He can communicate his love of history, his desire to be an advocate

for nonspeakers, his sense of humor, his joys and disappointments, and his physical and emotional pain and suffering.

3.    Students who also communicate with a letterboard have graduated from prestigious universities such as Oberlin College and Tulane University. Two students currently matriculating at University of California, Berkeley also communicate using a letterboard.

4.    Cognitive testing conducted after Student learned to communicate using the letterboard demonstrates very superior verbal comprehension.

5.    Without the letterboard, Student is unable to communicate his abilities and skills. He is unable to communicate his thoughts, desires, likes, dislikes, wants and needs.

6.    Before Student began using the letterboard, the District did not provide Student with the age-appropriate and grade-appropriate curriculum. Student was in an autistic support classroom with a life skills curriculum.

7.    After he began using the letterboard, the District placed Student in some grade level regular education classes, tacitly acknowledging his abilities. The District, however, never implemented Student's use of the letterboard across all school settings.

8.    The District did not provide a FAPE for Student and intentionally discriminated against Student in violation of the IDEA, Section 504, the ADA and Pennsylvania law.

9.    The letterboard is Student's preferred communication.

10.    All of Student's treating clinicians as well as a doctoral level neuropsychologist who is a licensed Pennsylvania school psychologist agree that the letterboard is effective communication for Student.

11.    Susan Chaplick is a highly regarded speech therapist and Student's longstanding clinician. She told the District the letterboard was a "game-changer" and without it, the District

2

was not getting a true sense of Student's capabilities. Student tested in the average to superior range when he communicated using the letterboard. Without the letterboard, Student's communication is unreliable.

12. Anne Robbins is a highly regarded doctoral level neuropsychologist and a licensed Pennsylvania school psychologist. She opined that the Student's communication using the letterboard is Student's thoughts and opinions. Dr. Robbins administered achievement testing to Student, which revealed that he has above average reading comprehension and average math skills. After observing Student at Lower Merion High School, she concluded that the District's program was not appropriate and far below Student's abilities.

13. Wendy Ross, MD, is a world renowned developmental-behavioral pediatrician and the director of Jefferson University Hospitals, Center for Autism and Neurodiversity. Dr. Ross has been honored as a CNN Hero for her work through her nonprofit, Autism Inclusion Resources.

14. Dr. Ross has been Student's treating physician for a decade. She opined that using the letterboard is effective communication for Student.

15. In 2019, CNN profiled Dr. Ross and Student. Student used the letterboard to communicate. A copy of the video clips are attached hereto as Exhibit 1.

16. Dr. Ross and Student have also presented at a conference on developmental disabilities at Children's Hospital of Philadelphia. During the presentation, Student answered audience questions, communicating using the letterboard.

17. Manley Ghaffari, MD, is a highly regarded psychiatrist who has treated Student for more than 3 years. Dr. Ghaffari and Student collaboratively make treatment decisions, including concerning medications based on Student's feedback and input using the letterboard.

3

18. As discussed in further detail below, from July 2017, through 11th grade and into 12th grade, Plaintiffs continuously tried to persuade the District to take appropriate steps to ensure that Student could use the letterboard throughout his school day and to revise Student's Individualized Education Plan ("IEP") to include access to the general education academics.

19. For more than a year, the District dragged its feet—not denying but also not agreeing to allow Student to communicate using the letterboard across his school day.

20. Then, the District abruptly denied Plaintiffs' longstanding request.

21. Throughout this time, Student was unable to appropriately access his school curriculum or to make appropriate academic, social and emotional progress. Student's mental well-being deteriorated. He suffered stress, anxiety, and mental anguish, including physical manifestations. Ultimately, Dr. Ghaffari, his treating psychiatrist recommended that Student not return to school because without access to his effective and preferred communication his mental and physical well-being would further deteriorate.

22. Plaintiffs timely notified the District that they intended to pursue unilaterally selected educational programming and to seek reimbursement from the District.

23. Then in its December 2018 IEP, after Dr. Ghaffari notified the District that Student could not safely return to school, the District acknowledged that the letterboard was a reasonable accommodation under the ADA.

24. However, the District refused to pay for a communication support person to be with Student across the school day, even though a communication support person is integral to Student's communication. The District also did not revise Student's IEP to include a plan for him to safely transition back to Lower Merion High School following his emotional trauma and failed to revise Student's goals for his regular education classes.

