**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **J.L., et al.**, | **CIVIL ACTION** |
| Plaintiffs, | |
| *v.* | **NO. 20-1416-KSM** |
| **LOWER MERION SCHOOL DISTRICT**, | |
| Defendant. | |

**MEMORANDUM**

**MARSTON, J.**                                                           **March 12, 2021**

In this case, Plaintiffs J.L. and F.L., individually and on behalf of their child A.L., and A.L., individually (collectively, "Plaintiffs"), allege that Defendant Lower Merion School District (the "District") failed to provide A.L. with a free appropriate public education ("FAPE") in violation of the Individuals with Disabilities Education Act ("IDEA"), Section 504 of the Rehabilitation Act, and state law. (Doc. No. 1.) Plaintiffs also allege that the District intentionally discriminated against A.L. in violation of Section 504 and the Americans with Disabilities Act ("ADA"). (*Id.*) The parties dispute whether Plaintiffs' ADA claim is separate from their IDEA and Section 504 claims. This dispute has practical import because it impacts whether Plaintiffs are entitled to a jury trial on their ADA claim.

The Court ordered the parties to brief the issue of whether Plaintiffs' ADA claim is independent of Plaintiffs' IDEA and Section 504 claims, and how that should impact discovery and the Court's scheduling order. (*See* Doc. No. 20.) The parties filed their briefs on July 24, 2020 (Doc. Nos. 21 & 22) and replied to each other's briefs (Doc. Nos. 23 & 24). The Court held oral argument on February 25, 2021. (Doc. No. 27.) For the reasons that are discussed

below, the Court finds that Plaintiffs' ADA claim is not separate from their IDEA and Section 504 claims and was fully exhausted before the hearing officer, and that they therefore are not entitled to a jury trial or full discovery on that claim.

I.

Taking the factual allegations in Plaintiffs' complaint as true, the facts of this case are as follows.

A.L., now nineteen years old, is non-verbal and began communicating using a letterboard[1] and communication support person in the summer of 2017, just before entering eleventh grade.  (Doc. No. 1 at ¶¶ 2, 43, 61–66.)  Prior to using the letterboard to communicate, A.L. studied in an autistic support classroom with "a life skills curriculum," but after he began using the letterboard, he was placed "in some grade level regular education classes."  (*Id.* at ¶¶ 6–7.)  However, despite his desire to use the letterboard "throughout the school day" and his parents' repeated requests throughout mid- to late-2017 that the District incorporate the letterboard into his individualized education program ("IEP") and train district staff on how to use it,[2] the District did not change A.L.'s IEP, "did not agree to implement [A.L.]'s use of the letterboard to communicate," and did not respond to his parents' request that a neutral third-party psychologist evaluate A.L. using the letterboard.  (*Id.* at ¶¶ 71–79.)  During this time, A.L.'s parents also sent District officials videos of A.L. using the letterboard to communicate, including

---

[1] A letterboard is "a laminate alphabet board held by a communication support person"; A.L. "points with his index finger to letters" on the board to communicate.  (Doc. No. 1 at ¶ 2.)  Several medical and educational professionals have concluded that the letterboard is an effective means for A.L. to communicate.  (*See id.* at ¶¶ 10–14, 17.)

[2] A.L.'s parents identify three requests in mid- to late-2017 that the District modify A.L.'s IEP to incorporate the use of the letterboard to communicate and that the District train district staff on how to be "communication support person[s]" who could help A.L. communicate with the letterboard.  (*Id.* at ¶¶ 72, 76, 80.)

to complete homework assignments.  (*Id.* at ¶ 84.)

Without having heard back from the District, A.L.'s parents hired Dr. Anne Robbins, a neuropsychologist and Pennsylvania-licensed school psychologist, to evaluate A.L.'s cognitive, speech, and language abilities.  (*Id.* at ¶¶ 12, 81–82.)  Those tests showed that A.L. had "average to . . . superior" abilities when using the letterboard, but that he was substantially less able to communicate using speech.  (*Id.* at ¶¶ 82–83.)

In January 2018, the District allowed A.L. to use the letterboard in his reading support class.  (*Id.* at ¶ 85.)  However, the District did not train school staff on how to use the letterboard with A.L.  (*Id.*)  It was not until April 2018, after allowing A.L. to participate in another regular education class with the letterboard, that the District agreed to train some school personnel.  (*Id.* at ¶¶ 86–88.)  However, the District refused to train A.L.'s one-on-one aide on how to use the letterboard, and ultimately cancelled the scheduled training.  (*Id.* at ¶¶ 89–90.)  A.L.'s parents requested that one of them be allowed to serve as A.L.'s communication support person until the District had trained school staff.  (*Id.* at ¶ 91.)  The District initially agreed to allow one of A.L.'s parents to serve as a communication support person during A.L.'s reading support class (the only time he was allowed to use the letterboard to communicate), but then went back on that agreement.  (*See id.* at ¶¶ 85, 91–92.)  On September 12, 2018, the District said that it would neither allow A.L. to use the letterboard nor permit one of A.L.'s parents to serve as his communication support person.  (*Id.* at ¶ 95.)

