EXHIBIT I

IN THE UNITED STATES DISTRICT FOR THE EASTERN

DISTRICT OF PENNSYLVANIA

- - -

| ■ and ■ | : | CIVIL ACTION |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| UPPER MERION SCHOOL | : | |
| DISTRICT, | : | NO. |
| Defendant | : | 20-CV-01416-KKSM |

- - -

Wednesday, August 18, 2021

- - -

    Videotaped deposition of MELISSA SINAPI-GIBSON, taken pursuant to notice, was held at the offices of 7 Bala Avenue, Suite 202, Bala Cynwyd, Pennsylvania 19004, commencing at 9:59 a.m., on the above date, before Torre Lynn Adams, a Court Reporter and Notary Public in the Commonwealth of Pennsylvania.

- - -

STREHLOW COURT REPORTING
54 FRIENDS LANE, SUITE 116
NEWTOWN, PENNSYLVANIA 18940
(215) 504-4622
SERVING NJ, PA, NY & DE

## Page 2

```
 1   APPEARANCES:
 2
 3   BATCHIS NESTLE & REIMANN LLC
     BY:  NICOLE REIMANN, ESQUIRE
 4       7 Bala Avenue
         Suite 202
 5       Bala Cynwyd, Pennsylvania 19004
         (215) 550-1764
 6       Nicole@SpecialEdLawGroup.com
 7       Representing the Plaintiff
 8
 9   WISLER PEARLSTINE, LLP
     BY:  MICHAEL KRISTOFCO, ESQUIRE
10   BY:  AMY T. BROOKS, ESQUIRE
         Blue Bell Executive Campus
11       460 Norristown Road, Suite 110
         Blue Bell, Pennsylvania 19422
12       (610) 825-8400
         Mkristofco@wispearl.com
13
         Representing the Defendant
14
15
16   ALSO PRESENT:
17       BILL HAYES, Videographer
18
19
20
21
22
23
24
```

## Page 3

```
 1              - - -
 2            I N D E X
 3              - - -
 4   WITNESS                     PAGE
 5   MELISSA SINAPI-GIBSON
     (Witness sworn.)              5
 6
 7
     EXAMINATION BY:
 8
     MS. REIMANN                   5
 9
                - - -
10
            E X H I B I T S
11
                - - -
12
     NO.    DESCRIPTION         PAGE
13
     Sinapi-Gibson-1  Binder of Documents     9
14
     Sinapi-Gibson-2  Notes from 12-8-17 Meeting   11
15
     Sinapi-Gibson-3  Reevaluation Report    105
16
17
18
19
20
21
22
23
24
```

## Page 4

```
 1           (By agreement of counsel, the
 2   sealing, certification and filing are waived;
 3   and all objections, except as to the form of the
 4   question, are reserved until the time of trial.)
 5              - - -
 6           VIDEO TECHNICIAN:  The time now is
 7   9:59 a.m.
 8           Your Honor, ladies and gentlemen
 9   of the jury, the following is a videotape
10   deposition.  My name is Bill Hayes.  The Court
11   Reporter is Torre Lynn Adams.  We're with
12   Strehlow Court Reporting.
13           This deposition is being taken on
14   August 18, 2021 scheduled for 10:00 a.m. at 7
15   Bala Avenue, Suite 202, Bala Cynwyd, PA, taken
16   in the case of ▇ and ▇ versus Lower Merion
17   School District, Civil Action Number
18   20-CV-01416-KSM, filed in the United States
19   District Court for the Eastern District of
20   Pennsylvania.
21           Present today is the witness,
22   Melissa Sinapi-Gibson.
23           Will counsel please identify
24   themselves and who they represent?
```

## Page 5

```
 1           MS. REIMANN:  Nicole Reimann,
 2   counsel for plaintiffs.
 3           MR. KRISTOFCO:  Mike Kristofco,
 4   counsel for Lower Merion School District.
 5           MS. BROOKS:  Amy Brooks, counsel
 6   for Lower Merion School District.
 7           VIDEO TECHNICIAN:  The Court
 8   Reporter will now swear in the witness.
 9              - - -
10           MELISSA SINAPI-GIBSON, after
11   having been duly sworn, was examined and
12   testified as follows:
13              - - -
14           EXAMINATION
15              - - -
16   BY MS. REIMANN:
17       Q.   Good morning.
18       A.   Good morning.
19       Q.   Have you ever given a deposition
20   before?
21       A.   I have not.
22       Q.   So, let me just give you a couple
23   of instructions.
24           If I ask you a question, you don't
```

