Exhibit 19

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

J.L. AND F.L., INDIVIDUALLY :
AND ON BEHALF OF A.L. :
AND A.L., INDIVIDUALLY, :
      Plaintiffs :
       :
   vs. :
       : CIVIL ACTION
LOWER MERION SCHOOL DISTRICT :
      Defendant : No. 20-CV-01416-KSM

---

ORAL DEPOSITION OF FREDERIC LE PAPE

TAKEN AT THE OFFICES OF:

Wisler, Pearlstine      1:44 p.m.
460 Norristown Road    Wednesday,
Suite 110              July 14, 2021
Blue Bell, PA  19422

---

BUCKS COUNTY COURT REPORTERS
Neshaminy Valley Commons
2410 Bristol Road
Bensalem, PA 19020
215-702-2730

Court Reporter: Audry Leister Stengel

Page 2

APPEARANCES:

Nicole Reimann, Esquire      For the Plaintiff
7 Bala Avenue
Suite 202
Bala Cynwyd, PA  19004-3205
Nicole@specialedlawgroup.com

Michael D. Kristofco, Esquire    For the Defendant
 and Amy Brooks, Esquire
Wisler, Pearlstine, LLP
460 Norristown Road
Suite 110
Blue Bell, PA  19422
mkristofco@wispearl.com

ALSO PRESENT:

Kimberly Fraser, Dir. of Student
   Services and Special Education

Page 3

I N D E X

WITNESS:          EXAMINED BY:      PAGE:

Frederic Le Pape    Mr. Kristofco      4

E X H I B I T S

NUMBER:                                       MARKED:

Le Pape 11    May 14, 2018 Email from      9
           Frederic Le Pape to
           Heather Van Horn and Mr.
           Borsch

Page 4

1   P R O C E E D I N G S
2   * * * * *
3   STIPULATION
4    It is hereby stipulated by and between
5  Counsel for the respective parties that they waive the
6  sealing and certification of the transcribed testimony
7  by the witness, and the filing of the original with the
8  Court, and all objections except as to form are to be
9  made at the time of Deposition, to be ruled upon by the
10 Judge at a later time.
11   * * * * *
12   FREDERIC LE PAPE
13 was called as a witness and having been first duly
14 sworn by the Court Reporter, was examined and testified
15   as follows:
16   * * * * *
17   **BY MR. KRISTOFCO:**
18 **Q.** Hi, Mr. Le Pape. My name is Mike
19 Kristofco, an Attorney representing Lower Merion School
20 District. I'm here to take your Deposition today in
21 connection with litigation which involves your son
22 Alex.
23   I'll ask you, have you ever had your
24 Deposition taken before?
25 **A.** Once, yes.

Page 5

1 Q. Okay. So this particular process is, as
2 you've just sat through the Deposition of your wife.
3 So you saw how the process plays out.
4 I just remind you to please make sure to
5 answer all the questions verbally. Wait until I
6 complete asking my question before you begin answering.
7 And also, if you're confused about any of
8 my questions just let me know, okay?
9 A. Yes.
10 Q. Are you taking any medications which would
11 impact your ability to provide a full and complete and
12 truthful answer to the questions relating to this case?
13 A. No.
14 Q. Is there any reason that you cannot provide
15 full and complete and truthful answers to the questions
16 relating to this case?
17 A. No.
18 Q. What did you do to prepare for your
19 Deposition today?
20 A. Nothing.
21 Q. Did you review any documents?
22 A. No.
23 Q. Did you meet with anybody?
24 A. No.
25 Q. Okay. Could you briefly just summarize

Page 6

1 your educational background and work history for me,
2 please?
3 A. Sure. So I did four years of business
4 studies in France. Worked in France for, for five
5 years in international business.
6 Moved to the U.S. in '95. Worked for
7 different U.S. companies, mostly in software services.
8 And started working for a French technology company in
9 2002. Between 2002 and 2004 in France. And then the
10 same job back to the U.S., to develop the business for
11 this company in the U.S.
12 And three years ago, I terminated that
13 employment and started working for a technology company
14 from Italy. And you know, introducing and expanding
15 their business in the U.S.
16 Q. Okay. And have you been trained as a
17 communication partner for Alex in Spelling to
18 Communicate?
19 A. Yes.
20 Q. And when were you trained?
21 A. Throughout from, you know, the first
22 seminar that we had in May, 2018. The end of the
23 seminar, we jumped in and for a few minutes handled the
24 stencil boards.
25 And after that, we, one of us would drive

