IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **J.L., et al.**, <br><br> Plaintiffs, <br><br> *v.* <br><br> **LOWER MERION SCHOOL DISTRICT**, <br><br> Defendant. | **CIVIL ACTION** <br><br> **NO. 20-1416-KSM** |

MEMORANDUM

**MARSTON, J.**                                                                                           December 23, 2021

Plaintiffs J.L. and F.L., individually and on behalf of their child A.L., and A.L., individually, (collectively, "Plaintiffs") allege that Defendant Lower Merion School District (the "District") failed to provide A.L. with a free appropriate public education ("FAPE") in violation of the Individuals with Disabilities Education Act ("IDEA"), Section 504 of the Rehabilitation Act, and state law.  (Doc. No. 33.)  Plaintiffs also allege that the District intentionally discriminated against A.L. in violation of the Americans with Disabilities Act ("ADA").  (*Id.*) Presently before the Court are the District's Motion for Summary Judgment on the ADA claim[1] (Doc. No. 61) and Plaintiffs' Motion for Summary Judgment on the liability aspect of the ADA claim (Doc. No. 64).[2]  For the reasons discussed below, the District's motion is granted, and Plaintiffs' motion is denied.

---

[1] The District also seeks summary judgment on the Section 504 claim (*see* Doc. No. 61 at 1); however, the hearing officer heard and denied that claim in the due process hearing (*see* Doc. No. 33 ¶ 165), so the Court denies the District's motion for summary judgment on Count III and will address it in the Court's decision on the parties' cross-motions for judgment on the administrative record.

[2] Plaintiffs seek a jury trial on the damages aspect of their ADA claim.  (Doc. No. 64 at 2.)

## I.  Factual Background

The relevant facts are as follows.

### A.  A.L.

A.L., who is now an adult, has attended schools in the District since he enrolled in kindergarten in 2006. (Doc. No. 64-36, J.L. Decl. ¶¶ 3, 14.) Since he was a child, A.L. has had a diagnosis of autism and a speech or language impairment. (*Id.* ¶ 3.) Although he has limited verbal speech abilities, A.L. describes himself as a non-speaker. (*Id.* ¶ 15; Doc. No. 64-70, A.L. Decl. ¶¶ 5, 24.) At Lower Merion High School, A.L. spent most of his school days in an autistic support classroom with other autistic students and support aides. (Doc. No. 64-70, A.L. Decl. ¶ 13.) Throughout his educational career, A.L. had an individualized education program ("IEP"), which listed curricular and extracurricular goals and enumerated the special education services A.L. would receive to advance those goals. (Doc. No. 64-36, J.L. Decl. ¶ 19.)

When A.L. was in tenth grade (the 2016–2017 school year), his parents grew increasingly concerned that his communication skills had stagnated (*id.* ¶ 21), so they enrolled him in "spelling to communicate"[3] lessons (*id.*; Doc. No. 64-70, A.L. Decl. ¶ 17). After just a few

---

[3] Spelling to Communicate is a method of communication by which a nonverbal speaker points to letters on a laminated alphabet letterboard held by a communication support person to communicate. Eight medical and educational professionals have opined that the Spelling to Communicate method is an effective means of communication for A.L. (*See* Doc. No. 64-36, Ltr. from Dr. Wm. Young (opinion from neurology, psychiatry, and headache medicine physician that "the letter board and communication partner is effective communication" for A.L.); Doc. No. 64-71, Chaplick Decl. (opinion from speech pathologist that "[t]he letter board was a game changer for A.L."); Doc. No. 64-74, Ghaffari Decl. (opinion from psychiatrist that "a letter board is a clear form of communication for A.L."); Doc. No. 64-79, Robbins Decl. ¶ 6 (opinion from neuropsychologist that "A.L. needs the letterboard and a communication partner to engage in the educational process"); Doc. No. 64-80, Prizant Decl. (opinion from researcher with focus on autism that "a letterboard and CRP is effective communication for A.L. under the ADA"); Doc. No. 64-82, Ross Decl. (opinion from developmental and behavioral pediatrician that "A.L. needs the letter board to communicate"); Doc. No. 64-84, Stephens Decl. (opinion from family practice physician that "A.L.'s communication using a letterboard and communication partner is effective communication for him"); Doc. No. 64-86, von Hagen Decl. (opinion from Board Certified Behavioral Analysis that "the letter board is effective communication for A.L.").)

months of lessons, A.L. was able to communicate using a letterboard and a communication support person. (Doc. No. 64-36, J.L. Decl. ¶ 24; Doc. No. 64-70, A.L. Decl. ¶ 17.) A.L. found communicating with the letterboard "liberating" and felt that he could "finally . . . exercise control over [his] own life." (Doc. No. 64-70, A.L. Decl. ¶¶ 18–19.)