4

## II.    JURISDICTION AND VENUE.

25.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the Constitution and laws of the United States as well as 42 U.S.C. § 12133, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) and the Americans with Disabilities Act ("ADA"), 42 U.S.C.S § 12101.

26.    This Court has supplemental jurisdiction of state law claims pursuant to 28 U.S.C. § 1367.

27.    Plaintiffs have exhausted their administrative remedies through the Pennsylvania Department of Education, Office of Dispute Resolution due process complaint ("Complaint") docketed at 21855/18-19AS.

28.    Venue in this district is proper under 28 U.S.C. § 1391(b) because the events and omissions giving rise to the claims in this case arose in this judicial district and all the parties reside in the Commonwealth of Pennsylvania and within this judicial district.

## III.    PROCEDURAL HISTORY

29.    Plaintiffs filed their Complaint in the Pennsylvania Department of Education, Office of Dispute Resolution on February 27, 2019.

30.    The central issue regarding each of Plaintiffs' claims is Student's right to use his effective and preferred communication throughout the school day.

31.    The Hearing Officer nonetheless (1) precluded Student's testimony using the letterboard at hearing and (2) excluded videos of Student using the letterboard in various settings.

32.    The District filed a motion to preclude on the ground that Student was not competent to testify.  The Hearing Officer ruled that Student could testify only if "he can testify

through some way that is not in dispute in this case" and precluded Student's testimony using the letterboard – Student's effective and preferred communication.

33.     The Hearing Officer disregarded testimony from Student's clinician, including his treating psychiatrist, who had opined that Student's use of the letterboard was effective communication.

34.     The Hearing Officer erred in precluding Student's testimony in support of Plaintiffs' claims. Student is a non-speaker. At the time of the hearing, Student was 18 years old. Precluding Student's use of the letterboard denied Student his right to testify in support of the Complaint. There was sufficient evidence in the record that the letterboard is effective communication for Student. As the finder of fact, the Hearing Officer should have heard Student's testimony and weighed it with the other evidence in the record at the close of the case.

35.     The Hearing Officer likewise erred when he excluded the videos of Student using the letterboard.

36.     Over the many months that Plaintiffs attempted to persuade the District to permit Student to use the letterboard throughout the school day, Plaintiffs provided numerous videos to the District of Student communicating using the letterboard, including to complete academic assignments.

37.     Plaintiffs sought to admit several of these videos at hearing.

38.     The Hearing Officer excluded the videos without viewing any of them to determine their admissibility.

39.     The exclusion of the videos was not harmless error. The videos were the best evidence of, and once the Hearing Officer precluded Student's testimony, the only direct evidence of Student's communication using the letterboard. Moreover, given that the District

6

had seen these videos long before December 2018, the videos also provided evidence of the District's knowledge and notice that the communication was effective.

40.     The parties submitted proposed findings of fact and closing memoranda of law on November 8, 2019. The Hearing Officer restricted the final briefing to a maximum of 35 pages.

41.     On December 15, 2019, the Hearing Officer issued his Final Decision and Order. He denied Plaintiffs' claims under the IDEA and Section 504. He further held that he lacked jurisdiction over Plaintiffs' ADA claim.

42.     This timely appeal follows.

## IV.    THE PARTIES.

43.     Student is nineteen years old. Student is a person with a disability under the definitions of the IDEA, Section 504, the ADA and Chapters 14 and 15 of the Pennsylvania Code.

44.     Plaintiffs reside within the boundaries of the District.

45.     The District is a local educational agency under the IDEA, 20 U.S.C. § 1401(19)(A), 34 CFR § 300.28(a), a recipient of federal funds subject to Section 504, 29 U.S.C. § 794(b)(2)(B),  and a "public entity" subject to Title II of the ADA, 42 U.S.C. § 12131(1). Its central office is located at 301 East Montgomery Avenue, Ardmore, PA 19003.

## V.    STATUTORY AND REGULATORY BACKGROUND.

46.     The IDEA was enacted to "ensur[e] children with disabilities and the families of such children access to a free appropriate public education and [to] improv[e] educational results for children with disabilities." 20 U.S.C. § 1400(c)(3).