Subsequently, the District held a three-day preliminary training session with some school personnel (but not A.L.'s one-on-one aide) on how to serve as a communication support person to an individual using a letterboard.  (*Id.* at ¶ 93.)  At the end of this training, the District prohibited A.L.'s use of the letterboard to communicate in school, but the District lied about this

decision to A.L.'s parents, claiming that they were still considering Plaintiffs' request.  (*See id.* at ¶ 94.)  The District later issued a revised IEP for A.L., in which they concluded that the training did not support A.L.'s use of the letterboard in school because there was no research demonstrating the effectiveness of this communication technique in a school setting.  (*Id.* at ¶ 95.)

Also in the fall of 2018, the District requested permission for their psychologist to evaluate A.L.  (*See id.* at ¶¶ 96, 99–100.)  A.L.'s parents agreed to this request, and asked that the District's psychologist speak with A.L.'s doctors and review the information that they (the parents) had provided to the District about A.L.'s use of the letterboard to communicate.  (*Id.* at ¶ 97.)  The District's psychologist did not comply with the parents' "multiple" requests, even after one of A.L.'s parents reported that A.L. was experiencing increased anxiety.  (*Id.* at ¶¶ 99–100.)

Due to his increased anxiety at school, A.L. went to visit his own psychiatrist.  (*See id.* at ¶ 101.)  The psychiatrist advised that without using the letterboard, A.L. could not "fully access his school curriculum or . . . make appropriate emotional and academic gains."  (*Id.*)  The psychiatrist recommended that A.L.'s parents remove him from school, because, without "an effective way to communicate," A.L.'s mental health would "further deteriorat[e]," potentially leading to "worsening aggression and self-injurious behaviors."  (*Id.*)  The next day, November 6, 2018, A.L.'s parents withdrew A.L. from school and informed the District that "they would seek reimbursement from the District for the cost of appropriate educational programming for" A.L.  (*See id.* at ¶¶ 101–02.)

On November 28, 2018, the District held an IEP meeting for A.L., but failed to address Plaintiffs' concerns.  (*Id.* at ¶¶ 103–04.)  On December 20, 2018, however, the District issued a revised IEP for A.L. and agreed to allow A.L. to use a letterboard and a communication support

person at school "as a reasonable accommodation under [the] ADA," but refused to fund a communication support person.  (*Id.* at ¶¶ 105, 107.)  Moreover, the revised IEP did not include a transition plan for A.L. to return to school despite his more than six-week absence, did not include any educational program to address his "extreme stress and anxiety," and did not include academic and behavior goals related to A.L.'s regular education classes.  (*Id.* at ¶ 106.)

A.L.'s parents, concerned about A.L.'s mental health, did not to send him back to the District's school.  (*See id.* at ¶ 108.)  Instead, they elected to homeschool him, providing him with "15-20 hours per week of academic lessons in English/Language Arts, math, science[,] and social studies with highly qualified tutors."  (*Id.* at ¶ 109.)

On February 27, 2019, Plaintiffs filed a due process complaint[3] with the Pennsylvania Department of Education.  (*Id.* at ¶ 29; *see also* Doc. No. 21-1 at p. 3.)[4]  In that proceeding, Plaintiffs sought compensatory education, reimbursement for their expenses in privately educating A.L., and reimbursement for Dr. Robbins's evaluation.  (Doc. No. 21-1 at p. 3.) Additionally, Plaintiffs alleged that the District discriminated against A.L. in violation of Section 504 and the ADA.  (*Id.*)  However, Plaintiffs argued that the hearing officer did not have jurisdiction over their ADA claim.  The hearing officer issued his decision on December 15, 2019.  (*Id.* at p. 34.)

---

[3] The administrative complaint named only A.L.'s parents as plaintiffs.  (*See* Doc. No. 21-1 at p. 5.) However, the hearing officer concluded that to treat A.L. as a non-party would "favor[] form over substance," and concluded that A.L. was a party to the administrative action.  (*Id.* at pp. 5–6.)

[4] The District provided a redacted version of the hearing officer's decision as Exhibit A to their brief regarding Plaintiffs' ADA claim.  (Doc. No. 26-1.)  The Court's discussion of the proceedings before the hearing officer is based on that document.  *Cf. Lewis v. Citibank, N.A.*, 179 F. Supp. 3d 458, 461 (E.D. Pa. 2016) (noting that at the motion to dismiss stage, the court may consider "'the allegations contained in the complaint, exhibits attached to the complaint and matters of public record,' and any 'undisputedly authentic documents that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document'" (quoting *Pension Benefits Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993))).