Page 6

 1  understand the question, you can just tell me
 2  and I'll rephrase it.
 3           If you need to take a break at any
 4  time, just let us know and you can just finish
 5  answering the question that I've asked and then
 6  you can take a break. It's not an endurance
 7  test. So, even if it's after a half an hour,
 8  that's fine.
 9       A.   Thank you.
10       Q.   And then the other thing is --
11  you've testified before, correct?
12       A.   Yes.
13       Q.   So, the other piece that's
14  important is for us to not speak over each other
15  and for you to give verbal answers, yes, no.
16  The Court Reporter can't take down your nodding
17  your head, although we are on video today, but
18  we need to have a complete record.
19           Do you understand that?
20       A.   Yes.
21       Q.   Okay. Great.
22           Could you please tell us what your
23  -- what your current position is?
24       A.   I am the lead supervisor of

Page 7

 1  special education for early intervention through
 2  12th grade, and then the special education
 3  supervisor for Grades 10 through 12 plus.
 4       Q.   Okay. And then could you tell us
 5  what your responsibilities and duties are as
 6  lead supervisor?
 7       A.   So, for lead supervisor, I oversee
 8  our related service providers, our agency
 9  supports, ensuring that we have appropriate
10  resources from a K to 12 lens.
11           I assign related service providers
12  and teams for early intervention evaluations
13  through 12th grade evaluations. And I support
14  classrooms K to 12 with respect to any
15  additional resources or supports that the teams
16  may need. I'm asked to come in and support when
17  needed for the lead supervisor role.
18       Q.   And when you say "related service
19  providers," who does that mean?
20       A.   That would be occupational
21  therapists, physical therapists, behavior
22  specialists, speech therapists.
23       Q.   And how many people report to you?
24       A.   Directly report to me would be

Page 8

 1  through my other -- step back.
 2           We have about 20 speech
 3  therapists. We have around -- I think it's six
 4  occupational therapists, two physical therapists
 5  and four behavior special -- BCBAs. And then
 6  from the lead supervisor lens, that's who
 7  directly reports to me.
 8       Q.   And then just from the supervisor
 9  from 10 through 12 plus, who reports -- does
10  anyone report to you in that role?
11       A.   Special education teachers in
12  those gray bands, I'm their immediate supervisor
13  for special education. So, they support to me
14  similarly or same related providers at that
15  level would report directly to me.
16       Q.   Okay. And to whom do you report?
17       A.   I report to Kimberly Frazier the
18  directors of people services and special
19  education.
20       Q.   And is that for both your role as
21  the lead supervisor and also supervisor?
22       A.   Yes.
23       Q.   Okay. Thank you.
24           MS. REIMANN: Just going to mark

Page 9

 1  this as Sinapi-Gibson-1.
 2                - - -
 3           (Whereupon, Exhibit
 4  Sinapi-Gibson-1 was marked for identification.)
 5                - - -
 6  BY MS. REIMANN:
 7       Q.   I'll represent to you that these
 8  were documents that were produced and Counsel
 9  represented that these were within your personal
10  file. I put it in a binder just because I
11  didn't have a binder clip large enough to hold
12  it all together, so that's why it's there.
13           If you could look at the document,
14  that the binder that the Court Reporter has
15  handed you, Sinapi-Gibson-1. Just I want to
16  start from 1. And you'll see in the lower
17  corner there's Bates stamp with your name and
18  then the number at the bottom. That's the
19  number we'll be referring to.
20       A.   Okay.
21       Q.   And if you could look at this,
22  Pages 1 and then through Page 17.
23           Do you know how this document came
24  to be in your file?

Page 42

1  MR. KRISTOFCO: I'm going to
2  object. Asked and answered.
3  You can answer it again.
4  THE WITNESS: I would have
5  discussed the plan that we were working towards
6  an IEP meeting and just a review of getting the
7  training set up and the requests that came
8  through this E-mail, the course descriptions.
9  BY MS. REIMANN:
10  Q.  And -- strike that.
11  Let's look at Sinapi-Gibson-1 at
12  Page 213 and 214.
13  Can you tell me what those notes
14  are?
15  A.  I'm sorry, 213 and 214?
16  Q.  Yes.
17  A.  214 looks like perhaps a note from
18  my home of items to purchase, personal notes.
19  And 213, I don't know what I was
20  doing.
21  Q.  Then let's turn to Page 219.
22  And if you could just read that
23  and I have a couple questions for you.
24  A.  Okay.