Page 7

1 Alex to every session he would have. So that would be
2 twice a week. We would alternate.
3 And we would, at the beginning, both just,
4 just observe. And then we got special training, as
5 well, one-on-one, from the communication partners
6 there.
7 Q. Okay. One thing just to clarify. You said
8 that the training started in May of 2018. Could it
9 have been May of 2017?
10 A. Sorry, '17, thank you.
11 Q. Okay. Did you ever go for training down in
12 Virginia?
13 A. Yes.
14 Q. And how long was that training?
15 A. We would go for three days with Alex. So
16 it was a few sessions through those three days.
17 Q. Do you view yourself as being fully trained
18 in Spelling to Communicate right now?
19 A. It depends who you compare to. I am not as
20 proficient as my wife. Because I haven't spent as much
21 time working with Alex on the board.
22 But for everyday communications, yes. And
23 you know, I am, I have the level of training requested.
24 Q. And when did you, when did you reach the
25 point where you felt like your communication, your

Page 8

1 ability to be the communication partner for Alex was
2 sufficient that you could clearly communicate with him?
3 A. In my case, it was probably a year,
4 approximately.
5 Q. That would be May, 2018?
6 A. Yes.
7 Q. Okay. Now, have you ever been in a
8 situation where you've tried using the letter boards
9 with Alex with Spelling to Communicate but it hasn't
10 been successful?
11 A. Yes.
12 Q. And when was the last time that that had
13 happened to you?
14 A. It's rare, but when he's in too much pain,
15 he cannot use the board efficiently. Migraine pain.
16 So communication is possible, but it's
17 limited to the basic.
18 Q. Okay. And did that situation happen to you
19 when you took Alex for any type of evaluation or
20 testing?
21 A. No.
22 Q. Did that ever happen when you were using
23 the Spelling to Communicate with Alex with any of his
24 school work?
25 A. No.

Page 9

1 Q. Let me show you a document. We can mark
2 this as Le Pape Exhibit 11. So this will be 11.
3 (Whereupon, the following Exhibit was
4 marked for identification as follows:
5 Exhibit Le Pape No. 11, a May 14, 2018
6 Email from Frederic Le Pape to Heather Van Horn and
7 Mr. Borsch.)
8 BY MR. KRISTOFCO:
9 Q. Mr. Le Pape, I'm showing you an email.
10 It's from May 14th, 2018. It's from you to Heather Van
11 Horn and Mike Borsch. Just take a minute to review
12 that, and then I have some questions for you about it,
13 okay?
14 A. Um-hum.
15 (Witness reviewing.)
16 Um-hum.
17 Q. Okay. So in the, in the second line of
18 this email, it says, you say: I think it was a letter
19 board mistake on my part that pushed him to the wrong
20 answer for the third question.
21 And you go on to say, he was over the I,
22 and when he touched the J, I encouraged him verbally
23 when it wasn't the correct first letter. Then he
24 continued with the name that started with J.
25 Do you see that?

Page 10

1 A. Yes.
2 Q. So explain for me what was going on here
3 and how you encouraged Alex verbally?
4 A. So I'm not sure I recall that exact
5 incident over three years ago, but if I try to think of
6 a thing that could have happened is, probably I pushed
7 him, I guessed wrong what he was doing and, and you
8 know, I misjudged what he wanted to say. But realized
9 right away that that was, that was a mistake.
10 So I gave him another chance. And then
11 because he was not clear. And then he clarified with,
12 you know, starting with the J.
13 Q. So, in this sentence where it says he was
14 over the I, and when he touched the J, I encouraged him
15 verbally.
16 What part of the training that you received
17 as a communication partner in Spelling to Communicate
18 deals with when, deals with the appropriateness of
19 verbal encouragement?
20 A. At the beginning, you use more prompting.
21 So and you try to fade the prompting as much as
22 possible as you go.
23 So as my wife was saying, the
24 communication and regulation partners who work with him
25 at Inside Voice, they can go silent all the time. They