### B. *Plaintiffs' Requests to Amend A.L.'s IEP and Allow Use of the Letterboard*

A.L. spent the summer of 2017 learning how to use the letterboard, and when he returned to school for eleventh grade, the letterboard was his chosen and preferred method of communication. (Doc. No. 64-36, J.L. Decl. ¶ 24; Doc. No. 64-70, A.L. Decl. ¶ 60.) A.L. was placed in regular education classes (history and health) for the first time in his educational career (Doc. No. 64-36, J.L. Decl. ¶ 35; Doc. No. 64-70, A.L. Decl. ¶ 34), but he was not allowed to use the letterboard in class, and without the letterboard, he felt like he was "silenced" and could not meaningfully engage in his coursework (Doc. No. 64-70, A.L. Decl. ¶ 35).

Beginning in October 2017, Plaintiffs made dozens of requests that A.L. be permitted to use a letterboard throughout the school day and that the school train A.L.'s one-on-one aide to serve as a communication support person. (*See* Doc. No. 64-42; Doc. No. 64-43; Doc. No. 64-46; Doc. No. 64-47; Doc. No. 64-48; Doc. No. 64-50; Doc. No. 64-51; Doc. No. 64-52; Doc. No. 64-53; Doc. No. 64-54; Doc. No. 64-55; Doc. No. 64-56; Doc. No. 64-57; Doc. No. 64-58; Doc. No. 64-59; Doc. No. 64-60; Doc. No. 64-61; Doc. No. 64-62; Doc. No. 64-64.) Plaintiffs also requested that the District observe A.L.'s use of the letterboard and retain a neutral third party to evaluate his ability to communicate with the letterboard. (*See* Doc. No. 64-42; Doc. No. 64-43; Doc. No. 64-44; Doc. No. 64-49.)

When the District denied these requests, A.L.'s parents hired Dr. Anne Robbins, a neuropsychologist and licensed school psychologist, to evaluate A.L.'s cognitive, speech, and

language abilities.  (*See* Doc. No. 64-79, Robbins Decl. ¶¶ 4–6.)  Dr. Robbins concluded that A.L. "needs a letterboard and communication partner to have equal access to the program[s], activities, and services that Lower Merion School District offers."  (*Id.* ¶ 6.)

In early 2018, the District allowed A.L. to use a letterboard in his reading class, but they did not train anyone to act as his communication support person.  (Doc. No. 64-70, A.L. Decl. ¶ 20.)  In April 2018, the District agreed to train a communication support person but cancelled the training before it took place.  (Doc. No. 64-59; Doc. No. 64-60.)  When the District cancelled these trainings, A.L.'s parents requested that one of them be allowed to serve as a communication support person in A.L.'s reading class until the District trained a staff member.  (Doc. No. 64-62 at 2.)  The District initially agreed to this request but later reneged.  (Doc. No. 64-63 at 4.)

In July 2018, A.L.'s parents asked that his IEP be updated to allow A.L. to attend three regular education classes and participate in "[e]xtracurricular activities" such as "Friendship Circle" with a "[t]rained S2C [i.e., Spelling to Communicate] partner."  (Doc. No. 64-62 at 3.)  The District did not revise A.L.'s IEP over the summer (*see* Doc. No. 64-63 at 4), and in September 2018, the District decided that A.L. was not allowed to use the letterboard to communicate at school at all (Doc. No. 64-65 at 2–3).

Plaintiffs objected to the District's decision and renewed their requests that A.L. be allowed to use the letterboard in school and his one-on-one aide be trained as a communication support person.  (Doc. No. 64-65; Doc. No. 64-66; Doc. No. 64-67.)  A few weeks later, the District agreed to train school personnel in the Spelling to Communicate method, but they did not include A.L.'s one-on-one aide in that training.  (Doc. No. 64-67; Doc. No. 64-70, A.L. Decl. ¶¶ 50–51.)  Even after the training, the District did not revise A.L.'s IEP to allow him to use a

letterboard and communication support person.  (Doc. No. 64-36, J.L. Decl. ¶ 48.)