47.     The IDEA and its implementing regulations, 34 C.F.R. pt. 300, require states and local school districts that receive funds under the IDEA to provide school age residents who have

7

disabilities with a FAPE, comprised of, inter alia, special education, related services, and supplementary aids and services. *See, e.g.,* 20 U.S.C. §1401(9); 34 C.F.R. §300.17.

48.     The IDEA further confers upon school districts the requirement to develop, review, and revise an IEP for each child with a disability. 20 U.S.C. § 1412(a)(4).

49.     Section 504 also requires students with disabilities be provided access to a FAPE. 34 C.F.R § 104.33(a).

50.     In addition, Section 504 prohibits the exclusion of, or discrimination against, any otherwise qualified individual with a disability by federal fund recipients. 29 U.S.C. § 794(a).  Failure to provide accommodations and supplemental services constitutes discrimination under Section 504.

51.     When a school district denies a FAPE to a student, parents, on behalf of their child, may be entitled to various remedies under the IDEA, Section 504, and the Chapters 14 and 15 of the Pennsylvania Code, including tuition reimbursement and compensatory education.

52.     Title II of the ADA provides "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

53.     In enacting the ADA, Congress found that "individuals with disabilities continually encounter various forms of discrimination, including…the discriminatory effects of…communication barriers."  *Id.* at 12101(a)(5).

54.     The ADA requires public entities to provide equal opportunity to people with disabilities to benefit from and reach the same level of achievement in public programs as people without disabilities.  28 C.F.R. § 35.130(b)(1).

8

55. Regulations promulgated under the ADA also specifically require public entities to ensure that communication with a disabled person is as effective as communication with others. *Id.* at 35.160(a)(1).

56. Additionally, "where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity," a public entity must furnish "appropriate auxiliary aids and services." 28 C.F.R. § 35.160(b)(1).

57. The lone regulatory limitation on this duty provides that a public entity may be relieved of its duty only upon proving that, considering all funding and operating resources available, the proposed action would result in either (1) a fundamental alteration in the nature of the service, program or activity or (2) undue financial or administrative burdens. 28 C.F.R. § 35.164.

58. To quality for this exemption, a public entity must provide a written statement explaining its conclusions. *Id.*

59. A public entity claiming the exemption must still "take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that, to the maximum extent possible," the disabled individual receives the public entity's benefits and services. *Id.*

60. "In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities." 28 C.F.R. § 35.160(b)(2). In addition, the public entity "must provide an opportunity for individuals with disabilities to request the auxiliary aids and services of their choice...[and] shall honor the choice unless it can demonstrate that another effective means of communication exists or [is not] required under § 35.164." 28 C.F.R. Part 35, Appendix A.

## VI.    FACTUAL BACKGROUND

61.    Student describes himself as a non-speaker. He has diagnoses of Autism and anxiety. While he can generate sounds and utter a handful of words, he is unable to rely on speech to express himself. And very importantly to him, he cannot demonstrate his superior intellect and cannot have a full academic, social and emotional experience speaking to communicate.

62.    As a rising 11th grader, Student had begun to communicate using the letterboard. His speech therapist described this development as a "game-changer" for Student.

63.    With this development, Student has effective and preferred communication.

64.    Student used and uses the letterboard with a communication support person. The communication support person sits next to him and holds the letterboard in front of Student at shoulder to eye level. Student touches each letter as he is spelling.

65.    The communication support person records in writing the words and sentences Student communicates.

66.    The communication support person does not touch Student when he is spelling and does not record anything other than the letters Student touches.

67.    Dr. Ross opined that the communication support person functions as a "safety net" for Student and provides a level of anxiety reduction that is beneficial to him.

68.    There is a proscribed progression as individuals learn to communicate using the letterboard. For a new speller, the communication support person presents a lesson, which is on a high interest topic. After the material is presented, the speller is asked known questions that have only one answer. Once a speller shows that they can go to the letters fairly accurately, the communication support person asks semi-open questions that have a few possible answers. The

10

next level of questions is prior knowledge. The question hierarchy ends with open-ended questions.

69.     By the end of 2017 (the middle of 11th grade), Student could answer open-ended questions and converse using the letterboard. Since then, he initiates conversations with others and communicates regularly with his treating psychiatrist, speech therapist, treating developmental pediatrician, Parents and his tutors. He also communicates with friends.