After reviewing the "extremely voluminous record," including tens of thousands of pages of documents and the testimony of sixteen witnesses, the hearing officer concluded that the District had provided A.L. with a FAPE. (*Id.* at pp. 4, 25.) Specifically, he found that the District "made a reasonable and thoughtful decision" to deny A.L. the use of his letterboard given their "concerns regarding the lack of research and training issues involving the Spelling to Communicate methodology, as well as the ethical issues involving the significant doubt that the results are the authentic voice of [A.L.]." (*Id.* at p. 25.) The hearing officer also found that Plaintiffs were not entitled to reimbursement for their expenses in privately educating A.L., or for Dr. Robbins's evaluation. (*Id.* at pp. 28–29, 30–31.) Finally, the hearing officer concluded that Plaintiffs had failed to demonstrate that A.L. was discriminated against in violation of Section 504 or the ADA. (*Id.* at pp. 32–33.) In reaching that decision, the hearing officer assumed, but did not decide, that he did not have jurisdiction over Plaintiff's ADA claim. (*Id.* at p. 32.) However, the hearing officer alternatively ruled that if he did have jurisdiction over Plaintiffs' ADA claim, the District did not violate the ADA. (*Id.* at p. 33.)

Unsatisfied with the hearing officer's decision, Plaintiffs filed their complaint in this Court on March 12, 2020. (Doc. No. 1.) In their complaint, Plaintiffs advance three claims. First, they argue that the hearing officer erred in denying and dismissing their claim that the District denied A.L. a FAPE. (*Id.* at ¶¶ 114–28.) Second, they claim that the hearing officer erred in concluding that the District had not discriminated against A.L. in violation of Section 504. (*Id.* at ¶¶ 129–40.) Third, they maintain that the District discriminated against A.L. in violation of the ADA. (*Id.* at ¶¶ 141–52.)

## II.

The IDEA was enacted to ensure that public schools which receive federal funding

provide children with disabilities "a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).  If parents believe that the education their disabled child is receiving from his or her public school violates the IDEA, they may request an impartial due process hearing.  *Id.* § 1400(f)(1)(A).  In Pennsylvania, hearings are conducted by "hearing officers," who are outside contractors hired by the Pennsylvania Secretary of Education.  *See* 22 Pa. Code § 14.162(p)(1). After exhausting their administrative remedies, parents dissatisfied with the hearing officer's decision may seek judicial review in state or federal court.  20 U.S.C. § 1415(i)(2)(A); *see also Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 272 (3d Cir. 2014).

Congress has made clear that the IDEA does not "restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, Title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities." 20 U.S.C. § 1415(*l*).  However, when plaintiffs bring non-IDEA claims seeking relief that can be obtained under the IDEA, they must exhaust those claims through the IDEA administrative process.[5]  *Id.*; *see also Batchelor*, 759 F.3d at 272–73.  Non-IDEA claims require exhaustion under the IDEA administrative process when the "gravamen" of the plaintiff's complaint indicates that the plaintiff seeks relief for the denial of a FAPE.  *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 755 (2017).

When examining the gravamen of a complaint to determine whether it seeks relief for the

---

[5] Although the District concedes that Plaintiffs exhausted their ADA claims before the hearing officer (Hr'g Tr. at 21:2–20), and Plaintiffs maintain that exhaustion was not necessary (*see, e.g.*, Doc. No. 24 at pp. 9–10), the Court  nonetheless is required to consider whether Plaintiffs have exhausted their FAPE-related claims, because exhaustion is a jurisdictional requirement.  *See Wellman v. Butler Area Sch. Dist.*, 877 F.3d 125, 130–31 & n.6 (3d Cir. 2017); *T.R. v. Sch. Dist. of Phila.*, 458 F. Supp. 3d 274, 285 (E.D. Pa. 2020).

denial of a FAPE, the Court examines both the complaint as a whole, as well as claim-by-claim. *Wellman*, 877 F.3d at 132. In conducting this analysis, the Court "pay[s] less attention to whether the complaint includes such IDEA buzzwords as 'FAPE' or 'IEP,'" than to "the relief sought . . . at base." *K.M. ex rel. C.M. & C.M.M. v. Bd. of Educ. of Montgomery Cty.*, Civil Action No. PX-17-2759, 2019 WL 330194, at *4 (D. Md. Jan. 25, 2019). The Supreme Court has provided a two-question framework for courts to use when evaluating the gravamen of a plaintiff's complaint. *See Fry*, 137 S. Ct. at 756–57. First, courts ask whether the plaintiff could have brought the same claim if the alleged conduct occurred at a public facility other than a school. *Id.* at 756. Second, they ask whether an adult visiting the school could have advanced the same claim. *Id.* In determining the gravamen of the plaintiff's complaint, the Court must consider whether the plaintiff first pursued administrative remedies available to them under the IDEA before shifting to judicial proceedings. *Id.* at 757.