Page 43

1  Q.  Do you know how this document came
2  to be in your file?
3  A.  I don't know exactly, no.
4  Q.  Do you know what this document
5  concerns?
6  A.  This is from the visit, the
7  observation that included Heather Van Horn at
8  Springfield.
9  Q.  Okay. Now, you said earlier you
10  went to two observations, correct?
11  A.  Yes.
12  Q.  So, let's talk about the first
13  observation.
14  Who was there with you?
15  A.  Denise Grimly.
16  Q.  And were you in the room with [redacted]
17  or were you in a different room?
18  A.  I believe I was in the room with
19  [redacted]
20  Q.  Okay. And tell us what you
21  observed.
22  A.  There was a desk that was facing
23  -- desk of table that was face -- the chair was
24  facing the wall. [redacted] was sitting at that

Page 44

1  chair. His face was towards the wall. And the
2  communication partner was sitting to his --
3  would have been his right.
4  Q.  And who was the communication
5  partner?
6  A.  Emily.
7  Q.  Okay. And then just tell us about
8  -- so, you were in the same -- you and Denise
9  Grimly were in the room?
10  A.  I believe so.
11  Q.  Okay. And so, tell us about how
12  long were you there for.
13  A.  Probably about 45 minutes to an
14  hour.
15  Q.  Okay. And did you speak with
16  Parents before or after?
17  A.  I recall speaking with the Parents
18  beforehand, and [redacted] in a general area.
19  Q.  Okay. Did you speak with them
20  after?
21  A.  I spoke with -- I believe I spoke
22  -- I don't recall.
23  Q.  And then did you ask -- after the
24  observation, you spoke with Denise Grimly,

Page 45

1  though, correct?
2  A.  Yes.
3  Q.  And what did you discuss?
4  A.  We discussed the observation, what
5  we saw, the conditions, the setup, and just that
6  we were interested in going back for another
7  observation.
8  Q.  Okay. And what did Denise Grimly
9  say to you about what she saw?
10  A.  She wasn't sure what it was that
11  she saw.
12  Q.  And -- okay. And what -- can you
13  be more specific? What did she say exactly?
14  A.  We saw a spelling at a very high
15  rate with no errors, and that was in her --
16  perplexing.
17  Q.  That's what she told you?
18  A.  I don't recall her exact words.
19  Q.  Without recalling her exact words,
20  did she tell you that it was somehow perplexing?
21  A.  It was something that we thought
22  was necessary to go back and take another look.
23  Q.  Okay. And then you went back in
24  January; is that right?

Page 46

1  A. Yes.
2  Q. Could you tell us for the setup
3  when you went back a second time? Were you in
4  the room with ▮
5  A. I was not.
6  Q. Where were you?
7  A. Outside in another space where
8  there was access to a monitor.
9  Q. Did Denise Grimly also go with you
10 at that visit?
11 A. Yes.
12 Q. And was she with you?
13 A. She was with me, yes.
14 Q. How long were you there for?
15 A. Probably similar time, 45 minutes
16 to an hour.
17 Q. Okay. And did you speak with the
18 Parents beforehand?
19 A. Probably a greeting.
20 Q. And did you speak with them after?
21 A. Yes.
22 Q. What did you say to them?
23 A. I spoke with Mr. ▮ And she
24 was requesting again that the District do this,

Page 47

1  adopt this for ▮ and that she was requesting
2  the training. And I told her that we would be
3  back in touch as an IEP team.
4  Q. Did you tell her anything? Did
5  you say anything about your observation?
6  A. No.
7  Q. You didn't say anything about what
8  you observed?
9  A. No, I did not, not at Spelling to
10 Communicate, not at the Springfield facility.
11 Q. Did you say anything to Ms. ▮
12 about what you observed at a later time?
13 A. I shared with the ▮ that I'd
14 like to go back for a second visit after I saw
15 the first visit.
16 Q. And what else did you share with
17 them per that conversation?
18 A. That I, too -- that I similar to
19 Ms. Grimly, I was worrying about how quickly the
20 spelling was taking place. And there was also
21 questions about the curriculum that they were
22 using, the materials they were using, where were
23 they gathering that from and how were they
24 relating that information.