Page 11

1 don't really need to do any prompting at all.
2 I'm not at that level. I don't do it as
3 often with Alex to be at that level. I could get
4 there, if I, if I invested the time if we had the
5 opportunity.
6 So at that time, in 2018, I was still
7 probably using, you know, more prompting. And you
8 know, you use prompting when you see what the person
9 needs to kind of encouragement. You don't prompt to a
10 letter, you just prompt to action, so.
11 Q. So when he, so he touched the J, and it
12 says when he touched the J, I encouraged him verbally
13 when it wasn't the correct first letter.
14 So how do you know that that wasn't the
15 correct first letter, that J wasn't the correct first
16 letter?
17 A. I mean three years later, without seeing
18 the, what the question was, probably I'm guessing that
19 that was --
20 MS. REIMANN: Please don't guess. If you
21 don't know, just say you don't know.
22 THE WITNESS: I don't know. Three years
23 ago, I don't know.
24 BY MR. KRISTOFCO:
25 Q. So in Spelling to Communicate, isn't every

Page 12

1 letter that he touches the correct letter?
2 A. There's a lot of dysregulation in people
3 with autism. So they make mistakes.
4 The more comfortable they are with using
5 the method and with their communication partners, the
6 fewer mistakes they make.
7 But sometimes they touch a letter that they
8 don't intend to touch.
9 Q. So, that idea that the person makes a
10 mistake, how do you know it's a mistake versus what
11 they intended to do?
12 A. Typically, if the word doesn't make any
13 sense, if it's J-Z-A-B-Y, that's not a word. So you
14 know that's a mistake.
15 Q. So, is it fair to say that the Spelling to
16 Communicate assumes that the speller has the capability
17 of producing words that make sense in response to
18 circumstances or prompts that call for a response?
19 A. So let me say that the method works really
20 well in Alex's case because Alex is nonspeaking. He
21 cannot produce sound with his mouth. But he still
22 learns by himself English.
23 So he can, he has the language. But he
24 cannot express it verbally.
25 Q. So, your wife had testified that he is


**Page 13**

1  capable of saying some limited words. Do you disagree
2  with that?
3  A.  Yes, yes, he can verbally say some limited
4  words, yes.
5  Q.  So, I guess what I'm trying to understand
6  with this whole idea about him spelling something on
7  the board that is, you know, described as a mistake,
8  is, do you show the word when it's all spelled out to
9  Alex, and does he indicate to you in some way that it
10  was a mistake? Or do you as the partner believe it's a
11  mistake?
12  A.  So there's two different things. First is,
13  is it word or not? So if he's spelling something that
14  is not a word, you know it's a mistake.
15  And you give a second chance. It's, so
16  that's the number one.
17  And every word that he, you know, he makes,
18  you take. And if it doesn't grammatically make sense,
19  or if it's unclear, you ask, you know, you would ask
20  Alex to clarify.
21  Q.  So, everything that — let me back up for a
22  second.
23  The idea that if he spells something that's
24  not a word, it must be a mistake, is that something
25  that was part of the training in Spelling to

**Page 14**

1  Communicate?
2  A.  Yes. If it's make a word that, you know --
3  yes.
4  Q.  Okay. And the idea that if he spells words
5  that when they're put together they don't make sense,
6  you go back and prompt him to redo what he did, how
7  many times do you do that?
8     MS. REIMANN: Well, I'm going to object
9  because that's not what he said. He asked for
10  clarification.
11     So I don't know if prompting to redo what
12  he did is really the appropriate characterization.
13     BY MR. KRISTOFCO:
14  Q.  How many times do you go back and ask him
15  to redo it?
16  A.  There's no like rule. It depends on, on
17  him. How, you know, how he feels that day. If he's
18  regulated. If he's not.
19  It depends on the difficulty of the
20  subject. If it's something simple, clear, academic
21  lesson, that he has then to answer, you know, some,
22  some questions and it's, he's going to do it, you know,
23  flawlessly.
24  But if he has to write an essay about
25  himself, something emotional, then it may be that he