Shortly after the training, the District asked to evaluate A.L.  (Doc. No. 67-70, A.L. Decl. ¶ 49.)  His parents agreed but requested that the District's psychiatrist observe A.L. using the letterboard to communicate.  (*Id.*)  The District refused, and A.L. was "very stressed because [he] knew that [he] would not be able to show [his] ability" without the letterboard.  (*Id.*)

Around this time, A.L. began experiencing increased anxiety.  (Doc. No. 67-70, A.L. Decl. ¶ 52.)  In November 2018, his psychiatrist advised that A.L. was "feeling anxious and stressed when he is at school because he cannot use his letterboard to communicate."  (Doc. No. 64-74 ¶ 10.)  The psychiatrist suggested that A.L.'s parents withdraw him from school because, if the school continued to refuse "to accommodate his effective communication," A.L.'s situation at school would become "intolerable" and "his mental and physical health [would] deteriorate[]."  (*Id.* ¶¶ 9–10.)  A.L.'s parents pulled him from school the next day.  (Doc. No. 64-70 ¶¶ 56–57.)

A few weeks after he was pulled out of school, the District held a meeting to discuss A.L.'s IEP.  (Doc. No. 61-5, J.L. Dep. at 74:4–23.)  They revised A.L.'s IEP to allow him to use a letterboard and communication support person in school but continued to refuse to fund the communication support person.  (*See* Doc. No. 64-69, A.L. IEP, Nov. 28, 2018 ("If [A.L.] brings a letter board and a communication partner to school, the [Lower Merion] team will allow their use as a reasonable accommodation under [the] ADA.").)  The revised IEP also did not include a transition plan for A.L. to return to school following his more than six-week absence, did not include programming to address his "extreme stress and anxiety," and did not include academic and behavioral goals regarding A.L.'s regular education classes.  (*Id.*)  Unsatisfied with the District's efforts and concerned about their son's mental health, A.L.'s parents did not send him back to school.  (Doc. No. 67-70, A.L. Decl. ¶ 57.)  Instead, they continued homeschooling him,

providing him with tutors who instructed him in English/Language Arts, math, science, and social studies.  (Doc. No. 61-5, J.L. Dep. at 8:5–9:18.)

### C. *Effect on A.L.*

Because the District refused to allow A.L. to use a letterboard and declined to fund a communication support person, A.L. was unable to meaningfully participate in academic and extracurricular activities, which he claims caused him to suffer "humiliation, mental anguish, pain and suffering, and loss of educational benefit."  (Doc. No. 33 ¶ 163.)

*Academic Programming.*  Although A.L. was enrolled in regular education classes for history, health, and anatomy, he was not receiving credit for these courses.  And, because he was not allowed to use his letterboard, A.L. could not meaningfully participate in class.  (Doc. No. 64-36, J.L. Decl. ¶ 35; Doc. No. 67-70, A.L. Decl. ¶ 34.)  Without the letterboard, A.L. was left unable to communicate and could not discuss the curriculum with his classmates or teachers.  (Doc. No. 67-70, A.L. Decl. ¶ 35.)  Yet, with the letterboard, A.L. scored in the ninety-third percentile on the Kaufman Test of Educational Achievement – 2d Edition.  (Doc. No. 64-79, Robbins Decl. ¶ 13.)

*Guidance Counseling.*  The District provides guidance counseling services to its students.  (*Id.* ¶ 11.)  A.L. hoped to one day attend college and wanted to meet with the guidance counselor to discuss courses requirements, standardized testing, and the admissions process.  (Doc. No. 64-36, J.L. Decl. ¶ 27, Doc. No. 67-70, A.L. Decl. ¶¶ 28–29.)  Because the District did not allow him to use the letterboard or provide him with a communication support person, A.L. was unable to effectively communicate with the guidance counselor to discuss his path to college.  (*Id.*)

*School Nurse Services.*  The District offers school nurse services for its students.  (Doc. No. 34 ¶ 153.)  Without the letterboard, A.L. was unable to communicate his medical issues to

the school nurse.  (Doc. No. 67-70, A.L. Decl. ¶ 26.)