70.     Student communicates using the letterboard in a range of settings. For example, Student has suffered frequent and debilitating migraines due to the stress and anxiety he suffered and continues to suffer as a result of Defendant's violation of his civil rights. The migraines have necessitated numerous trips to the emergency room. Student is able to communicate with emergency room doctors and personnel using the letterboard, including to describe the pain he is experiencing.

71.     Student wanted to use the letterboard throughout the school day to communicate, to participate in regular education classes, and to enjoy other opportunities nondisabled students enjoy.

72.     In the summer of 2017, Parents emailed the District a video of Student using the letterboard. Parents requested that the District review the video so the IEP team could discuss how the District would implement Student's use of the letterboard to enable Student to benefit from the District's programming and access the curriculum.

73.     The District did not respond.

74.     At the beginning of the 2017-2018 school year (11th grade), Parents asked the District to observe Student using the letterboard.

75.     The District rejected the request.

11

76.     Still in the fall of 2017, Parents followed up, requesting the District (1) train school personnel so Student could communicate with the letterboard, (2) allow Student to use the letterboard across the school day, (3) revise Student's IEP to focus on academics, including individualized reading support and (4) retain a neutral third party professional to evaluate Student's communication using the letterboard.

77.     Plaintiffs also reported to the District that Student's long-time speech/language therapist had concluded that Student's use of the letterboard was a "game changer."

78.     The District did not respond to Parents' request that the District retain a neutral third party professional to evaluate Student's communication using the letterboard. Instead, it only recommended that Student audit two regular education courses and participate in specialized instruction in reading. The District did not agree to implement Student's use of the letterboard to communicate.

79.     The District never responded to the request that a neutral third party professional evaluate Student using the letterboard.

80.     In December, Plaintiffs again requested that the District train school staff as Student's communication support person, including Student's 1:1 and trial implementation of Student's use of the letterboard across all school settings. They also asked that the District revise Student's IEP for additional inclusion in regular education classes and curriculum.

81.     Plaintiffs further informed the District that they were retaining Dr. Robbins to perform cognitive and achievement testing and to assess Student's communication using the letterboard.

82.     Plaintiffs also obtained an independent evaluation of Student's speech and language abilities and provided the report to the District. Results from the testing showed that

12

Student demonstrated abilities from the average to the superior range when Student communicated using the letterboard.

83.	The speech/language evaluation reported a significant discrepancy in Student's ability to express himself using speech to communicate versus using the letterboard to communicate.

84.	Through the fall of 2017 and for the year that followed, Plaintiffs sent the District videos of Student using the letterboard, including to complete assignments and homework. Plaintiffs also set up a Vimeo account to share links with the District.

85.	In January 2018, the District agreed that Student could communicate using the letterboard in his reading support class. The District, however, failed to train school staff to implement what it had agreed to do. Student's reading support teacher had never functioned as a communication support person with any other students and had not been trained to do so.

86.	In April 2018, the District added another regular education class to Student's schedule.

87.	The District, however, continued to omit academic goals and communication-related accommodations for Student's regular education classes.

88.	In April 2018, the District agreed to train certain school personnel, so Student could communicate using the letterboard.

89.	The District, however, continued to refuse to train Student's 1:1—the person who was with Student throughout his school day.

90.	The District scheduled the training for May 24, 2018, but then canceled it.

13

91.     Plaintiffs requested that Parent act as Student's communication support person at school until the District completed the training. The District agreed to allow Parent to act as Student's communication support person in reading support.

92.     Then on September 12, 2018, the District reneged. It refused to implement Student's use of the letterboard or to permit Parent to act as Student's communication support person.

93.     The District finally participated in a preliminary 3-day training session at the end of September 2018. The District elected not to train Student's 1:1—the person who would be with Student every day and all day including in his regular education classes.

94.     The District decided at the end of this preliminary training that it would not continue with the training and would prohibit Student's use of the letterboard to communicate. But the District did not communicate its decision to Plaintiffs when they next met. Instead, the District continued to convey that it was agreeing to consider Plaintiffs' request.

95.     After the meeting, the District issued a revised IEP, stating that the training did not support Student's use of the letterboard because there was not research demonstrating its effectiveness within a school setting.

96.     Also, in the fall of 2018, the District requested permission to evaluate Student.

97.     Parents agreed and asked the District to get feedback from Student's clinicians and to review the information they had provided concerning Student's use of the letterboard to communicate.