### III.

The analysis of whether Plaintiffs' ADA claim is separate from their IDEA and Section 504 claims and how any difference should impact discovery and scheduling proceeds in three parts. First, the Court must decide whether Plaintiffs were required to exhaust their ADA claim before the hearing officer. If they were required to exhaust, the Court must next determine whether they did so. If Plaintiffs did, then the Court must consider to what extent Plaintiffs should be entitled to develop additional evidence in this action. The Court addresses each in turn.

### A.

When examining whether Plaintiffs' ADA claim requires exhaustion, the Court finds that the gravamen of Plaintiffs' complaint was the denial of a FAPE. Therefore, Plaintiffs were

required to exhaust their ADA claim.

Viewing the complaint as a whole, it is clear that Plaintiffs' claims center around the quality of education that A.L. received when he was prohibited from using the letterboard to the fullest extent Plaintiffs believed A.L. should have been allowed.  For instance, Plaintiffs claim that before A.L. began using the letterboard, "the District did not provide [him] with [an] age-appropriate and grade-appropriate curriculum," and that without the letterboard, "the District was not getting a true sense of [A.L.'s] capabilities."  (Doc. No. 1 at ¶¶ 6, 11.)  As such, "the District's [educational] program was not appropriate and far below [A.L.'s] abilities."  (*Id.* at ¶ 12.)  Indeed, this suit was precipitated by Plaintiffs' frustrations that the District would not allow A.L. to "use the letterboard throughout his school day" and did not respond to their repeated requests to revise A.L.'s IEP "to include access to . . . general education academics" or to train school personnel on how to help A.L. communicate using the letterboard.  (*Id.* at ¶¶ 18, 72, 76, 80, 85, 89–94, 103–07.)  The District's failures meant that A.L. "was unable to appropriately access his school curriculum or to make appropriate academic, social[,] and emotional progress."  (*Id.* at ¶¶ 21, 61; *see also id.* at ¶¶ 78, 85–87 (alleging that A.L. was not able to reap the full benefit of his regular education classes because he was not allowed to use his letterboard to communicate).)

The allegations in the complaint rarely imply that the District's refusal to allow A.L. to use a letterboard or to pay for a communication support person prevented A.L. from being able to access the school, as opposed to preventing him from accessing his *education*.  (*See, e.g.*, *id.* at ¶ 24 ("[T]he District refused to pay for a communication support person to be with [A.L.] across the school day, even though a communication support person is integral to [A.L.'s] communication.").)  However, even the glancing allegations that the District discriminated

against A.L. more broadly than simply failing to provide him with a FAPE relate any alleged discrimination back to the quality of A.L.'s education.  For instance, Plaintiffs allege that A.L.'s parents withdrew A.L. from school because A.L.'s psychiatrist advised that if A.L. could not use the letterboard at school, he was "without an effective way to communicate," which could have deleterious effects on his mental health.  (*See id.* at ¶¶ 101–02.)  Yet, Plaintiffs also state that the reason A.L. was so disturbed by the District's refusal to allow him to use the letterboard was that A.L. "felt that the District thought that he was not competent and that the District did not believe in his abilities."  (*Id.* at ¶ 108.)  In other words, A.L.'s primary concern was not access to the school, but rather a disagreement with the school's assessment of his academic abilities.

Under the *Fry* framework, Plaintiffs' complaint alleges "grievances [that] all stem from the [District's] alleged failure to accommodate [A.L.'s] condition and fulfill his educational needs."  *Wellman*, 877 F.3d at 133; *see Fry*, 137 S. Ct. at 756–57.  At base, Plaintiffs complain about the adequacy and quality of A.L.'s education while he was a student in the District.  This is not the sort of claim that a non-student could advance against the District; nor is it the type of claim that A.L. could level at a non-school public facility such as a courthouse, community center, or library.  *See Wellman*, 877 F.3d at 133–34; *K.M.*, 2019 W.L. 330194, at *5; *see also S.D. ex rel. A.D. v. Haddon Heights Bd. of Educ.*, 722 F. App'x 119, 126 (3d Cir. 2018) ("The substance of Appellants' grievance is that Appellee failed to provide instruction tailored to meet S.D.'s special needs resulting from his disability.  Their claims therefore concern the denial of a FAPE to S.D.").