Page 48

1  Q. After the second visit, I assume
2  you had a discussion with Denise Grimly about
3  ▮ communication with the letter board and
4  communication partner?
5  A. I would say yes.
6  Q. What did she say -- what did she
7  say to you?
8  A. I don't recall specifically what
9  Ms. Grimly said and what date and time you're
10 referring to.
11 Q. So just generally after that
12 second visit, can you tell us generally what Ms.
13 Grimly said about the observation?
14 A. Ms. -- there -- there was a
15 question about what we saw and whether or not it
16 was ▮ coming through or other people.
17 Q. And this is what she said to you
18 after -- in January of 2018?
19 A. I don't recall her exact words.
20 Q. But generally, she raised that
21 concern with you in January 2018?
22 A. Yes.
23 MR. KRISTOFCO: Let's take a
24 break.

Page 49

1  MS. REIMANN: Sure.
2  VIDEO TECHNICIAN: We're now going
3  off record. The time now is 11:10 a.m.
4  - - -
5  (Whereupon, a brief recess was
6  held at this time.)
7  - - -
8  VIDEO TECHNICIAN: We're now back
9  on record. The time is 11:19 a.m.
10 BY MS. REIMANN:
11 Q. I just want to go back to
12 Sinapi-Gibson-2, which is the notes,
13 Mr. Fadley's notes from the internal meeting on
14 December 8, 2017.
15 Do you know who Leah Batchis is?
16 A. She's an attorney.
17 Q. Do you recall any discussions in
18 this internal meeting that the notes are marked
19 as Sinapi-Gibson-2 concerning Ms. Batchis?
20 A. No.
21 Q. Do you recall ever discussing with
22 Mr. Fadley or anyone else on the IEP team
23 Ms. Batchis?
24 A. No.

13 (Pages 46 to 49)

Page 50

    1    Q.   Let's go back to Sinapi-Gibson-1,
    2  Page 220.
    3    A.   Page 220?
    4    Q.   Page 220, handwritten notes.  Take
    5  whatever time you need to read through those.
    6    A.   Okay.
    7    Q.   Are these your notes?
    8    A.   Yes.
    9    Q.   And it says up on the left
   10  11-1-17, "▮▮▮▮ plan."
   11         Can you tell us what these notes
   12  are?
   13    A.   It looks like an internal meeting
   14  with myself, Mike would be Mike Borsch, Deb
   15  Bosin, Heather Van Horn and Liz Serpentine.
   16    Q.   Deb Bosin is a special language
   17  therapist, correct?
   18    A.   Yes.
   19    Q.   Why were these four people plus
   20  yourself having an internal meeting?
   21    A.   They're members of ▮▮▮ IEP
   22  team.
   23    Q.   Okay.  And what was the purpose of
   24  this meeting?

Page 51

    1    A.   I believe to bring me up-to-date
    2  on where things were and to discuss Parents'
    3  request for courses looks like down below,
    4  there's courses here.
    5    Q.   And so, up further it says "CBI."
    6         What is CBI?
    7    A.   Community-based instruction.
    8    Q.   What's PCI?
    9    A.   I believe that's a program that
   10  ▮▮▮ was using.
   11    Q.   For what?
   12    A.   I don't -- part of picture
   13  communication perhaps.  I'm not familiar -- I'm
   14  not recalling what PCI in this context is about.
   15    Q.   Okay.  And what is Razz Kids?
   16    A.   It's a web-based reading program.
   17    Q.   And then over to the right, it
   18  says "Multiple choice/sentence (creates with
   19  multiple choice sample)."
   20         Do you know what that means?
   21    A.   It would have been part of --
   22  part of -- part of our discussion, maybe around
   23  ▮▮▮ responds to question.
   24    Q.   And underneath it says "Open-ended

Page 52

    1  questions are/minimal."
    2         What did you mean by that?
    3    A.   That ▮▮▮ struggles to answer
    4  open-ended questions.
    5    Q.   And then it says "Repeats
    6  phrases."
    7         Is that what you were talking
    8  about before, the echolalia?
    9    A.   Yes, that would be in reference to
   10  that.
   11    Q.   And then do you know what you
   12  meant there when you have adaptive, and
   13  underneath it, textiles/foods and then an arrow
   14  support?
   15    A.   I believe I'm referring to
   16  adaptive PE and textiles in foods is a course at
   17  the high school level.  And it is provided with
   18  support.
   19    Q.   Okay.  And then up at the top, you
   20  have behaviors and screaming, pulling hair.
   21         Do you see that?
   22    A.   Yes.
   23    Q.   And then next to it, you have "Now
   24  using sentence to request help instead of