**Page 15**

1  needs to, it's not going to come out the first time.
2  Just like if I write something that's emotional, or if
3  I'm using Microsoft Word, I may delete, I may erase.
4  I'm going to edit myself.
5  But you cannot do that on the board. Once
6  you've spelled a word, it's there. Except if you use
7  the keyboard.
8  So if you use the laminated board, that's
9  the only chance to edit is if it doesn't make a lot of
10  sense, and somebody asks you to clarify, then you have
11  a chance, a second chance to express your thoughts
12  differently.
13  Q.  Is there any terminology that you use when
14  you ask Alex to clarify?
15  A.  No.
16  Q.  How do you, how do you go about, let's say
17  he spelled out, you know, three words that collectively
18  don't make any sense. They're all words, but together
19  they don't make sense.
20  How do you, how do you then approach him to
21  clarify what he means by that?
22  A.  Just simply say: Alex, I'm not quite sure,
23  you know, what this means. Can you clarify for me?
24  Can you say this again? And give him a chance.
25  Q.  And you just start over?

**Page 16**

1  A.  Yes.
2  Q.  Okay. And when do you know to stop the
3  clarification process?
4  A.  When he's done typing. When he's done
5  spelling.
6  Q.  Well, what if he does it and it still
7  doesn't make sense, do you go back a third time?
8  A.  Yes, you would have to go back until it's
9  clear.
10  Q.  Okay. And just to make sure I understand
11  what we're talking about, we're talking about clear to
12  the communication partner, correct?
13  A.  Not just that so grammatically correct, you
14  know, English. And then that it makes sense. So you
15  may not grasp a hundred percent what it says if it's a
16  subject that you don't understand, you're not very
17  proficient in.
18  But it's clear enough that somebody should
19  make sense of it. Should understand it.
20  Q.  Okay. Did you, did you ever attend any
21  meetings with anybody from the School District that
22  your wife also did not attend?
23  A.  I would guess over the course of the, of
24  Alex's, it may have happened.
25  Q.  Do you have any specific recollection of

Page 17

1 attending any meetings between July of 2017 and the end
2 of 2018 that your wife also did not attend?
3 A. I cannot recall.
4 Q. Okay. Did you attend any of the
5 observations that the District employees went to in
6 Springfield when they observed Alex use the letter
7 board?
8 A. Yes.
9 Q. Okay. And do you know whether it was the
10 first observation, the second observation?
11 A. Definitely the first.
12 Q. The first? And who was present for that?
13 A. So it was Melissa, and Denise, so Denise
14 Grimley, and Melissa Sinopski-Gibson.
15 Q. And do you recall what occurred at that
16 observation?
17 A. Yes. They were in the room with Alex. We
18 were in a separate room but watching it on the screen.
19 And it took a long time to get to this
20 point. And so after the session, we went in the room,
21 me and Jen. And we said, so what did you think? It
22 was my first question.
23 Q. And did Melissa or Denise answer?
24 A. Yes, Denise answered and said, she said you
25 can't deny it, it's real communication. And you know,

Page 18

1 they were smiley, enthusiastic, it was --
2 Q. And did they have any questions?
3 A. Yeah, I think the question was mostly that
4 they were wondering how to apply that in the school
5 setting.
6 Q. Okay. And were there any, were there any
7 decisions made after that first observation as far as
8 what the next steps were going to be?
9 A. The next step was for them to go back to
10 base, go back to the school, and share what they
11 thought. And you know, and from what we were hoping,
12 that there would be a turn-around and, and that we
13 could work towards implementing this at school.
14 Q. Okay. Did you ever go into school and
15 demonstrate how the letter board works at school with
16 any of the people?
17 A. Personally, no.
18 Q. Okay. Did you ever see the one-to-one Aide
19 work with Alex?
20 A. See him physically?
21 Q. Yeah, did you observe how he interacted and
22 worked with Alex in the school setting?
23 A. Very briefly on a few occasions, when I
24 brought Alex to school, because he was late. And so I
25 would walk Alex to the classroom. So it was very