*Extracurricular Activities.*  The District offers extracurricular activities, such as Best Buddies and the Friendship Club, for its students.  (Doc. No. 34 ¶ 154.)  Before learning how to use the letterboard, A.L. attended a pizza party with the Best Buddies group.  (Doc. No. 64-21, F.L. Dep. at 19:8–20:6.)  He felt ostracized because he was unable to meaningfully communicate with his classmates and did not return to Best Buddies.  (*Id.*)  After learning how to use the letterboard, A.L. hoped to return to club meetings, but he was unable to do so because he needed a communication support person to use the letterboard and the District refused to provide him with one.[4]  (Doc. No. 67-70, A.L. Decl. ¶ 38.)

*Socialization*.  The District schedules breaks in the school day, which allow its students the opportunity to socialize with one another.  (Doc. No. 34 ¶ 156.)  Without the letterboard and a communication support person, A.L. could not socialize with his peers.  (Doc. No. 67-70, A.L. Decl. ¶ 38.)  A.L. was also a football fan but alleges that he was unable to attend Lower Merion High School's games because the District did not provide him accommodations, so he was unable to communicate.  (*Id.* ¶ 42.)

*Off-Campus Activities.*  The District coordinates off-campus activities, such as field trips, for its students.  (Doc. No. 34 ¶ 157.)  A.L. wanted to attend field trips with his classmates but alleges that he was unable to do so without a letterboard and communication support person.  (Doc. No. 67-70, A.L. Decl. ¶ 44.)

## II.     Procedural History

On February 27, 2019, Plaintiffs filed a due process complaint with the Pennsylvania

---

[4] The District did not allow A.L.'s parents to serve as his communication support person in Friendship Club due to confidentiality concerns for the other members of the club.  (Doc. No. 61-5, J.L. Dep. at 18.)

Department of Education seeking compensatory education, reimbursement for their expenses in privately educating A.L., and reimbursement for A.L.'s private psychologist's evaluation. (Doc. No. 33 ¶ 39; *see also* Doc. No. 13-3 at 3.) Plaintiffs also alleged that the District discriminated against A.L. in violation of Section 504 and the ADA.[5] (Doc. No. 33 ¶ 39; *see also* Doc. No. 13-3 at 3.) On December 15, 2019, the hearing officer ruled against Plaintiffs on all of their claims, concluding that the District had provided A.L. a FAPE, had not discriminated against A.L., and—assuming that he had jurisdiction over the ADA claim—had not violated the ADA. (Doc. No. 13-3 at 4, 25, 28–34.)

Unsatisfied with the hearing officer's decision, Plaintiffs filed suit in this Court on March 12, 2020. (Doc. No. 1.) Plaintiffs sought review of the hearing officer's decision and brought separate claims against the District for intentional discrimination against A.L. in violation of the ADA. (*Id.* ¶¶ 114–52.) This Court previously concluded that the ADA claim was subsumed in the administrative appeal but gave Plaintiffs the opportunity to amend their Complaint. *J.L. v. Lower Merion Sch. Dist.*, CIVIL ACTION NO. 20-1416-KSM, 2021 WL 949456 (E.D. Pa. Mar. 12, 2021).

Plaintiffs filed an Amended Complaint in which they raised a revised ADA claim. (Doc. No. 33.) The ADA claim now alleges that the District failed to ensure that communications with A.L. were as effective as communications with others and that the District failed to provide sufficient services to allow A.L. to participate in various school activities. (*Id.* ¶¶ 4, 150–63.) After the District filed an Answer (Doc. No. 34), the Court issued a Scheduling Order (Doc. No. 36). Under the Scheduling Order, the case is proceeding on two tracks: one schedule governs the administrative appeal and the other governs the ADA intentional discrimination claims. (*Id.*)

---

[5] Plaintiffs argued that the hearing officer did not have jurisdiction over the ADA claim. (*See* Doc. No. 13-3 at 31–32.)

Pursuant to the Scheduling Order, the District moved for summary judgment on the ADA intentional discrimination claim. (Doc. No. 61.) The District argues that the ADA claim is not actually "independent from their claim from denial of FAPE" and the ADA claims "should not be considered as separate independent legal claims." (Doc. No. 61-1 at 5.) The District also argues in the alternative that, even if the ADA claim is independent, it cannot stand because there is no evidence that the District acted with deliberate indifference. (*Id.*) Finally, the District argues that J.L. and F.L. have not stated an associational discrimination claim and that any harm they may have faced is derivative of A.L.'s harm. (*Id.* at 18.) Plaintiffs oppose the motion. (Doc. No. 68.)