98.     The District's reevaluation was deficient.

99.     Despite multiple requests by Parents, the District's psychologist did not speak with or even contact Student's private clinicians during the evaluation process.

14

100. Even after Parent reported Student's increased anxiety, the District's psychologist did not speak with either his psychiatrist or developmental pediatrician.

101. Student's treating psychiatrist issued a letter on November 5, 2018, which Plaintiffs provided to the District the next day. It stated:

> without letter-boarding he is not able to fully access his school curriculum or to make appropriate emotional and academic gains. I have recommended that he does not return to school because forcing [Student] to be at school without an effective way to communicate will lead to further deterioration of his mental well-being and lead to worsening aggression and self-injurious behaviors.

102. On November 6, 2018 Parents sent notice they would seek reimbursement from the District for the cost of appropriate educational programming for Student.

103. The District convened an IEP meeting on November 28, 2018.

104. The District did not address Plaintiffs' concerns at that meeting.

105. After Student had been out of school for more than six weeks, the District revised the IEP and sent the revision to Parents on December 20, 2018.

106. The IEP did not include a transition plan for Student to return to Lower Merion High School following the emotional trauma he experienced before his psychiatrist recommended that he not attend school. There was no educational programming to address Student's extreme stress and anxiety. And the IEP did not include academic and behavior goals for Student's participation in regular education classes.

107. The District finally agreed that Student could bring a letterboard and communication support person to school as a reasonable accommodation under ADA. The District, however, did not agree to fund Student's communication support person.

15

108. Student's mental health had deteriorated to the point that Student could not return to school. Student felt that the District thought he was not competent and that the District did not believe in his abilities. This caused him grave stress and anxiety and serious physical manifestations.

109. Unable to return to school, Plaintiffs developed and implemented a comprehensive education for Student within his home and community. Initially, Student received 15-20 hours per week of academic lessons in English/Language Arts, math, science and social studies with highly qualified tutors. Because of increased migraines, he has been able to participate in less academic instruction than he initially did.

110. His curriculum was designed by a special educator and a doctoral level educator and is based in part on Lower Merion's own curriculum and statewide grade-level standards.

111. Student participates in social and transition activities including exploring post-secondary education, field and community trips, entrepreneurship, advocacy and community service.

112. He receives speech, behavior support, counseling and psychiatric services.

113. Dr. Robbins, a Pennsylvania licensed school psychologist, opined that Parent-provided educational programming is appropriate.

## Count I - IDEA, 20 U.S.C. §§ 1400 *et seq;* Section 504, 29 U.S.C. § 794 *et seq.* and Chapters 14 and 15 of the Pennsylvania Code—Denial of a FAPE

114. Plaintiffs incorporate paragraphs 1 through 113 as though fully set forth herein.

115. The IDEA and Section 504 and their implementing regulations require that students with disabilities be provided a FAPE. See, e.g., 20 U.S.C. §1401(9); 34 C.F.R. §300.17

116. The Hearing Officer erred when he denied and dismissed Plaintiffs' claim that the District denied Student a FAPE.

16

117. Student did not make meaningful progress in Lower Merion High School.

118. Even after the District received the speech/language evaluation (December 2017) and the neuropsychological evaluation (April 2018) and the results demonstrating that the District's programming was not appropriate given Student's cognitive ability and skills, the District failed and refused to correct and revise Student's programming and placement.

119. Even after Parents and Student's psychiatrist and developmental pediatrician told the District that Student was suffering extreme stress and mental anxiety including physical manifestations, the District did not correct and revise Student's programming and placement.

120. The District also denied Student a FAPE when it failed and refused to implement Student's communication using the letterboard throughout the school day.

121. The Hearing Officer erred when he denied Plaintiffs' request for reimburse for independent educational evaluations Plaintiffs obtained.

122. Plaintiffs are entitled to reimbursement for the evaluations they obtained.

123. The District violated the IDEA when it failed to respond to Plaintiffs' request for an independent evaluation and failed to evaluate Student in all areas of suspected need.

124. The Hearing Officer erred in denying Parents' request for reimbursement of the cost of the educational programming they provided.