Indeed, as the District correctly noted at the hearing on this issue, Plaintiffs do not allege that the District's refusal to allow A.L. to use a letterboard prevented him from being able to eat lunch in the cafeteria, use the restroom, or attend a school play or football game—the types of

activities the District must make available to anyone, not just students.  (Hr'g Tr. at 14:16–24.)
Although the complaint recites the elements of an ADA claim, Plaintiffs' factual allegations
focus on A.L.'s access to *educational* services, and not general access to the school, and as such
the gravamen of the complaint is the denial of a FAPE.  *See K.M.*, 2019 WL 330194, at *5 ("The
gravamen of Plaintiffs' claims is that without this particular facilitated communication in the
educational setting, K.M. is denied an educational program necessary to achieve age-appropriate
educational milestones.").  *But see J.G. v. L.A. Unified Sch. Dist.*, Case No. 2:19-cv-01268-R-E,
2019 WL 5158973, at *3–4 (C.D. Cal. Sept. 26, 2019) (finding that a school's denial of a non-
verbal student's "request to use his iPad at school as a communication device" alleged
discrimination related to "the school's lack of proper accommodations for [the plaintiff's]
disability, and not about the deficiency in the quality of education he received . . . ."); *Duncan*,
2019 WL 401650, at *4 (finding that, as the plaintiff needed his letterboard "to be independent
and communicate in society," the "claim could be pressed against any place of public
accommodation that refused to allow Plaintiff to utilize his letter board to communicate").

        A claim-by-claim analysis yields similar results.  It is true that in their Section 504 and
ADA claims, Plaintiffs' allegations borrow verbatim from the language of the relevant statutes
and their implementing regulations.  For instance, Plaintiffs claim that the "District denied [A.L.]
the benefits of the services, programs, and activities furnished by the District."  (Doc. No. 1 at ¶
144.)  *See* 42 U.S.C. § 12132 ("Subject to the provisions of this subchapter, no qualified
individual with a disability shall, by reason of such disability, be excluded from participation in
or be denied the benefits of the services, programs, or activities of a public entity, or be subjected
to discrimination by any such entity.").[6]  However, Plaintiffs fail to identify *what* programs and

---

[6] Plaintiffs' Section 504 claim contains similar language.  (*Compare* Doc. No. 1 at ¶ 135 ("The District
excluded [A.L.] from participation in, denied him the benefits of, and subjected him to discrimination

services A.L. was denied.  To the extent this information may be drawn from certain factual allegations, the Court finds that these allegations centrally allege that A.L. was denied access to a FAPE.  Indeed, in describing the damages that A.L. suffered as a result of his Section 504 and ADA claims, Plaintiffs state that A.L. was subjected to "humiliation, mental anguish, pain and suffering, *and loss of educational benefit*."  (Doc. No. 1 at ¶¶ 140, 152 (emphasis added).)  For these reasons, a claim-by-claim analysis of Plaintiffs' complaint, like an analysis of the complaint as a whole, reveals that the crux of Plaintiffs' complaint remains the denial of a FAPE.

This conclusion comports with decisions from other bodies that have considered whether a claim that a student has been denied the opportunity to use a letterboard in school is a claim about a denial of FAPE.  For instance, in *K.M. ex rel. C.M. & C.M.M.*, the Maryland District Court considered whether a student who was denied the use of a letterboard and trained facilitator in school was required to exhaust her ADA claims through the IDEA's administrative processes before bringing them in court.  *K.M.*, 2019 WL 330194, at *1.  The court concluded that the "gravamen" of the plaintiff's claims was that without the letterboard, the student was "denied an educational program necessary to achieve age-appropriate educational milestones." *Id.* at *5.  Therefore, the court held that the student was required to exhaust her Section 504 and ADA claims through the IDEA's administrative processes, because it was unfathomable that the student could bring these same claims against a non-school public facility, or that a non-student would be able to bring them against the school.  *Id.*  So too here.

Similarly, in *In re Fairfield (CT) Board of Education*, the Office for Civil Rights of the

---

under programs and activities receiving federal financial assistance based on his disability by not allowing [him] to effectively communicate."), *with* 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .").

United States Department of Education reported the results of an investigation into a school district that prohibited people from holding a non-verbal student's letterboard in mid-air while she used it.  72 IDELR 165, at 857–58 (U.S. Dep't of Educ., Off. for C.R. Feb. 2, 2018).[7]  The Office for Civil Rights explained that "[t]o the extent there [was] a dispute about the appropriateness of using a specially-trained communication partner . . . this disagreement was ultimately a substantive pedagogical issue that [was] best resolved through [the IDEA's due process procedures]."  *Id.* at 860.

This Court is aware of one case, *Duncan v. San Dieguito Union High School District*, that held that a school's denial of the plaintiff's use of a letterboard created Section 504 and ADA claims that did not have to be exhausted using the IDEA's administrative processes.  Case No.: 3:18-cv-00321BEN-BLM, 2019 WL 4016450, at *4 (S.D. Cal. Aug. 23, 2019).  However, this case is distinguishable.  First, there, the plaintiff was authorized to use a letterboard and a communication partner to participate in his classes.  *Id.* at *1.  However, the plaintiff's history teacher ignored the plaintiff and instead spoke directly to his communication partner.  *Id.*  The teacher also forced the plaintiff to answer a question without using his letterboard.  *Id.*  Based on these incidents, the court found that the plaintiff's claims were only "tangentially" related to access to education (i.e., were only tangentially related to the provision of a FAPE) and that the "central tenet" of the plaintiff's complaint was "that the denial of his letter board as a communication device equates to not being accommodated and thus prelcude[d] [him] from access to the school itself."  *Id.* at *4.[8]

---

[7] The Court is not bound by the Office for Civil Rights's conclusions in *In re Fairfield*, and notes that the Office's report of its investigation in that matter "is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such."  72 IDELR at 860.  Nonetheless, the Court finds the Office's conclusions in that matter informative.