Page 53

    1  behaviors during routine times -- not able to
    2  carry through during unstructured settings."
    3         Do you know what he meant by that?
    4    A.   I don't -- no, not specifically.
    5    Q.   Generally, was that talking about
    6  ▮▮▮ communication?
    7    A.   It's under behaviors, so this
    8  could have been -- I believe it would have been
    9  about -- we were in the conversations around his
   10  behavior during these notes.
   11    Q.   And then if we could turn to Page
   12  237 of Sinapi-Gibson-1 and over to Page 238.
   13         If you could just go ahead and
   14  read that and then I'll have some questions for
   15  you.
   16    A.   Okay.
   17    Q.   So, you'll see this is an E-mail
   18  from Ms. ▮▮▮ dated December 24, 2017.  And
   19  it's to you and a number of other people at the
   20  District.  And it attaches information on a
   21  video.
   22         Do you see that?
   23    A.   Yes.
   24    Q.   Okay.  And --

14 (Pages 50 to 53)

Melissa Sinapi-Gibson
August 18, 2021

## Page 54

1  A. Yes.
2  Q. Did you review this video?
3  A. I believe I would have.
4  Q. But you don't specifically recall
5  reviewing it?
6  A. I don't.
7  Q. Did you review videos that Ms.
8  ▓▓▓▓ provided?
9  A. Yes.
10 Q. How many videos did you review?
11 A. I don't recall the total number.
12 Q. Okay. And did you review the --
13 the videos that you reviewed, did you review
14 them in their entirety or just pieces of them?
15 A. I believe I reviewed them in their
16 entirety.
17 Q. But you don't know whether you
18 reviewed every video that Ms. ▓▓▓▓ sent?
19 A. I don't.
20 Q. And do you recall reviewing the
21 video that's referenced here?
22 A. I believe I reviewed it. I don't
23 -- I believe I reviewed it.
24 Q. And did you -- for the videos you

## Page 55

1  did review, did you make any notes?
2  A. I believe I would have.
3  Q. But you don't recall whether you
4  did or not?
5  A. I recall a video of which I did
6  not take notes, but viewed the video and
7  utilized my pencil to put underneath where the
8  board was being held to watch whether or not the
9  board moved.
10 Q. Okay. So, that's the one video
11 that you recall?
12 A. Yes.
13 Q. And what did you conclude from
14 that?
15 A. The board moved.
16 Q. Can you describe how the board
17 moved?
18 A. My pencil was put directly in line
19 with where the board was.
20 Q. The bottom or top?
21 A. The bottom of the board and the
22 board was moving up and down.
23 Q. Was it moving left to right?
24 A. I don't recall the motion of which

## Page 56

1  it was left or right, but it was moving up and
2  down for sure, yes.
3  Q. And was it moving up and down with
4  each letter?
5  A. Throughout the session.
6  Q. Okay. And from your pencil, how
7  much was it moving?
8  A. I don't have -- I didn't measure
9  it, just from an eyesight, it moved up and down
10 from being held study.
11 Q. Okay. And how much did it move up
12 and down?
13 A. Throughout the session.
14 Q. I don't mean how often. I know
15 you didn't take a measurement, but was it an
16 inch? Was it two inches? What did you observe
17 in terms of how much it was being moved?
18 A. Without taking a measurement, I
19 don't think I should answer a specific
20 measurement.
21 Q. Okay. Well, I'm not asking for a
22 specific measurement. You've just described how
23 you held a pencil and the board moved up and
24 down. So, how much was it moving up and down?

## Page 57

1  Was it inch, two inches?
2  A. Well, that would be --
3  Q. Okay. Can you give an
4  approximation? You can't do that?
5  A. I cannot since it moved up and
6  down. It didn't stay steady.
7  Q. Okay. But when it moved up and
8  down, how much did it move?
9  A. I don't -- I don't -- I don't -- I
10 don't recall the amounts of inches it moved up
11 and down.
12 Q. Okay. So, you can't tell us
13 whether it was an inch or five inches?
14 A. I can tell you that the board was
15 not steady.
16 Q. That's all you can tell us?
17 A. Yes.
18 Q. And there's no place you could go
19 to look to see how much the board was being
20 moved; is that right?
21 A. Right, yes.
22 Q. And you don't -- do you recall
23 which video -- what ▓▓▓▓ was doing in the video?
24 A. I don't.

15 (Pages 54 to 57)

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

5c2ded9e-6108-49ba-8415-b0a9a2489a53