Page 19

1 brief.
2 Q. Okay. Did you ever, did you ever see Alex
3 interact with the Guidance Counselor?
4 A. No.
5 Q. Did you ever observe Alex interact with the
6 School Nurse?
7 A. No.
8 Q. Did you ever observe Alex interact in
9 Friendship Club?
10 A. Yes.
11 Q. And when was that?
12 A. I can't recall. It was before we did, we
13 knew about Spelling to Communicate.
14 Q. Do you know what grade Alex was in at the
15 time?
16 A. I can't remember.
17 Q. And what do you recall about Friendship
18 Club?
19 A. I was very disappointed. And I told
20 Heather about it. They were, you know, students from
21 Lower Merion with their, you know, friends. And it was
22 a pizza party in the cafeteria or, yeah, I believe it
23 was the cafeteria. It was a big open space, lots of
24 tables. And there was just not much going on.
25 Alex was pretty much by himself. We were

Page 20

1 invited to join in, so one person from the family was
2 invited. But nothing was happening. They were, there
3 were one or two that could communicate a little bit.
4 The other students were engaging a bit with
5 them. But it was more like them having pizza. And I
6 was really offended by that.
7 Q. And when you brought this up to Heather,
8 what did she say?
9 A. She said, well, you know, I think she said
10 no, like it can happen that there's not much
11 communication and so on. And it wasn't, I wasn't
12 really satisfied with the answer.
13 She was not present there. And it just
14 seemed like there was nothing going on.
15 Q. Did --
16 A. That lasted like awhile. Like half an hour
17 to an hour.
18 Q. Did you make any decisions about whether
19 Alex would continue with Friendship Club after that?
20 A. He did not, I think, after that.
21 Q. Did he ever resume Friendship Club again?
22 A. I think he did.
23 Q. And do you recall how long of a period of
24 time that was?
25 A. I can't recall, no.

Page 21

1 Q. Did you ever observe Alex in the
2 community-based instruction?
3 A. No.
4 Q. Okay. Did you ever observe Alex in the, in
5 any of his classes?
6 A. No.
7 Q. What do you recall about the District's
8 concerns about there not being any research to support
9 Spelling to Communicate?
10 A. I think they were looking for really clear
11 instructions, like a user guide on how to take the
12 method and implement it universally to all the students
13 who needed it or could have benefitted from it at Lower
14 Merion.
15 Q. And from what I understand, there is no
16 actual training manual or user guide for Spelling to
17 Communicate; is there?
18 A. No.
19 Q. Okay.
20     MR. KRISTOFCO: Let me just take a quick
21 break, talk to my clients.
22     MS. REIMANN: Sure.
23     (Whereupon, a short recess was taken.)
24     BY MR. KRISTOFCO:
25 Q. So in the training that you received for

Page 22

1 Spelling to Communicate, was there any discussion about
2 how the communication partner is supposed to move the
3 board, if at all?
4 A. So you don't move the board when the person
5 is pointing. You move it to give it a break, to reset,
6 when either, you know, the word is not correct, it's
7 not an English word.
8 Or as we discussed before, if it doesn't,
9 it's not logical, it doesn't make sense what has been
10 said.
11 Q. Are there any kind of protocols or rules
12 about what you're allowed to do as far as nonverbal
13 prompting is concerned?
14 A. There, you know, it's a lot of guidelines,
15 yes. So the beginning, you do use a lot of prompting.
16 You kind of need to kind of motivate or get things
17 going. It's not fluent. It's not flowing.
18 You know, you struggling. It's a new
19 method. You're handling things, it's not, you know, it
20 needs time to get used to on both sides.
21 And then as you progress, and we were, you
22 know, going periodically to the sessions and we were
23 practicing, the experienced communication partner would
24 say, okay, well, now try to do less.
25 Because you're comfortable prompting, so

Page 23

1 you kind of, you know, stay at this level. So you have
2 to be a little bit reminded to do less and then you
3 take it out, take it out, take it out, until you have
4 extremely minimal.
5 Q. Your wife had testified about Alex having
6 issues with migraines?
7 A. Yes.
8 Q. And when do you recall the migraines
9 starting for Alex?
10 A. You know, it's pretty much at the time when
11 things were not really advancing. We were frustrated
12 because we had found this method. We were really
13 trying to bring the school onboard. And felt like they
14 were really dragging their feet.
15 So it was in 2018, at some point. And it
16 was at that time.
17 Q. Now, is being in a routine very important
18 for Alex?
19 A. It is important, yes.
20 Q. Okay. And if he's taken out of his
21 routine, does that also cause him anxiety?
22 A. It can.
23 Q. In 2018, that was the time that you and
24 your wife were requesting that Alex be placed in more
25 general education classes, correct?