Plaintiffs separately moved for summary judgment on the liability aspect of the ADA claim. (Doc. No. 64.) First, they argue that the District "had a duty under the ADA to allow A.L. to use the letterboard" (Doc. No. 64-88 at 10), and it violated that duty by denying Plaintiffs' request to use the letterboard (*id.* at 11–14). Second, they argue that no exception to the ADA applies. (*Id.* at 16.) Finally, they argue that they are entitled to damages because the District acted with deliberate indifference toward A.L.'s rights. (*Id.* at 17.) Defendant opposes this motion. (Doc. No. 66.)

### III.    Standard of Review

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247–48 (1986).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.   "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  At "summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up).

"The same standards and burdens apply on cross-motions for summary judgment." *United States v. Weiss*, 461 F. Supp. 3d 183, 187 (E.D. Pa. 2020) (quoting *Allah v. Ricci*, 532 F. App'x 48 (3d Cir. 2013)).  "If review of the cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts."  *Id.* (cleaned up).

**IV.   Discussion**

Before considering the merits of the ADA claim, the Court must assess whether the ADA claim arises out of denial of a FAPE.

### A.     *Plaintiffs Were Required to Exhaust the ADA and Section 504 Claims*

The IDEA was enacted to ensure that public schools that receive federal funding provide children with disabilities "a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  If parents believe the education their child is receiving from his public school violates the IDEA, they may request an impartial due process hearing.  *Id.* § 1400(f)(1)(A).  The IDEA's administrative process is

conducted in compliance with state regulations. *Id.* § 1415(f)(1)(A). In Pennsylvania, hearings are conducted by "hearing officers," outside contractors hired by the Pennsylvania Secretary of Education. *See* 22 Pa. Code § 14.162(p)(1). After exhausting their administrative remedies, parents dissatisfied with the hearing officer's decision may seek judicial review in federal or state court. 20 U.S.C. § 1415(i)(2)(A); *see also Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 272 (3d Cir. 2014).

Congress has made clear that the IDEA does not "restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, Title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities." 20 U.S.C. § 1415(*l*). However, when plaintiffs bring non-IDEA claims seeking relief that can be obtained under the IDEA, they must exhaust those claims through the IDEA administrative process. *Id.*; *see also Batchelor*, 759 F.3d at 272–73. Non-IDEA claims must be exhausted through the IDEA administrative process when the "gravamen" of the plaintiff's complaint indicates that the plaintiff seeks relief for denial of a FAPE. *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 755 (2017).

When looking to the gravamen of Plaintiffs' complaint to determine whether it seeks relief for the denial of a FAPE, the Court must consider the individual claims within the complaint and the collection of claims in the complaint as a whole. *Wellman v. Butler Area Sch. Dist.*, 877 F.3d 125, 132 (3d Cir. 2017). The Supreme Court has instructed that one "clue" that the gravamen of a complaint arises out of denial of a FAPE "can come from asking a pair of hypothetical questions": "First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school? Second, could an adult at the school have pressed essentially the same grievance?" *Fry*, 137 S. Ct. at 747. When the

11

answer to both questions is no, then the complaint likely seeks relief for denial of a FAPE. *Id.* In addition to these hypothetical questions, the Supreme Court also instructed courts to consider the history of the proceedings. *Id.* That a plaintiff has previously pursued administrative remedies under the IDEA is a sign that the gravamen of the plaintiff's complaint concerns the denial of a FAPE. *Id.*

The Court finds that the gravamen of Plaintiffs' Amended Complaint—including their amended ADA claim—concerns the denial of a FAPE, so Plaintiffs were required to exhaust the ADA claim at the due process hearing.