125. The District programming and placement in the IEP provided to Plaintiffs on December 20, 2018 is not appropriate.

126. Student is making educational progress in the Plaintiffs' unilaterally-selected program.

127. The educational programming Parents are providing to Student is appropriate.

17

128.    The equities favor full reimbursement of the cost of Plaintiffs' unilaterally selected program.

WHEREFORE, Plaintiffs respectfully request that this Court reverse the Decision and Order, enter judgment for Plaintiffs and against Defendant, award Plaintiffs compensatory education, reimbursement for Plaintiffs' unilaterally selected educational program and for the independent evaluations they obtained, together with attorneys' fees and costs and all other relief that this Court deems appropriate and equitable.

**Count II – Discrimination in Violation of Section 504, 29 U.S.C. § 794 *et seq.***

129.    Plaintiffs incorporate paragraphs 1 through 128 as though fully set forth herein.

130.    The Hearing Officer erred in denying Plaintiffs' claims under Section 504.

131.    The District has intentionally, purposefully and with deliberate indifference violated the rights of Student under Section 504.

132.    Section 504 and its implementing regulations require that qualified individuals with disabilities not be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance based on their disability. 29 U.S.C. § 794(a).

133.    Student is a qualified individual with a disability.

134.    The District offers programs and activities that receive federal financial assistance.

135.    The District excluded Student from participation in, denied him the benefits of, and subjected him to discrimination under programs and activities receiving federal financial assistance based on his disability by not allowing Student to effectively communicate.

18

136.    The District had knowledge of Student's disabilities entitling him to protection under Section 504.

137.    The District acted intentionally or with deliberate indifference towards Plaintiffs' rights.

138.    The District knew that a federally protected right was substantially likely to be violated and failed to act despite that knowledge.

139.    Plaintiffs suffered damages as a result of the District's conduct.

140.    Student suffered and continues to suffer damages including but not limited to humiliation, mental anguish, pain and suffering, and loss of educational benefit.

WHEREFORE, Plaintiffs respectfully request judgment in favor of Plaintiffs and against Defendant and an award of damages together with attorneys' fees and costs and all other relief this Court deems equitable and appropriate.

## Count III—ADA, 42 U.S.C. § 12131

141.    Plaintiffs incorporate paragraphs 1 through 140 as though fully set forth herein.

142.    Student is a qualified individual with a disability under Title II of the ADA.

143.    The District is a public entity subject to the requirements of Title II of the ADA. The District excluded Student by reason of his disability from participation in the services, programs and activities furnished by the District.

144.    The District denied Student the benefits of the services, programs, and activities furnished by the District.

145.    The District failed and refused to take appropriate steps to ensure that communication with Student was as effective as communication with others.

19

146.    The District failed and refused to furnish appropriate auxiliary aids and services to afford student an equal opportunity to participate in and enjoy the benefits of the services, program and activities furnished by the District.

147.    The District failed to provide access to the most integrated setting.

148.    The District discriminated against Student in violation of Title II of the ADA.

149.    The District acted intentionally or with deliberate indifference towards Plaintiffs' rights.

150.    The District knew that a federally protected right was substantially likely to be violated and failed to act despite that knowledge.

151.    Plaintiffs suffered damages as a result of the District's conduct.

152.    Student suffered and continues to suffer damages including but not limited to humiliation, mental anguish, pain and suffering, and loss of educational benefit.

WHEREFORE, Plaintiffs respectfully request judgment in favor of Plaintiffs and against Defendant and an award of damages together with attorneys' fees and costs and all other relief this Court deems equitable and appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Parents and Student hereby demand a trial by jury in the above-captioned action of all issues triable by jury.

Respectfully submitted,

Nicole Reimann. (PA #57707)
Leah Snyder Batchis (PA #203605)
Jeffrey S. Basch (PA #327731 )
Batchis Nestle & Reimann LLC
7 Bala Avenue, Suite 202
Bala Cynwyd, Pennsylvania 19004
Nicole@SpecialEdLawGroup.com
Telephone: (215) 550-1760
Fax: (215) 550-1768
*Attorneys for Plaintiffs*

Dated: March 12, 2020

J.L. and F.L., individually and on behalf of A.L., and A.L., individually

v.

Lower Merion School District

## EXHIBIT 1

https://www.cnn.com/videos/us/2019/04/25/cnnheroes-ross-upd-19-mixed.cnn

https://www.facebook.com/watch/?v=465989803944119