[8] *J.G. v. Los Angeles Unified School District*, which involved a non-verbal student's desire to use his iPad

Here, unlike in *Duncan*, Plaintiffs challenge the District's refusal to grant A.L. his preferred accommodation, not an individual teacher's failure to use an accommodation that had already been granted.  (*See, e.g.*, Doc. No. 1 at ¶ 94.)  There is a difference between a school acknowledging that a particular accommodation is required and then refusing to provide it and a school deciding that a particular accommodation is unnecessary or even harmful and therefore refusing to provide it.  Only the latter situation is implicated in this case.  And, unlike in *Duncan*, here the "central tenet" of Plaintiffs' complaint is the denial of a FAPE.  As such, *Duncan*'s reasoning is not persuasive for the argument that Plaintiffs' Section 504 and ADA claims should be found to seek relief unavailable under IDEA.

This Court recognizes, however, that the *Fry* framework is not completely dispositive of this issue.  In a footnote, the *Fry* Court explicitly declined to answer whether "exhaustion [is] required when the plaintiff complains of the denial of a FAPE, but the specific remedy she requests . . . is not one that an IDEA hearing officer may award."  *Fry*, 134 S. Ct. at 752 n.4.[9] However, the Third Circuit explicitly answered this question pre-*Fry*, holding that even when plaintiffs sought remedies unavailable under the IDEA, they were still required to exhaust when damages sought overlapped with damages available under the IDEA.  *See Batchelor*, 759 F.3d at 276–78.  And, this holding has been re-affirmed in a nonprecedential opinion from the Third Circuit post-*Fry*.  *See J.L. ex rel Leduc v. Wyo. Valley W. Sch. Dist.*, 722 F. App'x 190, 194 & n.3 (3d Cir. 2018) (collecting cases); *see also J.M. v. Francis Howell Sch. Dist.*, 850 F.3d 944,

---

as a communication device in school, was decided on similar grounds.  *See J.G.*, 2019 WL 5158973, at *3–4.

[9] This question appears to implicate the futility exception to the exhaustion requirement.  *See Henry*, 2019 WL 4247914, at *9 (finding that exhaustion would be futile—and thus not required—where "the plaintiff seeks remedies unavailable under the IDEA"); *James S. ex rel. Thelma S. v. Sch. Dist. of Phila.*, 559 F. Supp. 2d 600, 619 (E.D. Pa. 2008) (finding that exhaustion would be futile in part because the hearing officer had no authority to grant compensatory damages).

950 (8th Cir. 2017) (same); *Doe v. Williamson Cty. Bd. of Educ.*, Case No. 3:20-cv-00486, 2020 WL 7385262, at *8–9 (M.D. Tenn. Dec. 16, 2020) (finding that, as a matter of statutory interpretation, "[n]othing about requesting one form of relief that is *un*available under the IDEA negates a request for another form of relief that is available").

Here, Plaintiffs seek "an award of damages together with attorneys' fees and costs and all other relief this Court deems equitable and appropriate." (Doc. No. 1 at pp. 19–20.) The Third Circuit faced a nearly identical situation in *Batchelor*; the plaintiffs there sought "compensatory damages and punitive damages, statutory damages, reasonable attorney's fees, and such further relief as this court deems just and appropriate." *Batchelor*, 759 F.3d at 276 (quotation omitted). Because the *Batchelor* plaintiffs sought at least some relief, such as attorneys' fees, that was available to them under the IDEA, the Third Circuit ruled that exhaustion was required. *Id.* at 276–77. Additionally, the Third Circuit observed that the IDEA allows district courts to craft appropriate remedies for violations of the IDEA, including monetary awards (though not as compensatory or punitive damages). *Id.* Identical principles govern here. Because Plaintiffs seek at least some relief for their Section 504 and ADA claims that is available to them under the IDEA, they were required to exhaust those claims.

B.

Having decided that Plaintiffs' ADA claim as pled needed to be exhausted before the hearing officer, the Court must next consider whether Plaintiffs did exhaust this claim. *See Wellman*, 877 F.3d at 130–31 (failure to exhaust deprives the court of subject-matter jurisdiction). The Court finds that they did.