Page 24

1 A. Yes. That was something Alex wanted and we
2 felt something that was appropriate. He was --
3 Q. And when you were talking about your work
4 history, you had indicated that you got a job about
5 three years ago. When did that happen?
6 A. It happened in January, 2018.
7 Q. Okay. And did that job change the amount
8 of time that you were home at all?
9 A. Yes. In the sense that I actually spent
10 more time at home. I wasn't traveling very much.
11 But it was not a big change. I was more at
12 home, but not a huge change from before. I was going
13 to the same office. Pretty much doing the same job,
14 but just for a different company.
15 Q. And do you, do you utilize the boards every
16 time you communicate with Alex?
17 A. Most times, yes.
18 Q. What instances would you not use the boards
19 for?
20 A. Well, if we're not, if we're in the street,
21 I don't have it with me. I didn't take it maybe, or
22 we're getting out of the car. I still talk to Alex.
23 You know, we can, he understands everything I say.
24 So sometimes I don't need feedback, just
25 say, okay, this is what we need to do, and in other

Page 25

1 words, get out of the car and go this way as opposed to
2 that way, we're going to go to this door first or.
3      MR. KRISTOFCO: Okay. I don't think I have
4 any additional questions.
5      MS. REIMANN: I don't have anything. Thank
6 you.
7      (Whereupon, the Deposition was concluded at
8 2:27 o'clock p.m.)
9
10      I have read my Deposition, and it is true and
11 correct except for any corrections noted on the
12 attached Errata Sheet, which I have also signed.
13
14 DATE:_____
                        Frederic Le Pape
15
16
17
18
19
20
21
22
23
24
25

Page 26

1                   CERTIFICATE
2 I, Audry Leister Stengel, a Notary Public
3 in and for the County of Montgomery, Pennsylvania; and
4 being the officer before whom the Deposition of
5 Frederic Le Pape was taken, do hereby certify that
6 Frederic Le Pape, the witness whose testimony appears
7 in the foregoing Deposition, was duly sworn by me on
8 July 14, 2021, and that the transcribed Deposition of
9 said witness is a true record of the testimony given by
10 him that the proceedings are here recorded fully and
11 accurately to the best of my ability; that I am neither
12 Attorney or Counsel for, nor related to any of the
13 parties to the action in which this Deposition was
14 taken, and further that I am not a relative of any
15 attorney or counsel employed by the parties hereto, or
16 financially interested in this action.
17
18
19                _____
20                Audry Leister Stengel,
                  Court Reporter
21
22
23
24
25

Page 27

1                   ERRATA SHEET
  Date forwarded: August 10, 2021     NO.: AJL-7465-B
2 Caption: JL and FL vs. Lower Merion School District
  PLEASE DO NOT MAKE ANY CHANGES IN THE DEPOSITION
3 TRANSCRIPT. IF YOU HAVE ANY CORRECTIONS, LIST THEM
  BELOW. UPON COMPLETION, SIGN THE DEPOSITION ON PAGE
4 25, AND ALSO AT THE BOTTOM OF THIS FORM.
  PAGE    LINE      CORRECTIONS
5  19     17    It was Best Buddies
6  20     19    not Friendship Club
7  20     21
8 ___ ___ _____
9 ___ ___ _____
10 ___ ___ _____
11 ___ ___ _____
12 ___ ___ _____
13 ___ ___ _____
14 ___ ___ _____
15 ___ ___ _____
16 ___ ___ _____
17 ___ ___ _____
18 ___ ___ _____
19 ___ ___ _____
20
21 Signature: _____ Date: 8/18/21
            Frederic Le Pape