Viewing the complaint as a whole, it is clear that Plaintiffs' ADA claim centers around the quality of education that A.L. received when he was prohibited from using the letterboard to the extent Plaintiffs believe he should have been allowed. Plaintiffs allege that "[t]he District did not . . . furnish appropriate auxiliary aids and services to afford [A.L.] an equal opportunity to participate in and enjoy the benefits of services, programs, and activities conducted by the District." (Doc. No. 33 ¶ 150.) They further allege that the District's refusal to provide A.L. with a letterboard and communication support person violated the ADA by preventing A.L. from participating in guidance counselor services, school nurse services, extracurricular activities, academic programs, and off-campus activities and denying him the opportunity to socialize with his peers. (*Id.* ¶¶ 152–57.) Plaintiffs contend that this alleged discrimination caused A.L. to suffer "humiliation, mental anguish, pain and suffering, and loss of educational benefit." (*Id.* ¶ 163.) These allegations support the finding that Plaintiffs seek relief only for the denial of a FAPE. *See J.L. ex rel. Leduc v. Wyoming Valley W. Sch. Dist.*, 722 F. App'x 190, 193 (3d Cir. 2018) (holding that the plaintiff's claim arose solely out of denial of a FAPE where the complaint alleged that the school district's failure to provide a one-to-one aide to protect the

student violated her "educational rights," "educational programs," "educational services," the "educational environment," the "educational setting," and the plaintiff's "special educational needs"); *S.D. ex rel. A.D. v. Haddon Heights Bd. of Educ.*, 722 F. App'x 119, 126 (3d Cir. 2018) ("The substance of Appellants' grievance is that Appellee failed to provide instruction tailored to meet S.D.'s special needs resulting from his disability.  Their claims therefore concern the denial of a FAPE to S.D."); *Henry v. Sch. Dist. of Phila.*, CIVIL ACTION NO. 19-1115, 2019 WL 4247914, at *8 (E.D. Pa. Sept. 6, 2019) (holding that the plaintiffs' claim arose out of the denial of a FAPE where the plaintiffs alleged the school district "deprived [the student] of access to the educational opportunities and benefits provided by the District").

Put differently, the allegations in the Amended Complaint do not imply that the District's refusal to allow A.L. to use a letterboard or to pay for a communication support person prevented him from being able to access *the school*; they imply that this refusal prevented A.L. from being able to access *his education*.  (*See, e.g.*, Doc. No. 33 ¶ 151 ("The District violated the ADA when it did not provide equal opportunity to [A.L.] to benefit from and pursue the same level of achievement in its public programs *as students without disabilities*." (emphasis added)).) Although some of the allegations relate to extracurricular activities, the IDEA mandates that IEPs provide for disabled students to participate in extracurricular and other nonacademic activities.  20 U.S.C. § 1414(d)(1)(A)(i)(IV); *see also Wellman*, 877 F.3d at 134 (holding that the plaintiffs' claim that the student, a football player, was excluded from attending games on the sidelines as a result of his disability was "intertwined with [the student's] complaints about the school's failure to accommodate his educational needs, which include his participation in extracurricular activities"); *F.S. ex rel. Scarano v. Crestwood Sch. Dist.*, CIVIL ACTION NO. 3:19-1593, 2020 WL 6445985, at *4 (M.D. Pa. Nov. 3, 2020) (holding that a complaint alleging

13

that the school district failed to accommodate the non-verbal, wheelchair-bound student's participation in a cheerleading program sought relief for failure to provide a FAPE). A.L.'s IEP did just that: it included goals of meeting with the guidance counselor and socializing with peers and provided accommodations so A.L. could meet with the school nurse. (*See generally* ORD0844, A.L. IEP, Dec. 2, 2016.) Given this, we find that the ADA claim unquestionably arises out of the District's alleged denial of a FAPE. *Wellman*, 877 F.3d at 134; *F.S.*, 2020 WL 6445985; *see also Z.G. ex rel. C.G. v. Pamlico Cty. Pub. Schs. Bd. of Educ.*, 744 F. App'x 769, 780 (4th Cir. 2018) (holding that allegations that the student was not afforded sufficient accommodations to attend field trips "demonstrate that the plaintiffs' retaliation claim arises directly from the parents' advocacy for [the student's] educational rights").