Although Plaintiffs did not actively pursue their ADA claim before the hearing officer, (*see* Doc. No. 21-1 at p. 32), Plaintiffs did fully litigate their Section 504 claim through the

IDEA's administrative process (*see id.* at pp. 31–33; *see also* Hr'g Tr. at 6:6–9, 18:1–11).  As

other judges in this District have recognized, "the ADA 'extends the nondiscrimination rule of

Section 504 to services provided by any "public entity" (without regard to whether the entity is a

recipient of federal funds . . . ).'" *Travis G. v. New Hope-Solebury Sch. Dist.*, 544 F. Supp. 2d

435, 445 (E.D. Pa. 2008) (quoting *Chambers v. Sch. Dist. of Phila.*, Civ. A. No. 05-2535, 2007

WL 515497, at *5–6 & n.4 (E.D. Pa. Nov. 30, 2007)).  Therefore, claims brought under Section

504 "are treated as analogous" to claims brought under the ADA, "[b]ecause 'the remedies,

procedures[,] and rights' under the ADA are the same as those under Section 504." *T.M. ex rel.

T.M. v. Quakertown Cmty. Sch. Dist.*, 251 F. Supp. 3d 792, 813 (E.D. Pa. 2017) (quoting 42

U.S.C. § 12133).  As the District correctly noted at oral argument, Section 504 and ADA "claims

[are] based on the same facts and the same legal standard" (Hr'g Tr. at 18:7–8).  The Court

concludes that by fully litigating their Section 504 claim before the hearing officer, Plaintiffs

adequately exhausted their ADA claims through the IDEA's administrative processes.

In the alternative, even if fully litigating their Section 504 claim before the hearing

officer was insufficient for Plaintiffs to have fully exhausted their ADA claim, the Court would

still find exhaustion.  Although the hearing officer assumed without deciding that he did not have

jurisdiction to consider Plaintiffs' ADA claim, he nonetheless concluded that if he did have

jurisdiction, Plaintiffs failed to prove that the District violated the ADA.[10]  (Doc. No. 21-1 at pp.

---

[10] The Third Circuit has recognized four circumstances in which exhaustion is not required by the IDEA: "(1) exhaustion would be futile or inadequate; (2) the issue presented is a purely legal question; (3) the administrative agency cannot grant relief; and (4) exhaustion would cause severe or irreparable harm." *D.E. v. Central Dauphin Sch. Dist.*, 765 F.3d 260, 275 (3d Cir. 2014).  Here, Plaintiffs allege that the futility exception to exhaustion applies to their ADA claim.  (*See* Hr'g Tr. at 12:3–10.)  Plaintiffs take this position because they read the hearing officer as holding that he did not have jurisdiction over their ADA claim.  (*Id.* at 12:7–15; *see also* Doc. No. 22 at p. 15.)  Yet, rather than explicitly holding that he did not have jurisdiction over Plaintiffs' ADA claim, the hearing officer *assumed without deciding* that he did not have jurisdiction over it.  (Doc. No. 21-1 at p. 32 ("[I]t is assumed, since the parties seeking relief do not believe the hearing officer has jurisdiction over the [ADA] claim, that the claim should not be determined

32–34.)  Such a ruling on the merits of Plaintiffs' ADA claim—even as an alternative ruling—was sufficient to exhaust the claim.  Moreover, at this juncture, principles of judicial economy support finding exhaustion here.  To require Plaintiffs to return to the hearing officer and litigate their ADA claim—a claim that would require the hearing officer to reconsider the same evidence and legal standard he already reviewed when ruling on the merits of Plaintiffs' Section 504 claim—would be wasteful of the litigants' and hearing officer's time and resources, and would do nothing to help clarify the factual and legal issues now before the Court.

The Court finds that Plaintiffs successfully exhausted their ADA claim before the hearing officer and that the ADA claim, like their IDEA and Section 504 claims, is on appeal of the hearing officer's decision.[11]

## C.

Finally, Plaintiffs request a jury trial on their ADA claim and seek "garden variety discovery," such as document review and witness depositions.  (Doc. No. 22 at p. 17.)  However, given the Court's conclusion that the ADA claim is in essence a denial of a FAPE, Plaintiffs are not entitled to a jury trial on that claim.[12]

The Third Circuit has explained that a district court has an independent duty to determine

---

in this decision.").)  Nonetheless, the Court concludes that even if Plaintiffs did not exhaust their ADA claim before the hearing officer, it would be futile to require them to do so now.  The hearing officer indicated in his decision that if he did have jurisdiction over Plaintiffs' ADA claim he would have denied it.  (Doc. No. 21-1 at pp. 32–33.)  Moreover, he did reach the merits of Plaintiffs' Section 504 claim which he denied—and which must be evaluated using the same standard as their ADA claim.  (*Id.*)  *See T.M.*, 251 F. Supp. 3d at 813.  Therefore, even if Plaintiffs failed to exhaust their ADA claim, the futility exception to the exhaustion requirement excuses them from doing so in this case.