The *Fry* framework also supports the conclusion that Plaintiffs' ADA claim "stem[s] from the [District's] alleged failure to accommodate [A.L.'s] condition and fulfill his educational needs." *Wellman*, 877 F.3d at 133; *see also Fry*, 137 S. Ct. at 756–57. The conduct complained of could not have occurred outside of the school setting, and a nonstudent visitor could not have "pressed essentially the same grievance." *Fry*, 137 S. Ct. at 756. As to the first hypothetical question raised by *Fry*, A.L. could not have brought a similar claim against a public theater or library—those institutions are not tasked with providing access to educational services such as guidance counselors, nurses, and school clubs. *T.R. v. Sch. Dist. of Phila.*, 4 F.4th 179, 195 (3d Cir. 2021) ("Clearly, the Plaintiffs could not have brought the same claims—about participation in educational services—against a public theater or library."). And as to the second question, Plaintiffs repeatedly acknowledge that the District offers these services and programs "*for its high school students*." (Doc. No. 33 ¶ 152–57.) An adult visiting the District would certainly not have access to meet with the guidance counselor, receive treatment from the school nurse,

participate in the Friendship Club, attend academic programs, socialize with students, or go on field trips. *Wellman*, 877 F.3d at 133 (explaining that an adult "could not (and would not)" have complained of the school district's failure to provide accommodations to attend German and physical education classes, attend study hall, and safely attend football games and practices).[6]

The history of the proceedings also shows that the gravamen of this suit seeks relief for the denial of a FAPE. A.L.'s parents' requests that the District allow A.L. to use a letterboard and provide him with a communication support person were requests to revise his IEP. (*See, e.g.*, Doc. No. 64-42 at 2–3; Doc. No. 64-43 at 2.) When Plaintiffs found the District's proposed solutions inadequate, they sought relief under the IDEA. (Doc. No. 33 ¶ 39; *see also* Doc. No. 13-3 at 3.) The Plaintiffs' prior pursuit of the IDEA's administrative remedies and the fact that the Amended Complaint includes a claim for denial of a FAPE provides "strong evidence" that the substance of the ADA claim concerns the denial of a FAPE. *Fry*, 137 S. Ct. at 757; *see also T.R.*, 4 F.4th at 197 (holding that "the history of these proceedings supports the conclusion that Plaintiffs seek to remedy the denial of a FAPE" where the complaint includes a claim under the IDEA for the denial of a FAPE); *Wellman*, 877 F.3d at 136 (explaining that the fact that the student's parents had previously sought an IEP suggested that the plaintiffs sought relief for the

---

[6] Plaintiffs argue that several of these "services and activities—like attending defendant's football games—are activities adults and other visitors to the defendant School District would also have a legal right to access under the ADA." (Doc. No. 68 at 13.) However, the Amended Complaint does not allege—and there is no evidence in the record—that the District barred A.L. from attending football games. (*See generally* Doc. No. 33.) And even if it did, it is not clear how the District's refusal to allow A.L. to use a letterboard and provide him with a communication support person impeded his ability to attend football games as a fan; nor is it clear how a similarly situated adult football fan could bring a complaint against the school for denial of a letterboard and communication support person. *Contra K.L. v. Scranton Sch. Dis.*, Civil No. 3:19-0670, 2020 WL 42723, at *4 (M.D. Pa. Jan. 3, 2020) (holding that the complaint, which brought an ADA claim after being pinned into a straight-backed office chair, did not arise out of denial of a FAPE because, if this had occurred in a public theater, the plaintiff could have brought suit and, if a special-needs adult visiting the school were similarly restrained, they could also bring suit).

denial of a FAPE).[7]

This conclusion does not change because Plaintiffs requested monetary damages. "Monetary damages are not available under the IDEA and cannot be awarded at an administrative hearing." *J.L.*, 722 F. App'x at 194 (quoting *Batchelor*, 759 F.3d at 276–77). But "[t]his is not dispositive" where "the complaint [does] not seek money damages exclusively," because "district courts are empowered to grant relief beyond that requested, and money damages may sometimes be awarded as reimbursement." *Id.* That is the case here. Because Plaintiffs do not exclusively seek monetary damages (*see* Doc. No. 33 ¶ 163), they were required to exhaust their ADA claim.

### B. *Plaintiffs Exhausted Their ADA Claim*

Because Plaintiffs' ADA claim needs to have been exhausted before the hearing officer, the Court must determine whether Plaintiffs exhausted the claim. *See Wellman*, 877 F.3d at 130–31 (explaining that a plaintiff's failure to exhaust a claim deprives the court of subject matter jurisdiction over that claim). The Court finds that they did.