[11] This conclusion comports with Plaintiffs' alternative argument that, to the extent they were required to exhaust their ADA claim before the hearing officer, they did so.  (*See* Doc. No. 22 at p. 19 ("If Plaintiffs were required to exhaust the IDEA's administrative procedures before bringing their ADA claim in this Court, they have done so.").)

[12] The Seventh Amendment creates a right to a jury trial "[i]n suits at common law, where the value in controversy shall exceed twenty dollars."  U.S. Const. amend. VII.  This Amendment applies to statutory

whether the IDEA has been satisfied (i.e., whether a student has been provided with a FAPE).
*Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 757 (3d Cir. 1995).  With this responsibility of
independently evaluating the hearing officer's decision comes the discretion to consider evidence
not proffered at the administrative hearing, provided that evidence is "relevant, non-cumulative,
and useful in determining whether Congress's goal [of a FAPE] has been reached for the child
involved."  *Id.* at 760.  This analysis should be tailored to the specific facts and claims that are
before the Court.  *See Antoine M. v. Chester Upland Sch. Dist.*, 420 F. Supp. 2d 396, 402 (E.D.
Pa. 2006).  While parties are required to exhaust their claims, they need not exhaust their
evidence; they may present new evidence to the Court that could have been presented to the
hearing officer but was not.  *See M.C. ex rel Conyers v. Sch. Dist. of Phila.*, 393 F. Supp. 3d 412,
417 (E.D. Pa. 2019).

Evidence that *has* already been presented at administrative proceedings should not be
independently proffered to the Court if it is irrelevant or cumulative.  *See D.K. v. Abington Sch.
Dist.*, 696 F.3d 233, 253 (3d Cir. 2012); *Bernardsville Bd. of Educ. v. J.H.*, 42 F.3d 149, 161 (3d
Cir. 1994); *Robert B. v. W. Chester Area Sch. Dist.*, No. Civ.A. 04-CV-2069, 2005 WL 2396968,
at *9–10 (E.D. Pa. Sept. 27, 2005).  The Court may consider four factors in deciding whether to
admit additional evidence:  (1) whether the parties were procedurally barred from introducing the
evidence at the administrative hearing; (2) "whether the party seeking admission of the evidence
deliberately withheld it at the hearing for strategic reasons"; (3) whether introducing the

---

rights only "if the statute creates legal rights and remedies, enforceable in an action for damages in the
ordinary courts of law."  *Curtis v. Loether*, 415 U.S. 189, 194 (1974).  A denial of a FAPE is an equitable
injury, and so plaintiffs who complain solely of a denial of a FAPE are not entitled to a jury trial.  *See
Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, Civil Action No. 05-2535, 2014 WL 3572931, at *2–3 &
n.3 (E.D. Pa. July 21, 2014); *see also Sheils v. Pennsbury Sch. Dist.*, Civil Action No. 14-2736, at *12
(E.D. Pa. Oct. 8, 2014) (holding that the IDEA "is not a statute that is enforceable in an action for
monetary damages").

additional evidence would prejudice the non-proffering party; and (4) "the potential impact of the admission of the evidence on the administration of justice, that is, whether the party seeks to introduce not just new evidence but a new legal theory unrelated to the legal theory presented at the due process hearing." *K.D. v. Downington Area Sch. Dist.*, Civil Action No. 16-0165, 2016 WL 4502349, at *1 (E.D. Pa. Aug. 29, 2016). The Court must first evaluate a party's proffered evidence before excluding it. *Susan N.*, 70 F.3d at 759.

Here, Plaintiffs have identified some additional evidence that they wish to introduce in relation to their IDEA and Section 504 administrative appeal. (*See* Doc. No. 22 at pp. 17–18.) However, because Plaintiffs sought the opportunity to take full discovery related to their ADA claim, they have not detailed the additional evidence they wish to present with respect to that claim. (*See* Doc. No. 22 at pp. 17–18; *cf.* Hr'g Tr. at 13:9–17.) At this time, the Court reserves ruling on the specific additional discovery that will be permitted in this action.[13]

IV.

For these reasons, the Court finds that Plaintiffs' ADA claim as pled arises out of the alleged denial of a FAPE, was administratively exhausted, and is an administrative appeal not entitled to a jury trial. The Court, however, will provide Plaintiffs the opportunity to amend their complaint to the extent Plaintiffs are able to plead additional facts that may show that their ADA claim does not arise out of the District's alleged denial of a FAPE to A.L. Finally, the Court reserves ruling on what evidence it will consider in supplement to the administrative record.

An appropriate order follows.

---

[13] The Court will likely allow Plaintiffs the opportunity to introduce additional evidence, in particular evidence Plaintiffs argue is relevant and yet was refused by the hearing officer. The parties shall meet and confer in an attempt to come to an agreement as to what additional evidence will be presented.