Plaintiffs did not actively pursue their ADA claim before the hearing officer (*see* Doc. No. 31-1 at 32), but they fully litigated their IDEA and Section 504 claims (*see id.* at 31–33). Claims brought under Section 504 "are treated as analogous" to claims brought under the ADA "because the remedies, procedures, and rights under the ADA are the same as those under

---

[7] This conclusion comports with decisions from other bodies that have considered whether claims that students have been denied the use of a letterboard arise out of the denial of a FAPE. *See, e.g.*, *K.M. ex rel. C.M. & C.M.M. v. Bd. of Educ. of Montgomery Cty.*, Civil Action No. PX-17-2759, 2019 WL 330194 (D. Md. Jan. 25, 2019) (holding that the "gravamen" of the plaintiff's claims was that, without the letterboard, she was unable to achieve "educational milestones" and those claims were subject to the IDEA's exhaustion requirement); *In re Fairfield (CT) Bd. of Educ.*, 72 IDELR 165, at 857–58 (U.S. Dep't of Educ., Off. for C.R. Feb. 2, 2018) ("To the extent there [was] a dispute about the appropriateness of using a specially-trained communication partner . . . this disagreement was ultimately a substantive pedagogical issue that [was] best resolved through [the IDEA's administrative process].").

Section 504." *T.M. ex rel. T.M. v. Quakertown Cmty. Sch. Dist.*, 251 F. Supp. 3d 792, 813 (E.D. Pa. 2017) (cleaned up). Because the ADA and Section 504 claims are based on the same legal standards and arise out of the same facts, Plaintiffs adequately exhausted their ADA claims through the IDEA's administrative processes.[8]

Accordingly, the Court will consider the Plaintiffs' ADA claim, like their IDEA and Section 504 claims, on appeal from the hearing officer's decision.

### C.  *Plaintiffs Are Not Entitled to a Jury Trial on the ADA Claim*

Because Plaintiffs' ADA claim seeks a remedy for denial of a FAPE, they are not entitled to a jury trial on that claim.[9] The Seventh Amendment creates a right to a jury trial "[i]n suits at common law, where the value in controversy shall exceed twenty dollars." U.S. Const. amend. VII. This Amendment applies to statutory rights only "if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law." *Curtis v. Loether*, 415 U.S. 189, 194 (1974). A denial of a FAPE is an *equitable* injury, so plaintiffs who seek solely to remedy such denial are not entitled to a jury trial. *See Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, Civil Action No. 05-2535, 2014 WL 3572931, at *2–3 & n.3 (E.D. Pa. July 21, 2014); *see also Sheils v. Pennsbury Sch. Dist.*, Civil Action No. 14-2736, 2014 WL 5038395, at *12 (E.D. Pa. Oct. 8, 2014) (holding that the IDEA "is not a statute that is enforceable in an

---

[8] In the alternative, the Court finds that exhaustion is not required in this case. (Doc. No. 21-1 at 32–34.) Exhaustion is not required where it would be "futile or inadequate." *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 275 (3d Cir. 2014). Because the hearing officer has already found that the Plaintiffs have not shown the District violated the ADA, the Court concludes that it would be futile to require the Plaintiffs to exhaust the claim before the hearing officer.

[9] Although Plaintiffs are not entitled to a jury trial on their ADA claim, the Court notes that approximately a year after Plaintiffs first approached the District regarding A.L.'s chosen and preferred method of communication, the District acknowledged that it would allow A.L. to bring a letter board and communication partner "*as a reasonable accommodation under [the] ADA*." (Doc. No. 64-69, A.L. IEP, Nov. 28, 2018 (emphasis added).) This fact will be taken into consideration in deciding Plaintiffs' Motion for Judgment on the Administrative Record.

action for monetary damages").[10]

## V.  Conclusion

For the reasons discussed above, the District's motion for summary judgment is granted, and Plaintiffs' motion for summary judgment is denied.

An appropriate order follows.

---

[10] However, as explained in the Court's opinion granting Plaintiffs' Motion to Supplement the Administrative Record, the Court can—and will—consider certain additional evidence in deciding the cross-motions for judgment on the administrative record. See *J.L. v. Lower Merion Sch. Dist.*, CIVIL ACTION NO. 20-1416-KSM, 2021 WL 4262321, at *6–7 (E.D. Pa. Sept. 17, 2021).