**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **J.L., et al.**, | **CIVIL ACTION** |
| Plaintiffs, | |
| *v.* | **NO. 20-1416-KSM** |
| **LOWER MERION SCHOOL DISTRICT**, | |
| Defendant. | |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                                                September 15, 2022

This case involves a difference in opinion concerning what is an effective communication method for A.L., a bright, hardworking, non-speaking student who attended Lower Merion High School. A.L. and his parents, J.L. and F.L., advocated that A.L. should be entitled to use his preferred method of communication, Spelling to Communicate ("S2C"), in the classroom. To use this method, A.L. needed a trained communication partner who could accompany him throughout the school day to hold the laminated letterboard he used to spell. Throughout A.L.'s schooling experience, the Lower Merion School District (the "District") worked with A.L. and his parents to provide the best possible educational environment for A.L. to reach his fullest potential. Unfortunately, after the District researched S2C, it declined to agree to A.L.'s preferred method because the District's research and investigation showed that S2C was not evidence based and may not have reflected A.L.'s true voice.

Following the District's refusal to implement S2C, A.L.'s parents, individually and on behalf of A.L., ("Plaintiffs") initiated a due process action against the District under the

Individuals with Disabilities Education Act (the "IDEA").  (ODR3745–50.[1])  Plaintiffs argued the District denied A.L. a free appropriate public education ("FAPE") by refusing to allow A.L. to use S2C in the academic setting and by refusing to provide A.L. with a trained communication partner.  (*Id.*)  They also claim the District procedurally violated the IDEA by refusing to conduct an independent educational evaluation despite Plaintiffs' repeated requests.  (*Id.*)  Plaintiffs sought compensatory education, reimbursement for the private program they developed for A.L. following his withdrawal from the District, and reimbursement for the psychological evaluation of A.L. that they coordinated.  (*Id.*)  Plaintiffs also claimed that the District violated Section 504 of the Rehabilitation Act of 1973 ("Section 504") and the Americans with Disabilities Act (the "ADA") by refusing to allow A.L. to use S2C until November 2018, after he had already stopped attending school.  (ODR3750.)

After a three-day hearing and review of a voluminous record, the Hearing Officer determined that the District provided A.L. with a FAPE even though it refused to implement S2C.  (ODR0008–40.)  The Hearing Officer found that he did not have jurisdiction over the Section 504 and ADA claims; however, he held if he had jurisdiction, he would find that the District did not violate Section 504 or the ADA.  (ODR0038.)  Subsequently, Plaintiffs filed a complaint in this Court challenging the Hearing Officer's determination and alleging violations of Section 504 and the ADA.  (Doc. No. 1.)  Presently before the Court are the parties' cross-motions for judgment on the supplemented administrative record.  (Docs. No. 63 & 65.)  For the reasons below, the District's motion is granted, and Plaintiffs' motion is denied.

---

[1] Citations beginning "ODR-" refer to the Administrative Record received from the Pennsylvania Department of Education Office of Dispute Resolution.

## I.   BACKGROUND

### A.   *Evidentiary Dispute*

The Court permitted Plaintiffs to "supplement the administrative record with A.L.'s testimony, using a letterboard." *J.L. v. Lower Merion Sch. Dist.*, Civil Action No. 20-1416, 2021 WL 4262321, at *6 (E.D. Pa. Sept. 17, 2021).  A.L. did not provide live testimony but rather provided a declaration in support of Plaintiffs' motion.  (Doc. No. 65-2.)  The District argues that because the Court allowed Plaintiffs to supplement the record with A.L.'s *testimony*, *not a declaration*, the Court should not now consider the declaration.  (Doc. No. 77 at 2.)  Plaintiffs argue that the Court should consider A.L.'s declaration because Plaintiffs provided the District with A.L.'s declaration before moving for judgment on the administrative record, "expecting defendant to notice A.L.'s deposition," but the District chose not to do so.  (Doc. No. 79 at 6.)

The Court will consider A.L.'s declaration.  A.L. declared under penalty of perjury that his declaration was true and correct (Doc. No. 65-2 at 8), and the District could have deposed A.L. but chose not to (Doc. No. 79 at 6).  The District also suggests that A.L. did not author his declaration, but it has not offered any evidence to support its suggestion (Doc. No. 80 at 3–4), and without such evidence, the Court declines to question the authenticity of the declaration. Accordingly, the Court will consider A.L.'s declaration in deciding the cross-motions for judgment on the administrative record.[2]

---

[2] The District also challenges Plaintiffs' citation to declarations from A.L.'s parents explaining the videos showing A.L. letterboarding.  (Doc. No. 77 at 4.)  Plaintiffs did not move to supplement the administrative record with these declarations, so the Court has not considered them while viewing the videos or deciding the cross-motions.

### B.    Factual Background

#### 1.    A.L.'s Language Impairment and His Introduction to the Spelling to Communicate Methodology

Since he was a child, A.L. has had a diagnosis of autism[3] and a speech or language impairment.  (*Id.*)  Although A.L. has limited verbal capabilities, he describes himself as a non-speaker.  (Doc. No. 65-2 ¶ 5.)  A.L., who is now an adult, attended school in the District from kindergarten through the beginning of his senior year.  (ODR0392.)  Throughout his educational career, A.L. has had an individualized education program ("IEP"), which set curricular and extracurricular goals and enumerated specially designed instruction he would receive to advance those goals.  (ODR0407.)  Every IEP A.L. has had since his fourth-grade year has noted the need "to consider . . . assistive technology related to writing needs."  (ODR0429.)

By the end of his tenth-grade year, A.L.'s parents became increasingly concerned that his communication skills had stagnated, so they enrolled him in S2C lessons with an extracurricular group not affiliated with the District.  (Doc. No. 65-1 ¶¶ 6–7.)  S2C is a method by which a communication partner holds a letterboard[4] in the eyeline of a nonverbal speaker and the speaker points to letters on the board.  (ODR0301.)  The communication partner writes out the letters the speaker points to, letter by letter, and re-directs the speaker if he is pointing to letters in a nonsensical order.  (ODR0320; *see also* ODR0181 (one of A.L.'s communication partners testifying that he "won't accept" if A.L. points to the wrong letters).)  For instance, A.L.'s

---

[3] Autism is a "developmental disability significantly affecting verbal and nonverbal communication and social interaction."  34 C.F.R. § 300.8(c)(1)(i).  Characteristics associated with autism include "engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences."  *Id.*

[4] A letterboard is a laminated, 8 ½ x 11 board.  (ODR0301.)  The left side of the letterboard lists the alphabet (in alphabetical order) over five rows, and the far-right side of the letterboard includes punctuation (a comma, an exclamation mark, a question mark, and a period), a "backspace" button, and a "DONE" button, which the speaker points at to indicate that he is finished with his thought.  (*Id.*)

mother testified that A.L.'s communication partners helped him "[i]f he appears to get stuck or if he appears to get random"; that is, "they'll say [A.L.], reset, I'm going to go back and I'm going to read the last thing that made sense because you lost me there."  (ODR0320.)  Similarly, if the communication partner does not understand what the speaker is spelling, they may pull the board away and have the speaker start over.  (ODR0177; *see also* ODR0186 ("If he gets inaccurate or if he gives me a string of letters, I'll pull the board back . . . .").)  The communication partner will never touch the speaker's hand, but they may make "gestural prompts," such as a wave, "to get [the speaker] to go to a certain side of the board, or to show them, okay, your letter is in this vicinity."  (ODR0180–81; *see also* Homework Video at 5:00–5:30 (demonstrating how A.L.'s communication partner guided him to the correct letter).)

At the time of the administrative hearing, there was no peer-reviewed research supporting the legitimacy of S2C as an evidence-based methodology.  (ODR1930.)  The American Speech-Language-Hearing Association ("ASHA") issued a position statement on Facilitated Communication and the Rapid Prompting Method.[5]  (ODR2813.)  ASHA said,

> It is the position of the American Speech-Language-Hearing Association (ASHA) that use of the Rapid Prompting Method (RPM) is not recommended because of prompt dependency and the lack of scientific validity.  Furthermore, information obtained through the use of RPM should not be assumed to be the communication of the person with a disability.

(*Id.*)  S2C's efficacy is also called into question because the State of Virginia's Speech and Audiology Licensing Board assessed an $8,000 fine against Elizabeth Vosseller, the creator of S2C, for practicing without a license from 2004 through 2017.  (ODR1930.)

Despite the lack of research-based evidence supporting S2C, certain experts who

---

[5] S2C is a form of Facilitated Communication based on the Rapid Prompting Method. (ODR1922.)

observed A.L. believed the method worked for him.  (ODR1322.)  For instance, Dr. Anne

Robbins, a neuropsychologist, evaluated A.L. using S2C and found that his responses were

"more deliberate and reliable" when he was using the method.[6]  (ODR1327.)  She concluded,

"As [A.L.] has progressed in this alternative communication method, it has become apparent that

he has significantly greater vocabulary, background knowledge, and learning capacity than was

previously recognized."  (ODR1331.)  Likewise, Susan Chaplick, A.L.'s private speech-language

pathologist, observed A.L. using S2C and concluded that "[t]here is a significant discrepancy in

his ability to express himself verbally versus using the letter boarding technique."  (ODR2016.)

She also acknowledged that the method is not evidence based but said that it nevertheless "looks

very promising" for A.L.  (*Id.*)

### 2. Plaintiffs Propose Implementing S2C Into A.L.'s IEP and Enrolling A.L. in Regular Education Courses

By the fall of his junior year, A.L. had been using S2C for approximately four months in

connection with the private program not affiliated with the District.  (Doc. No. 65-1 ¶¶ 6–7.)  His

parents were pleased with A.L.'s progress and felt that this newfound ability to communicate

demonstrated that A.L. was far more intelligent than previously realized.  (ODR2026.)  In

October 2017, A.L.'s mother asked the District to implement S2C into A.L.'s school curriculum,

explaining that A.L. "requires these strategies [i.e., S2C] to fully access LMHS [Lower Merion

High School] curriculum."  (*Id.*)  In their request, A.L.'s parents proposed that his IEP be

updated so that (1) A.L. was spending the majority of his day in regular education classes, and

---

[6] Dr. Robbins concedes that her evaluations were not conducted in accordance with standardized administration protocol because (1) A.L. communicated on a letterboard with the assistance of a communication partner (his mother); and (2) his parents were present for the evaluations.  (ODR1325–26.)  Additionally, A.L.'s father served as the communication partner for the initial evaluation, but Dr. Robbins ended that evaluation prematurely because A.L. "was reluctant to participate (did not provide reliable responses to questions)."  (ODR1326.)

(2) at least one representative from the District was trained in S2C. (*Id.*) A.L.'s parents also invited representatives from the District, including Michael Borsch (A.L.'s special education teacher) and Debra Bosin (a speech-language pathologist), to observe A.L. using his letterboard with a trained communication partner. (*Id.*) Initially, the District declined the invitation because it "[did] not view this method as evidence based." (*Id.*)

During A.L.'s IEP Team meeting[7] on October 26, 2017, the IEP Team agreed to revise A.L.'s IEP to include A.L. auditing two regular education (a U.S. history and a health class) and enrolling in a special education reading support class with one-on-one instruction to complement these two classes. (ODR0850.) Additionally, A.L.'s parents renewed their request that the District implement S2C. (ODR0845.) The District again explained that it was unwilling to do so because S2C was not research based. (ODR0307 (A.L.'s mother testifying that "[t]he pushback in the meeting was about the lack of academic peer-reviewed research").) A.L.'s parents felt that A.L.'s progress using S2C was "the best evidence" of the method's efficacy and requested the District conduct "an independent evaluation of the effectiveness of these strategies by a mutually agreed[-]upon third party." (ODR2034.) When the District did not respond to the request for an independent evaluation, A.L.'s parents went ahead and obtained their own evaluation from Dr. Robbins. (Doc. No. 65-1 ¶ 16; ODR1322.)

Meanwhile, on November 6, A.L.'s IEP team held a telephonic meeting to discuss his

---

[7] In October 2017, A.L.'s IEP was prepared and reviewed by his parents and the District's speech-language pathologist, A.L.'s special education teacher, the District's transition coordinator, one of A.L.'s regular education teachers, A.L.'s private Board Certified Behavior Analyst, the school counselor, and a representative from the School Board (together, the "IEP Team."). (ODR0847.) By November 2018, A.L.'s IEP Team expanded to include the District's psychologist, A.L.'s reading teacher, the District's behavior analyst, a special education supervisor, an occupational therapist, the speech-language pathologist supervisor, the District's lead supervisor of clinical services, a "consultant," the District's special education coordinator, counsel for A.L.'s family, and counsel for the District. (ODR1633.) A.L. attended some, but not all, of the IEP meetings. (*Compare id. with* ODR0847.)

transition to the regular education classes, and A.L.'s parents requested that Mr. Borsch forward

"writings from [A.L.'s] voice via letter boarding" to the two new regular education teachers.

(ODR0957.)  On November 14, A.L. began auditing the regular education history and health

classes for approximately twenty minutes per class and did so well that "about a week later," he

started spending the full fifty-five minutes in each class.  (ODR0212.)  A few weeks later, on

November 29, A.L.'s IEP team held a brief telephonic meeting to discuss his progress in the

regular education classes and planned to "us[e] a class summary sheet . . . to communicate

[A.L.'s] progress and needs" in the regular education classes.  (ODR0982.)  At this point, A.L.'s

primary method of communication at school was still typing on a Bluetooth keyboard, which his

teachers had observed worked well for him.  (*See* ODR0984; *see also, e.g.*, ODR0109 (the

District's speech-language pathologist testifying that A.L. "actually does really well with

keyboarding, he can keyboard his ideas, things he wants using the laptop"); ODR0222 (A.L.'s

special education teacher testifying that "he could type extremely well" and that "[m]ost of his

activities were typed in some regard or another, because [the district] knew that was his

strength").

### 3.    A.L.'s Parents Continue to Urge the District to Train an Aide in S2C

On December 10, 2017, A.L.'s parents renewed their request that the District train an

aide in S2C, as they believed this would enable A.L. to spend more time in regular education

classes.  (ODR2043 ("We thus repeat our request that the District train [A.L.'s] team on the

method, provide a 1:1 [aide] trained in the method, and develop a plan to move [A.L.] into a less

restrictive program with greater access to regular education curriculum and classes.").)  A.L.'s

IEP Team held another meeting on December 15.  (ODR1081.)  At the meeting, A.L.'s mother

explained that "there is a dramatic difference in what [A.L.] can say versus what he knows/can

do via letterboarding."  (ODR1083.)  A.L.'s mother also reported that A.L. had been "so happy

8

[at] home" since his enrollment in the two regular education courses.  (ODR1083–84.)

Around this time, the District agreed to observe A.L. using S2C, and on December 18, Melissa Sinapi-Gibson (a special education supervisor) and Denise Grimley (a speech-language pathologist) observed A.L. at Inside Voices, the private facility where A.L. had learned and continued to practice the method.  (ODR0209; ODR1081.)  Ms. Grimley described the observation:

> [A.L.'s communication partner] was reading to him a passage about presidents, and then having him answer questions.  She would write his answers on her clipboard, she would use intonation patterns while she was reading, she would spell random words from her passage while she was reading the passage aloud to him.  And she went from very close-ended questions to open-ended questions at the end . . . . I also observed [the communication partner] using prompts, she would do things like, closer, go get it, left, up, down, while he was poking the letters.

(ODR0105.)  Ms. Sinapi-Gibson noted that A.L. was "spell[ing] words at a rate that [she] truly [had] not seen most high school students spell at" but did not think, at that point, that [A.L.'s communication partner] was guiding A.L.'s communication.  (ODR0076.)

Following this session, the District explained to A.L.'s parents that it wanted to conduct additional observations of A.L. using S2C.  (ODR2061.)  In response, A.L.'s mother emailed Ms. Sinapi-Gibson to alert her that A.L. was "stressed about having to constantly prove to [the District] that he is smart" and that A.L. had spelled, "Stop giving me stupid tests," upon learning the District wanted to observe him further using S2C.  (ODR2060.)  A.L.'s mother explained to Ms. Sinapi-Gibson, "We understand your desire for data and evidence, but we would ask that you in turn please be mindful of the emotional toll that this long, drawn out process is taking on [A.L.]."  (*Id.*)

### 4.   The District Continues to Observe A.L. and Agrees to Allow Letterboarding in His Reading Class

Following the District's personnel's initial observations of A.L. using S2C, A.L.'s IEP Team reconvened on January 8, 2018.  (ODR1163.)  A.L.'s parents asked the District to contract with the creator of the S2C method to train eight people to serve as communication partners for A.L.  (ODR1273.)  A week after the IEP meeting, Ms. Sinapi-Gibson privately expressed doubts about the efficacy of S2C to Kimberley Fraser, the District's Director of Student Services and Special Education.  (ODR1847.)  Her concerns about the method included the following:

- There is NO direct research on Spelling to Communicate.

- ASHA does not recognize it as an evidence[-]based practice.

- [The creator] was first trained in Rapid Prompt Method (RPM) which does have research and that research says it does not work.

- We have asked on multiple occasions, when does the individual become independent, currently they do not have completely independent individuals.

- The student does not currently use the S2C at home to communicate his daily happenings, strictly to complete homework.

- Speaking with experts in the Autism area, they frown upon the use due to lack of evidence to support it.

(*Id.*)

Notwithstanding Ms. Sinapi-Gibson's hesitations, the District followed up with its request to conduct additional observations of A.L. using S2C and sent Ms. Sinapi-Gibson, Ms. Grimley, and Ms. Van Horn back to Inside Voices on January 22.  (ODR0089.) Ms. Van Horn explained that she prepared questions for the session based on a mid-term being administered in A.L.'s U.S. history class.  (*Id.*)  A.L. and his communication partner began working through the short-answer and multiple-choice questions on the letterboard, but "he

wasn't getting the correct answers" and seemed "flubbled"—i.e., he seemed anxious responding to the questions. (ODR0090.) A.L.'s communication partner asked for an answer key, and "[t]hen the answers were coming out correctly." (*Id.*) Ms. Van Horn was troubled by what she observed, particularly by the fact that A.L.'s behavior and the communication partner's demeanor changed once the communication partner knew the correct answers. (*Id.*)

Although the District's educators had serious concerns about S2C following the January 22 observation, the District agreed to allow A.L. to use a letterboard at school during his one-on-one reading course, with the limitation that he was not allowed to use a communication partner. (ODR1205.) This meant that A.L. was allowed to use the letterboard to point to the letters without the assistance of an aide holding the letterboard, but someone would be there to transcribe the letters A.L. pointed to. (*Id.*) The District believed this accommodation would allow it to determine if letterboarding was an effective means of communication. (ODR0076 ("[W]e used the reading class as a way to extrapolate comprehension of items that were presented in history to see if [A.L.] could spell those responses on the letter board.").) But the letterboarding did not prove effective without a communication partner. (ODR0221.) Mr. Borsch explained that A.L. "did spell some things but did not communicate anything that was comprehensive to what we were discussing." (*Id.*)

Given its investigation of S2C, in February, the District again refused to train a one-on-one aide to serve as A.L.'s communication partner. (ODR2068.) The District explained that this decision was not financially motivated; rather, "[t]he lack of research behind S2C including research to drive appropriate training with fidelity remains a significant concern." (*Id.*) Although the District refused to train a one-on-one aide in the method, it permitted A.L.'s mother to serve as A.L.'s communication partner in his reading class on three or four different occasions

in February and March 2018.  (*Id.*; ODR0312.)

     **5.**       **The District Allows A.L. to Enroll in More Regular Education Courses and Tentatively Agrees to Train Staff in S2C**

A.L.'s IEP Team was scheduled to have another meeting on March 6, 2018.  (ODR2072.)

In advance of that meeting, A.L.'s parents emailed the District, expressing concern that A.L.'s

IEP "should begin to reflect the strengths and competence that we have seen when [he] uses the

boards and in his regular education classes."  (ODR1844.)  They also requested that A.L. be

allowed to use the letterboards "in all situations in which he needs to communicate."  (*Id.*)  The

District cancelled the March 6 IEP meeting without explanation "less than two hours before the

meeting."[8]  (ODR2072.)

The meeting was rescheduled to April 10.  (ODR1356.)  Susan Chaplick, A.L.'s private

speech-language pathologist, attended the meeting to discuss S2C.  (ODR1453.)  She explained

that there is a "noticeable difference" in A.L.'s communication abilities when A.L. works with

an experienced communication partner.  (*Id.*)  After Chaplick's presentation, the IEP team

discussed A.L.'s progress in the regular education history and health classes, and A.L.'s parents

lobbied for him to be enrolled in regular education anatomy, as well.  (ODR1455.)  The District

agreed, and A.L.'s IEP was revised for him to audit regular education anatomy for the fourth

quarter of the 2017–2018 school year.  (ODR1461.)  Finally, and significantly, the District

agreed to put together a team to be trained in S2C, including Ms. Van Horn, Ms. Sinapi-Gibson,

Ms. Grimley, Dr. Elizabeth Serpentine (a transition coordinator for the District), and one other

person to be identified at a later date.  (ODR1456.)  Although the District agreed to train this

team, they continued to deny the request to train a one-on-one aide to serve as A.L.'s

_____

     [8] It is not clear why the District cancelled the meeting with such short notice; however, A.L.'s mother and Ms. Van Horn "did discuss possibly postponing the meeting for several weeks so the District can gather more information" on A.L.'s use of the letterboard in reading class.  (ODR2070.)

communication partner.  (ODR0070.)

The District entered into a contract for training with the creator of S2C, and the training was scheduled to take place on May 24.  (ODR2083.)  Unfortunately, the School Board refused to approve the training "[g]iven that there is not research to support the use of letterboarding," so the training was cancelled.  (*Id.*)  A.L.'s parents were "deeply disappointed" that the training was cancelled, and A.L. reported that he "felt hopeless."  (ODR2084.)  In an email to the District, A.L.'s mother underscored A.L.'s frustration:  "The series of delays in getting S2C training so that [A.L.] can communicate in the school setting and fully participate in academic and social life have come at a great cost to [A.L.] both academically and emotionally."  (*Id.*)  Despite the setback of the School Board declining to provide funding for the May training, the District informed A.L.'s parents that it hoped to be able to reschedule the training at some point over the summer or at the beginning of the 2018–2019 school year.  (ODR2106.)

### 6.     A.L.'s Senior Year Begins, and a Team from the District Is Trained in S2C

On August 1, A.L.'s parents requested two categories of changes to A.L.'s IEP.[9] (ODR2106.)  First, they requested that A.L. be enrolled in three grade-level regular education courses to be "more aligned with his intellectual capabilities."  (*Id.*)  And second, they requested that A.L. be "allow[ed] to communicate at school."  (*Id.*)  A.L.'s parents acknowledged that the District may not be prepared to discuss the second point until after the District's staff completed the S2C training but urged the District to amend A.L.'s IEP to allow him to audit three regular education courses as soon as possible.  (*Id.*)  On August 7, in response to A.L.'s parents' requests, the District asked to reevaluate A.L.  (ODR1477.)  A.L.'s parents agreed to the reevaluation with the expectation that "the evaluation will consider [their] request for change in

---

[9] A.L.'s parents made this request prior to the start of his senior year.  (ODR2106.)

placement as well as . . . [A.L.'s] use of spelling boards to communicate." (ODR1480.) The reevaluation was set for October 2018. (ODR1840.)

Meanwhile, the District attempted to arrange for the developer of S2C to come and train a District team (consisting of Ms. Van Horn, Mr. Borsch, and Ms. Grimley). (ODR1641.) The developer of S2C was unavailable, so another representative came in her stead and led a three-day training in September 2018. (ODR0077.) The training was disorganized, and the trainer failed to provide a manual because there were "no specific guidelines for using the boards in academic and functional settings." (*Id.*) The trainer was also unable to answer questions about the use of the method in the academic setting and admitted that "there [was] no current scientific research or data to support the use of letter boarding with a facilitated communication partner." (ODR1641) Ms. Van Horn felt that she left the training without any "new information that was going to help us get [A.L.] to be that person guiding us" and stated that she did not think "any amount of training . . . would help [A.L.] to be independent working on these boards." (ODR0092.) Ms. Grimley explained that she found A.L.'s performance at the training "really inconsistent"—"at times he wasn't accurate . . . he might have tapped two or three times and then finally got to an H." (ODR0107.)

A week after the training concluded, A.L.'s parents followed up with the District to see when it was planning to hold an IEP meeting and implement S2C. (ODR2181.) A.L.'s IEP Team met on October 9 to review his progress and discuss the S2C training. (ODR1490.) At the meeting, the District refused to move forward with S2C because "[t]he training for trial did not yield evidence to support the usage of letter boarding based on the lack of research and studies to demonstrate effective use within a school setting." (ODR1499.) The District agreed that A.L.

could use the letterboards without the support of a communication partner if he chose to do so.[10]
(*Id.*)  The District also reiterated that A.L. could also communicate via a Bluetooth keyboard.
(*Id.*)

### 7.    A.L.'s Scheduled Evaluation and Eventual Withdrawal

On October 22, on the eve of the District's reevaluation of A.L., his father emailed
Dr. Andrea Fina, the District's psychologist who was scheduled to conduct the evaluation, and
explained that A.L. was "on edge like we've never seen him" with anxiety about the evaluation.
(ODR1839–40.)  Dr. Fina forwarded the message to Ms. Sinapi-Gibson and said, "I see that I'm
being set up for 'testing results are not valid and caused undue stress.'"  (ODR1839.)  Dr. Fina
went forward with the testing on October 24 and noted that A.L. "did not appear to be frustrated
or demonstrate negative behaviors" during the evaluation.  (ODR1642.)  A.L. scored in the third
percentile in cognitive skills, indicating that his "nonverbal cognitive skills are poorly developed
and an area of weakness."  (*Id.*)  Dr. Debra Bosin, a speech-language pathologist for the District,
also evaluated A.L. and found that he is a "skilled typist using his index fingers."  (ODR1926.)

On October 25, A.L. stopped attending school due to anxiety.  (*Id.*)  And on November 5,
Dr. Manely Ghaffari, A.L.'s psychiatrist, wrote to the District explaining that A.L. was
experiencing increased anxiety, self-injurious behaviors, and aggression "due to [the District's]
inability to meet his individualized needs by implementing his spell to communicate strategy."
(ODR2022.)  She suggested that A.L. required homebound instruction out of medical necessity
until the District developed a program that would meet his mental health and educational needs.
(*Id.*)  A.L.'s pediatrician, Dr. Wendy Ross, authored a similar letter, "recommending that he not
return to LMHS" "until we can ensure that the school is ready to utilize [A.L.'s] form of

---

[10] The District also reversed its decision that A.L.'s mother could come in and serve as his
communication partner in Ms. Van Horn's reading class.  (ODR0214; ODR2126.)

communication effectively, consistently, and respectfully." (ODR1971.)

A.L. remained out of school, and on November 28, his IEP Team met for the final time. (ODR1597.) A.L.'s parents disagreed with the results of the reevaluation because A.L. had performed so much better in his private evaluation with Dr. Robbins. The District, however, noted that it believed that Dr. Robbins's evaluation was flawed because she broke from standardization by evaluating A.L. using S2C with his mother as his communication partner. (ODR1638.) The District shared with A.L.'s parents "that the use of letter boarding, specifically, holding the letter board/keyboard could not prove authorship [i.e., A.L.'s true voice] and therefore was not a reliable way to assess A.L.'s learning." (*Id.*) The District reiterated that A.L. could use his letterboard or a keyboard to communicate if he was able to do so without the use of a partner. (*Id.*) The District also agreed to revise A.L.'s IEP for him to attend another regular education health course (and a complementary one-on-one reading course) and agreed that District would review videos of him using S2C to complete homework with his parents. (ODR1639.) Although the District expressed doubts about the efficacy of the S2C method, the IEP prepared following this meeting provided, "If [A.L.] brings a letter board and a communication partner to school, the [Lower Merion] team will allow their use as a reasonable accommodation under ADA." (ODR1708.) A.L.'s parents rejected the proposed IEP revisions on December 21. (ODR2202.)

Following his withdrawal from high school, A.L. has continued his education from home, working with six private tutors who he typically meets with for one hour twice a week.[11] (ODR0313.) A.L. uses S2C with all of his tutors. (*Id.*) A.L. reads novels and has expressed a desire to earn a high school diploma and pursue post-secondary education. (*Id.*)

---

[11] A.L. also took an online history course taught by a professor from the University of Pennsylvania. (ODR0313.)

### C.     Procedural History

On February 27, 2019, Plaintiffs filed a due process complaint with the Pennsylvania Department of Education, claiming that the District failed to provide A.L. with a FAPE beginning in February 2017 by refusing to allow A.L. to use S2C at school and by refusing to train a one-on-one aide to serve as his communication partner.  (*See* ODR3745–50.)  Plaintiffs also claimed that the District procedurally violated the IDEA by refusing to conduct an independent educational evaluation despite Plaintiffs' repeated requests.  (*Id.*)  Plaintiffs sought compensatory education for the period from February 27, 2017 through the end of the 2017–2018 school year, reimbursement for the private program they developed for A.L. for the 2018-2019 school year, and reimbursement for the evaluation of A.L. by their neuropsychologist. (ODR3750.)  Plaintiffs also alleged the District discriminated against A.L. in violation of Section 504 and the ADA and sought damages and attorneys' fees.  (*Id.*)

The Hearing Officer heard three days of testimony and reviewed thousands of pages of record evidence.  (*See* ODR0042–339; *see generally* ODR0372–3738.)  On December 15, 2019, he issued an opinion concluding that the District had provided A.L. with a FAPE.  (*See* ODR0008–40.)  He based this conclusion, in large part, on the District's witnesses who he found credibly testified that S2C was not a reliable means of communication for A.L.  (ODR0039.) The Hearing Officer also found that the District committed a procedural violation when it did not file for a due process hearing after Plaintiffs requested an independent evaluation but the Officer concluded that this violation was harmless because A.L. received a FAPE.  (ODR0036.) Accordingly, he denied Plaintiffs' request for compensatory education, tuition reimbursement, and reevaluation reimbursement.  (*See* ODR0008–40.)  And, although the Hearing Officer determined that he did not have jurisdiction over the ADA claim, he concluded that, even if he had jurisdiction, Plaintiffs had "not established that the failure of the school district to provide

Spelling to Communicate methodology with an adult communication partner constitutes a violation of the ADA." (ODR0039.) He found that Plaintiffs did not show that the District's failure to provide a communication partner was discrimination on the basis of a disability in violation of Section 504 and thus denied Plaintiffs' request for damages and attorneys' fees under the Section 504 and the ADA. (*Id.*)

On March 12, 2020, Plaintiffs filed a complaint in this Court appealing the Hearing Officer's decision. (Doc. No. 1.) Plaintiffs sought review of the Hearing Officer's decision and brought separate claims against the District for intentional discrimination in violation of Section 504 and the ADA. (*Id.* at 16–20.) The Court held that Plaintiffs' Section 504 and ADA claims were duplicative of the administrative appeal but gave Plaintiffs the opportunity to amend their complaint. *J.L. v. Lower Merion Sch. Dist.*, Civil Action No. 20-1416, 2021 WL 949456 (E.D. Pa. Mar. 12, 2021). Plaintiffs amended their complaint in an attempt to differentiate the Section 504 and ADA claims from the claim that A.L. was denied a FAPE. (Doc. No. 33.)

After Plaintiffs amended their complaint and the District filed an amended answer, the Court issued a Scheduling Order setting this case on two tracks: one schedule governed the Section 504 and ADA claims and the other governed the administrative appeal.[12] (Doc. No. 34.) As to the Section 504 and ADA intentional discrimination claims, both parties moved for summary judgment. (Docs. No. 61 & 64.) The Court granted summary judgment in favor of the District because Plaintiffs' intentional discrimination claims sought a remedy for denial of a FAPE, so they were properly addressed at the administrative level (and through the appeal of the

---

[12] The Court set the case on two tracks because, if Plaintiffs stated claims for intentional discrimination unrelated to the denial of FAPE claim, they may have been entitled to a jury trial on those claims, whereas the administrative appeal was to be decided by the Court on the administrative record. (Doc. No. 34.)

Hearing Officer's decision).  *J.L. v. Lower Merion Sch. Dist.*, Civil Action No. 20-1416, 2021 WL 6072815 (E.D. Pa. Dec. 28, 2021).

       As to the administrative appeal, Plaintiffs moved to supplement the administrative record to include A.L.'s testimony, videos of A.L. using S2C, and a peer-reviewed study on the efficacy of S2C as a means for communication for persons with autism.  (Doc. No. 38.)  The Court permitted Plaintiffs to supplement the administrative record with A.L.'s testimony (to be offered using S2C) and four videos of A.L. using S2C in academic settings, but the Court denied Plaintiffs' request to supplement the administrative record with the peer-reviewed study.  *J.L.*, 2021 WL 4262321.  Both parties moved for judgment on the administrative record as to the FAPE-based claims.[13]  (Docs. No. 63 & 65.)  The Court held oral argument on the cross-motions on April 29, 2022.  (Doc. No. 86.)

## II.      STANDARD OF REVIEW

       In IDEA cases, district courts are to conduct a "modified *de novo* review" of a hearing officer's decision.  *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 269–70 (3d Cir. 2003).  The court exercises plenary review over a hearing officer's legal conclusions, *Colonial Sch. Dist. v. G.K. ex rel. A.K.*, No. 17-3377, 2018 WL 2010915, at *2 (E.D. Pa. Apr. 30, 2018), *aff'd*, 764 F. App'x 192 (3d Cir. 2019), but must give "due weight" to a hearing officer's factual findings, *S.H.*, 336 F.3d at 269.  Although a hearing officer's factual findings are considered *prima facie* correct, the court may depart from those findings if it explains why and supports its explanation with citations to the administrative record.  *Id.* at 270.  The court may not, however, "substitute its own notions of sound educational policy for those of local school authorities."  *Id.*

---

[13] Plaintiffs supplemented the administrative record with a declaration from A.L. and videos of A.L. using S2C.  (Docs. No. 38-1, 5-2.)  The Court has considered both pieces of evidence.

(quoting *MM v. Sch. Dist. of Greenville Cty.*, 303 F. 3d 523, 5301 (4th Cir. 2002)).

## III. ANALYSIS

Plaintiffs seek review of the Hearing Officer's decision, which found that the District did not violate the IDEA, Section 504, or the ADA by refusing to allow A.L. to use S2C at school.

### A. IDEA Claim

Plaintiffs have appealed the Hearing Officer's determination that the District provided A.L. with a FAPE from February 2017 through December 2018.  (Doc. No. 1 ¶¶ 114–28.)

### 1. Statutory Framework

The IDEA offers federal funds to states to assist in educating children with special needs. *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017).  In exchange, the states agree to provide a FAPE to all eligible children.  *Id.*  A FAPE includes "special education" and "related services."  *Id.*; *see also* 20 U.S.C. § 1401(9).  "Special education" is "specially designed instruction . . . to meet the unique needs of a child with a disability," and "related services" are the services "required to assist a child . . . to benefit from" their special education.  20 U.S.C. § 1412(a)(1).

The IEP is "the centerpiece of the [IDEA's] education delivery system for disabled children."  *Honig v. Doe*, 484 U.S. 305, 311 (1988).  An IEP is a comprehensive plan prepared by the child's parents, teachers, and school officials detailing how the school will provide the child with the special education and related services that he or she needs.  *Endrew F.*, 137 S. Ct. at 994 (citing 20 U.S.C. § 1414(d)).  An IEP must propose an "educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Id.*  The IDEA sets forth detailed procedures for the preparation of IEPs:

> The IDEA requires that every IEP include "a statement of the child's present levels of academic achievement and functional performance," describe "how the child's disability affects the

20

> child's involvement and progress in the general education curriculum," and set out "measurable annual goals, including academic and functional goals," along with a "description of how the child's progress toward meeting" those goals will be gauged. §§ 1414(d)(1)(A)(i)(I)-(III).   The IEP must also describe the "special education and related services . . . that will be provided" so that the child may "advance appropriately toward attaining the annual goals" and when possible, "be involved in and make progress in the general educational curriculum." § 1414(d)(1)(A)(i)(IV).

*Id.*

If a child's parents believe the education their child is receiving from his or her public school violates the IDEA, they may request an impartial due process hearing.  20 U.S.C. § 1415(f)(1)(A).  The IDEA's administrative process is conducted in compliance with state regulations.  *Id.*  In Pennsylvania, hearings are conducted by "hearing officers," outside contractors hired by the Pennsylvania Secretary of Education.  *See* 22 Pa. Code § 14.162(p)(1). After exhausting their administrative remedies, parents dissatisfied with the hearing officer's decision may seek judicial review in federal or state court.  20 U.S.C. § 1415(i)(2)(A); *see also Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 272 (3d Cir. 2014).  On appeal, the burden of proof falls on the party challenging the hearing officer's decision.  *See Schaffer v. Weast*, 546 U.S. 49, 56–58 (2005).

### 2.    Analysis

Plaintiffs argue that the District ran afoul of the IDEA's substantive and procedural safeguards by failing to provide A.L. with a FAPE, by failing to educate A.L. in the least restrictive environment, and by failing to file for a due process hearing when it denied A.L.'s parents' request for an independent educational evaluation.  (Doc. No. 65-3 at 11–23.)  The Court considers each of these arguments in turn.

**a.** **The Hearing Officer Correctly Found that the District Provided A.L. with a FAPE**

Plaintiffs claim that the District denied A.L. a FAPE for three reasons:  (1) it failed to collaborate with A.L. and his parents; (2) it did not program for A.L.'s communication needs; and (3) it did not set any academic goals for A.L. even though he was enrolled in regular education classes.  (*Id.* at 11–18.)

**i.** **The District Collaborated with A.L. and His Parents**

First, Plaintiffs argue that the District deprived A.L. of educational benefit because it "utterly failed to collaborate" with A.L. and his parents and "dragged its feet" by refusing to determine whether A.L. could use the letterboard for over seventeen months.  (*Id.* at 11.)  The District argues that it made repeated efforts to work with A.L. and his parents to evaluate the S2C method.  (Doc. No. 77 at 5–6.)  The Hearing Officer agreed with the District.  He found that the District "made numerous efforts to investigate the parents' preferred [communication] method" and conducted a "thorough investigation of Spelling to Communicate."  (ODR0029.)

The Hearing Officer's findings are borne out by the administrative record.  Although the District may have hesitated to *implement* S2C given the dearth of research legitimizing the method, it did not "drag[] its feet" in *evaluating* S2C.  The District worked consistently and collaboratively with A.L. and his parents from the fall of 2017 onward to determine whether S2C was an appropriate method for A.L. to use in the academic setting.  Beginning in October 2017, the District considered whether to implement the S2C method but declined to observe A.L. using the method because it was not evidence based.  (ODR0307.)  But just two months later, after hearing about the progress A.L. appeared to be making with S2C from his parents, the District agreed to send two representatives to observe A.L. using the method.  (ODR0209.)  In December 2017, the District's personnel observed A.L. working with his communication partner.

(ODR0105.)  Although they had some concerns regarding the efficacy of the method because they observed A.L.'s communication partner prompting him during the sessions, the District agreed to continue to consider S2C and whether to implement the method.  (*Id.*)  And in January 2018, the District agreed to send additional District representatives to again observe A.L. using S2C to work through a U.S. history study guide.  (ODR0089.)  The District's representatives observed that A.L.'s communication was "flubbled" *until his communication partner got the answer key*, suggesting that the communication partner was guiding A.L.'s answers. (ODR0090.)

Then in April 2018, A.L.'s IEP team heard about A.L.'s success with S2C from his private speech-language pathologist.  (ODR1453.)  In May 2018, the District scheduled a training session, but the School Board refused to authorize the training because S2C was not research based.  (ODR2106.)  Despite this roadblock, the District found a way to move forward with the training in September 2018.  (ODR1641.)  At that training, however, the "facilitator shared that there [was] no current scientific research or data to support the use of letter boarding with a facilitated communication partner" (*id.*), and the District's speech-language pathologist found A.L.'s performance "really inconsistent" (ODR00107).  Additionally, A.L.'s long-standing special education teacher, Mr. Borsch, felt that he "was being trained to prompt [A.L.] to answer on the board."  (ODR0223.)

Although the District ultimately did not agree to use S2C in the academic setting, the record reflects the District's teachers and staff seriously researched and evaluated whether it could be used.  The record also shows that the District's teachers and staff had A.L.'s best interests at heart.  Unfortunately, the District could not overlook the lack of evidence supporting the method and the District's own observations calling the method's reliability into doubt, which

ultimately led to the District's determination that the use of S2C in the classroom was not

appropriate.[14]  (ODR1499.)  It is not the Court's role to second guess the District's decision not

to implement S2C.  *See K.D. ex rel. Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 256

(3d Cir. 2018) (holding that the school district provided the student with a FAPE where, among

other things, it revised the student's IEP to replace one reading program with three other

"research-based programs that provide phonics and reading comprehension instruction");

*Brandywine Heights Area Sch. Dist. v. B.N. ex rel. B.M.*, 248 F. Supp. 3d 618, 635–37 (E.D. Pa.

2017) (holding that a school district provided a student with a FAPE where it crafted his

specially designed instruction on research and evaluations the district conducted).

Plaintiffs also argue that the District refused to collaborate by failing to timely consider

Dr. Robbins's assessment concluding that S2C was an effective means of communication for

A.L.[15]  (Doc. No. 65-3 at 12.)  Pursuant to 34 C.F.R. § 300.502(c)(1), if a parent obtains an

independent educational evaluation and shares the results of that evaluation with the school

district, the school district must consider the report "in any decision made with respect to the

provision of FAPE to the child."  However, as discussed below, *see infra* Section III.A.2.c,

Dr. Robbins's evaluation is not an independent educational evaluation as contemplated by 34

C.F.R. § 300.502,[16] so the District did not violate the IDEA by failing to consider it until the fall

---

[14] Plaintiffs also argue that the District denied A.L. a FAPE because there is no evidence that it "continu[ed] the SETT (Students, Environments, Tasks, Tools) process."  (Doc. No. 65-3 at 13.)  But the record demonstrates that the District continued with the SETT process, and Plaintiffs have not identified any evidence to the contrary.  (*See, e.g.*, ODR1035; ODR1149.)

[15] A.L.'s mother sent the District Dr. Robbins's report on April 4, 2018, three business days before A.L.'s next IEP meeting was scheduled.  (ODR2076.)  The District felt that it was unable to review and consider the report before the meeting, so it offered to postpone the meeting or proceed with the meeting, with the understanding that the District would not be able to discuss the evaluation.  (*Id.*)  A.L.'s parents chose to proceed with the meeting.  (ODR2077.)  On September 12, the District confirmed that it was considering Dr. Robbins's evaluation through the District's own reevaluation.  (ODR2126.)

[16] As discussed below, Dr. Robbins's evaluation does not fall within the bounds of 34 C.F.R.

of 2018.

In sum, the evidence in the administrative record supports the Hearing Officer's

conclusion that the District thoroughly investigated the S2C method, and Plaintiffs' argument

that the District failed to provide A.L. a FAPE because it did not collaborate is not persuasive.

### ii.      The District Did Not Err in Declining to Implement S2C

Next, Plaintiffs argue that the District denied A.L. a FAPE by refusing to implement the

S2C method because A.L. was entirely unable to communicate without S2C.  (Doc. No. 65-3 at

13–18.)  The Hearing Officer concluded that District was not required to implement S2C because

the method was not research based and had not proven reliable and because it is not the parents'

or the Hearing Officer's role to second guess the District's decision about what methodology to

employ.  (ODR0028–33.)  The Court considers the soundness of the Hearing Officer's lines of

reasoning in turn.

*S2C's Reliability.*  The Hearing Officer concluded that the District was not required to

implement S2C because the method was not research based and had proven unreliable during the

District's own observations.  (ODR0028–33.)  The Hearing Officer based this conclusion in part

on the fact that he found the District's witnesses (who testified that S2C did not seem to be an

effective means of communication for A.L.) more credible than Plaintiffs' witnesses (who

testified that S2C was an effective means of communication for A.L.).  (ODR0030–33.)

Specifically, the Hearing Officer found Dr. Robbins's testimony "not credible or persuasive

because [she] was extremely evasive on cross-examination."  (ODR0032.)  He found

Ms. Chaplick's testimony less persuasive because "her testimony was elicited especially on

redirect examination through the use of very leading questions."  (ODR0033.)  He felt that

---

§ 300.502 because she evaluated the S2C method, not A.L.  (*See* ODR2034 (A.L.'s mother requesting "an independent evaluation of these [S2C] strategies by a mutually agreed upon third party").)

A.L.'s mother's testimony was "impaired by her admission that she encourages the student during letter board sessions." (*Id.*)  And he determined that Dr. Ross's credibility was "impaired by her testimony that she consults with the parents concerning medicine changes for the student despite the fact that the student is an adult and can allegedly communicate with the S2C letter board." (*Id.*)

Where a hearing officer makes credibility determinations about witnesses after hearing live testimony, the court "must accept the hearing officer's credibility determinations unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010) (cleaned up).  Plaintiffs argue that the Court should disregard the Hearing Officer's credibility determinations because extrinsic evidence, including A.L.'s own testimony and the videos of A.L. using S2C, demonstrates the effectiveness of the method and corroborates Plaintiffs' witnesses' testimony.  (Doc. No. 65-3 at 22–23.)

The Court agrees with Plaintiffs that these credibility determinations are sweeping and not necessarily supported by the testimonial evidence.  *But critically, there is no extrinsic evidence in the record to rebut these conclusions*.  As discussed in greater detail below, the non-testimonial evidence in the record demonstrates that S2C is not an effective means of communication for A.L.  S2C is not research based (ODR1930); ASHA has issued a position statement that communication methods such as S2C are "not recommended because of prompt dependency" (ODR2813); and A.L. is unable to communicate effectively with a letterboard unless there is a communication partner guiding his answers (ODR0221).  The Court is thus bound to adopt the Hearing Officer's credibility determinations and gives slightly less weight to the testimony of Dr. Robbins, Ms. Chaplick, A.L.'s mother, and Dr. Ross.  *See Jalen Z. v. Sch.*

*Dist. of Phila.*, 104 F. Supp. 3d 660, 674 (E.D. Pa. 2015).

After considering the testimonial and non-testimonial evidence (and giving less weight to the testimony of certain of Plaintiffs' witnesses), the Hearing Officer determined that S2C was not an effective means of communication for A.L. and therefore the District did not deny A.L. a FAPE by refusing to implement S2C, A.L.'s preferred communication method.  (ODR0029–33.) The Court agrees that the Hearing Officer's conclusion is supported by the record and supplemental evidence.  The fact that S2C is not research based and ASHA's position statement certainly support the District's decision not to implement S2C, but the most compelling pieces of evidence are the District's personnel's first-hand observations of A.L. using S2C.  Significantly, the District's personnel consisted of educators and staff, many of whom had worked closely and developed close relationships with A.L. over the years, and all of whom were dedicated to helping him achieve his fullest potential.  Ms. Grimley, the District's speech-language pathologist, observed A.L. using S2C in December 2017.  (ODR0105.)  She testified that A.L.'s communication partner "us[ed] prompts" and would say things like "closer, go get it, left, up, down, while he was poking the letters."  (*Id.*)  Ms. Van Horn, A.L.'s reading teacher, had a similar experience when she observed A.L. using S2C.  (ODR0090.)  She noted that he was "flubbled" and unable to provide the correct answers.  (*Id.*)  Yet, when his communication partner received the answer key, A.L. started answering the questions correctly, which troubled Ms. Van Horn and suggested to her that A.L.'s communication partner was guiding him to the correct answer.  (*Id.*)

And the efficacy of S2C is also called into doubt by the fact that A.L. is unable to communicate on the letterboard without a communication partner holding the board.  A.L.'s own experts could not explain why A.L. needed a communication partner to hold the letterboard

rather than have it placed on an easel in his line of sight, which calls into question whether S2C truly represents A.L.'s authentic voice.  (ODR0059 (A.L.'s pediatrician testifying that A.L. is unable to spell on the letterboard without the assistance of a communication partner).)  Similarly, Plaintiffs suggest that the point of the S2C training is to ensure that the communication partner has a good rapport with the speaker.  (*Id.*)  But it is unclear then why Mr. Borsch, A.L.'s special education teacher, or Ms. Van Horn, A.L.'s reading teacher, both of whom already had a strong rapport with A.L., needed to be trained in the method if the purpose of the training is simply to establish that rapport.  And it is troubling that these experienced educators were unable to successfully use the method with A.L. after having received three days of training.  (*Id.*; ODR0077.)

The Court has also reviewed the videos of A.L. using the S2C methodology and finds these videos further support the District's conclusion that S2C was not A.L.'s authentic voice. The videos show A.L. doing homework or working through lessons with various communication partners, including his mother and his father.  In the "Letter to the District" video, A.L. drafts a letter to the District with his communication partner Emily.  (Doc. No. 38-2 at 9, Ex. P-45.) Sometimes Emily repeats the letters out after A.L. spells them; sometimes she does not. (*Compare id.* at 7:30–8:28 *with id.* at 16:01–17:03.)  About five minutes into the video, A.L. begins spelling gibberish, and Emily pulls the board away and tells him to "take his time."  (*Id.* at 5:10–5:15.)  In the "Homework" video, A.L. is working through a history worksheet with his mother.  (Doc. No. 38-2 at 9, Ex. P-48.)  A.L.'s mother reads multiple choice questions and answers A through D aloud and then holds up a letterboard for A.L. to spell his response.  (*Id.* at 2:22–35.)  A.L. answers several questions correctly.  (*Id.* at 2:42.)  A few minutes in, however, A.L. incorrectly points to the letter "D."  (*Id.*)  His mother does not respond and instead pulls the

letterboard over so that he is then pointing at the letter "C," the correct answer; she proceeds to praise him for answering correctly.  (*Id.* at 3:00–04.)  They then move on to fill-in-the-blank questions.  (*Id.* at 4:00.)  The answer to one of the questions is "Japan."  (*Id.* at 4:08.)  A.L. begins responding by pointing to "G" and then "F."  (*Id.* at 4:08–11.)  His mother pulls the letterboard away to "reset" it.  (*Id.* at 4:11.)  When she puts the board back, he starts pointing to "A."  (*Id.*)  She pulls the board again and re-asks the question.  (*Id.* at 4:12.)  He points to "G," "L," "P," and "E," but his mother leaves the board in place.  (*Id.* at 4:25–28.)  When he gets close to "J," his mother repeats the letter "J," drawing out the word for a while ("Jayyyyyyyy"), and waves A.L. back toward the "J" on the board.  (*Id.* at 4:28.)  Once A.L. points at "J," his mother moves her hand to the left (in the direction of "A"), and he points to "A."  (*Id.* at 4:29.)  She then moves her hand down toward "P"; he points to "P"; she moves her hand back up to "A"; he points to "A"; she moves her hand over toward "N"; and he points to "N."  (*Id.* at 4:29–37.)  Based on these videos, it appears to the Court that A.L.'s communication partners are, to some degree, guiding him to the correct answer, which suggests that S2C is not A.L.'s own voice and supports the District's decision not to implement the method.

The Court acknowledges A.L.'s testimony that S2C is an effective means of communication for him (Doc. No. 65-2 ¶ 27) and the testimony of Plaintiffs' witnesses to the same effect (giving less weight to the testimony of the four witnesses whose credibility the Hearing Officer questioned) (*see* ODR 0047–229).  But that does not outweigh the bulk of the evidence, which goes to the contrary.  Accordingly, the Court finds that the Hearing Officer's conclusions that S2C is not an effective means of communication is supported by the evidence and agrees that the District did not deny A.L. a FAPE by refusing to implement the method.  *See Greenwood v. Wissahickon Sch. Dist.*, 571 F. Supp. 2d 654, 663 (E.D. Pa. 2008) (holding that a

school district was not required to implement facilitated communication to offer the student a FAPE under the IDEA because "the evidence does not show that Angela can effectively communicate utilizing facilitated communication").

*Methodology*.  The Hearing Officer also concluded that the District was not required to implement the S2C method because hearing officers and parents are not permitted to second guess a school district's decision about which methodology to implement to address a disabled student's needs.  (ODR0028–29.)  The Hearing Officer relied heavily on the Third Circuit's decision in *Ridley School District v. M.R.*, 680 F.3d 260 (3d Cir. 2012), in deferring to the District's choice of methodology.  (ODR0027–29.)

In *Ridley*, the student struggled with reading, and the school district issued an IEP proposing to adopt the *Project Read* program to help the student get back on track.  *Ridley*, 680 F.3d at 266.  The parents rejected the IEP and initiated a due process hearing because they wanted the school to implement *The Wilson Reading System* instead.  *Id.* at 278.  The Third Circuit affirmed the district court's ruling that the student's IEP was sufficient even though the parents disagreed with the program adopted.  *Id.* at 275.  The Third Circuit explained that "courts must accord significant deference to the choices made by school officials as to what constitutes an appropriate program for each student" and underscored that school districts are "not required to . . . implement the specific program requested by Parents."  *Id.* at 275, 277.

Here, as in *Ridley*, the District chose not to implement the S2C method but allowed A.L. to use different methods of communication, such as typing and unassisted letterboarding. (ODR1499.)  The District "was not required . . . to implement the specific program requested by [A.L.'s parents]."  *Ridley*, 680 F.3d at 275.  And it is not the parents', the Hearing Officer's, or this Court's role to second guess the communication methodologies the District chose to

implement.  *Id.* at 277.  "[S]chool districts have 'the primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method *most suitable* to the child's needs.'"  *Id.* at 279 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty., v. Rowley*, 458 U.S. 176, 208 (1982)) (emphasis added).  The District researched and observed the method and (justifiably) did not think S2C a *suitable*—let alone the *most suitable*—method of communication for A.L, so it was not required to implement the S2C method.  *See T.L. v. Lower Merion Sch. Dist.*, CIVIL ACTION NO. 15-0885, 2016 WL 3405453, at *17 (E.D. Pa. June 20, 2016) (holding that a school district did not violate the IDEA in declining to implement the parents' preferred reading program because the program the school implemented provided the student with "meaningful educational benefits in light of [his] intellectual potential and individual abilities"); *cf. T.M. ex rel. T.M. v. Quakertown Cmty. Sch. Dist.*, 251 F. Supp. 3d 792, 802 (E.D. Pa. 2017) ("The VB–MAPP is only one type of evaluation method.  The IDEA does not obligate a school district to use a particular methodology to evaluate a student's intellectual potential.").

Plaintiffs attempt to distinguish *Ridley* by claiming that S2C is A.L.'s *only* effective method of communication, so the alternative methods the District implemented were necessarily unsuitable for A.L.  (Doc. No. 65-3 at 15–16.)  But this argument is unpersuasive because the District allowed A.L. to communicate via typing, and the record demonstrates that A.L. is a skilled typist.  (*See* ODR0102 (the District's psychologist testifying that she "knew from discussion and from history that [A.L.] was a very good typist"); ODR0109 (the District's speech-language pathologist testifying that A.L. "actually does really well with keyboarding, he can keyboard his ideas, things he wants using the laptop"); ODR0183 (A.L.'s communication partner testifying that A.L. "also spell[s] on a keyboard"); ODR0222 (A.L.'s special education

teacher testifying that "he could type extremely well" and that "[m]ost of his activities were typed in some regard or another, because [the district] knew that was his strength"); ODR0233 (A.L.'s private reading tutor describing his typing as "phenomenal"); ODR0984 (November 2017 IEP stating that "[A.L.] has made significant progress with his writing and is a fluid typer").)  A.L. also progressed to the point of being able to audit regular education classes without the use of S2C in the classroom setting.  (ODR0212.)[17]

* * *

The record and supplemental evidence support the Hearing Officer's conclusion that the District was not required to implement S2C because it was not an effective means of communication for A.L.

### iii.   The District Did Not Err in Failing to Set Academic Goals Despite A.L.'s Enrollment in Regular Education Classes

Third, Plaintiffs argue that the District denied A.L. a FAPE because it allowed A.L. to participate in regular education courses but did not set any goals to measure his academic and social development in those courses.  (Doc. No. 65-3 at 18.)  The IDEA mandates that a student's IEP "set out 'measurable annual goals, including academic and functional goals,' along with a 'description of how the child's progress toward meeting' those goals will be gauged." *Endrew F.*, 137 S. Ct. at 994 (citing 20 U.S.C. § 1414(d)(1)(A)).  A district's failure to set measurable annual goals constitutes a procedural violation of the IDEA, but plaintiffs are entitled

---

[17] In *Ridley*, the Third Circuit also underscored the importance of peer-reviewed research in determining the appropriateness of programs designed for students.  *Id.* at 279; *see also id.* at 277 (acknowledging that schools "should strive to base a student's specially designed instruction on peer-reviewed research to the maximum extent possible").  Although the Third Circuit declined to set forth a bright-line rule that schools can implement programs *only* if they are research based, the discussion in *Ridley* illustrates the Third Circuit's preference for research-based programs, further supporting the District's decision not to implement S2C because it is not research based.

to recover for such violations only if they "impede[] the child's right to a free appropriate public education." *Rodrigues v. Fort Lee Bd. of Educ.*, 458 F. App'x 124, 127 (3d Cir. 2011); *see also G.N. v. Bd. of Educ. of Twp. Of Livingston*, Civil Action No. 05–3325 (JAG), 2007 WL 2265035, at *7–8 (D.N.J. Aug. 6, 2007) ("The failure to include goals and objectives violates IDEA. However, to elevate this failing to a denial of a FAPE would be elevating form over substance. The true question is whether the failure to include goals and objectives 1) resulted in the loss of educational opportunity, or 2) seriously infringed the parents' opportunity to participate in the process.").

Beginning in the fall of 2017, A.L.'s IEP provided for him to audit regular education U.S. history and health courses.  (ODR0850.)  Although A.L. was auditing these courses, his IEP did not include any academic goals to gauge his progress in the courses specifically.  (*See generally* ODR0844–915.)  Even without set goals, the District monitored A.L.'s progress in these courses: His IEPs detailed the percentage of time he remained "on-task"—or "in class, in seat, quiet, and follow[ing] aide directions"—in the audited courses.  (*See, e.g.*, ODR0985.)  And his regular education teachers provided regular written updates on A.L.'s progress that were included in his IEP.  (*See, e.g. id.* (update from A.L.'s health teacher indicating that A.L. was enrolled in the course "to help promote a healthy lifestyle," noting that A.L. had "some peer interactions" but had "difficulty reciprocating a response," and memorializing A.L.'s behaviors (both positive and disruptive) in class); ODR0986 (update from A.L.'s history teacher noting that he "is able to remain in the class for the entire period with support from his instructional aide," indicating that he "will make utterances or noises on average once every couple of minutes," and stating that he "has been able to keep pace with the current academic assignment[s]").)

The Hearing Officer acknowledged that the District may have committed a procedural

violation by failing to include goals related to the regular education courses A.L. was auditing but concluded that A.L.'s IEPs "were reasonably calculated, in view of the student's individual circumstances, to permit the student to make meaningful educational progress," so the Hearing Officer found that the District did not violate the IDEA. (ODR0031–32.) The Hearing Officer largely based this conclusion on hindsight evidence that A.L. "made substantial progress under the IEPs in effect from February 27, 2017 through the end of the 2017–2018 school year." (ODR0031.)

As a threshold matter, the Court finds that the Hearing Officer erred in basing this conclusion on evidence of A.L.'s progress *after* the IEPs were issued. The Third Circuit has made clear that hearing officers and district courts are to assess whether an IEP provides a FAPE "as of the time it is offered to the student, and not at some later date." *Fuhrmann v. E. Hanover Bd. of Educ.*, 993 F. 2d 1031, 1040 (3d Cir. 1993). "[S]o long as the IEP responds to the [student's] needs, its ultimate success or failure cannot retroactively render it [appropriate or] inappropriate." *Carlisle Area Sch. v. Scott P. ex rel. Bess P.*, 62 F.3d 520, 534 (3d Cir. 1995); *see also K.D.*, 904 F.3d at 255 (holding that a court "may not rely on hindsight to second-guess an educational program that was reasonable at the time").

Although the Hearing Officer should not have based his conclusion on hindsight evidence, the Court agrees that A.L.'s IEPs were reasonably calculated to provide him with a FAPE even though they did not set specific goals to measure his progress in the regular education courses. A.L. was not taking these courses for credit—he was auditing them "to determine how well [he] can handle the rigor in the regular education environment as well as work on socialization and develop greater executive functioning skills." (ODR0982.) The District closely monitored A.L.'s progress in the courses he was auditing, including by tracking

his time on task in each class and soliciting regular updates from the teachers.  (ODR0986.)

Moreover, A.L.'s IEPs set forth his present levels and included functional goals related to the

other courses he was taking and aimed at the ultimate goal of helping A.L. transition into the

community upon the conclusion of his education.  (ODR0853–54.)  For instance, his November

2017 IEP included goals related to his basic math class, where he learned to budget and calculate

prices at grocery stores.  (ODR0854.)  It also included reading and writing goals, such as a goal

that A.L. would "write/type his daily activities with support using a fill in the blank worksheet

with 100% accuracy."  (ODR0855.)

 Despite the District's procedural violation in failing to set academic and social goals to

measure A.L.'s progress in the regular education courses, A.L.'s IEP contained a sufficient

number of other goals and specially designed instructions aimed at providing him with the

fullest, most effective education possible.  Accordingly, the District's decision not to set goals

specific to A.L.'s time auditing the regular education classes did not impede on A.L.'s right to a

FAPE.  *See H.G. ex rel. Davis v. Upper Dublin Sch. Dist.*, No. Civ. A. 13–1976, 2015 WL

1808538, at *18 (E.D. Pa. Apr. 17, 2015) (holding that an IEP provided a FAPE even though it

did not articulate goals because it nevertheless "provide[d] access to meaningful educational

benefits"); *Rodrigues v. Fort Lee Bd. of Educ.*, Civil Action No. 2:08–cv–05736 (SDW)(MCA),

2011 WL 486151, at *7 (D.N.J. Feb. 7, 2011), *aff'd* 581 F. App'x 141 (3d Cir. 2011)

(acknowledging that the school committed procedural violations when it failed to set goals but

concluding that the failures "did not rise to the level of a substantive deprivation"); *G.N.*, 2007

WL 2265035, at *7–8 ("[T]he lack of goals and objectives did not result in the loss of

educational opportunity.").

\*  \*  \*

The District refused to allow A.L. to use S2C in an academic setting after thoroughly

investigating the method and determining that it was not effective.  The District also provided

A.L. with IEPs that set reasonable goals and provided specially designed instructions crafted to

allow A.L. to succeed to the fullest extent possible given his intellectual capabilities.  Based on

this, the Hearing Officer correctly determined that the District provided A.L. with a FAPE, and

because the District provided A.L. with a FAPE, he is not entitled to compensatory education or

tuition reimbursement.

### b.    Plaintiffs Waived the Argument that the District Did Not Educate A.L. in the Least Restrictive Environment

Plaintiffs also argue that the District violated the IDEA by failing to educate A.L. in the

least restrictive argument.  (Doc. No. 65-3 at 18–19.)  The IDEA includes a "mainstreaming

component," which "requires that a disabled child be placed in the least restrictive environment

that will provide him with a meaningful educational benefit."  *L.E. v. Ramsey Bd. of Educ.*, 435

F.3d 384, 390 (3d Cir. 2006).  "The least restrictive environment is the one that, to the greatest

extent possible, satisfactorily educates disabled children together with children who are not

disabled, in the same school the disabled child would attend if the child were not disabled."

*Carlisle Area Sch.*, 62 F.3d at 535.

Plaintiffs raise this argument for the first time in their motion for judgment on the

administrative record:  they did not raise it before the Hearing Officer, nor did they raise it in

their complaint appealing the Hearing Officer's decision.  (*See* ODR0008–40; Doc. No. 1

¶¶ 114–28.)  Because Plaintiffs did not raise this argument before the Hearing Officer, the Court

declines to consider it for the first time on appeal.  *See L.B. ex rel. R.B. v. Radnor Twp. Sch.*

*Dist.*, CIVIL ACTION No. 20-1768, 2021 WL 1224077, at *13 (E.D. Pa. Apr. 1, 2021)

("[B]ecause Plaintiff did not administratively exhaust its claims concerning the goals contained

in L.B.'s IEPs, the Court does not have jurisdiction to rule on those issues."); *D.C. v. Mount Olive Twp. Bd. of Educ.*, Civil No. 12–5592 (KSH), 2014 WL 1293534, at *21 (D.N.J. Mar. 31, 2014) ("[S]everal of the plaintiffs' present arguments were not presented to the agency either in form or in spirit, and thus cannot fairly be deemed exhausted . . . ."); *Centennial Sch. Dist. v. Phil L. ex rel. Matthew L.*, 799 F. Supp. 2d 473, 480 n.3 (E.D. Pa. 2011) (declining to consider argument that the parents "did not explicitly raise . . . at the due process hearing").

### c.   The Hearing Officer Did Not Err in Declining to Reimburse Plaintiffs for the Private Evaluation

Plaintiffs also argue that the Hearing Officer erred in failing to reimburse A.L.'s parents for Dr. Robbins's evaluation.  (Doc. No. 65-3 at 21.)  In October 2017, A.L.'s mother emailed Ms. Serpentine and Mr. Borsch to "discuss moving forward" with S2C and said that she and A.L.'s father "would like to further explore . . . hav[ing] an independent evaluation of the effectiveness of [S2C] by a mutually agreed upon third party."  (ODR2034.)  The Hearing Officer denied Plaintiffs' request to be reimbursed for this evaluation on the ground that this request "was not really a request for an independent educational evaluation as that term is used in special education law" but, rather, a request that the District "evaluate or study the Spelling to Communicate methodology."  (ODR0035–36.)

We agree with the Hearing Officer.[18]  "The parents of a child with a disability have the

---

[18] Although the Hearing Officer concluded that A.L.'s parents did not request an independent evaluation as contemplated by the IDEA regulations, he continued his analysis.  (ODR0036.)  He noted, in dicta, that had the parents' request been proper, the district "erred when it did not file for a due process hearing after receipt of the parents' request" (in violation of 34 C.F.R. § 300.502(b)(1)) but concluded that A.L.'s parents were nevertheless not entitled to reimbursement because the District's failure to do so was "clearly harmless."  (*Id.*)

This conclusion is incorrect as a matter of law—there is no "clearly harmless" exception to the reimbursement available under 34 C.F.R. § 300.502.  If A.L.'s parents had requested to be reimbursed for a private evaluation *of A.L.* and the District had failed to reimburse them or file for a due process hearing, the District would have been in violation of the regulations and would be obligated to reimburse A.L.'s parents.  *M.P. ex rel. V.C. v. Parkland Sch. Dist.*, No. 5:20-cv-04447, 2021 WL 3771814, at *17 (E.D. Pa.

right . . . to obtain an independent educational evaluation *of the child* . . . ." 34 C.F.R. § 300.502(a)(1) (emphasis added). But A.L.'s parents were not seeking an evaluation *of A.L.*; they were seeking an evaluation *of S2C*. (*See* ODR2034 (A.L.'s mother requesting "an independent evaluation of these [S2C] strategies by a mutually agreed upon third party").)

Moreover, parents are entitled to reimbursement for private evaluations of their children only "if the parent disagrees with an evaluation obtained by the public agency." 34 C.F.R. § 300.502(b)(1). It does not matter whether this disagreement arises before or after the parents seek the private evaluation, *see Warren G. v. Cumberland Cty. Sch. Dist.*, 190 F.3d 80, 87 (3d Cir. 1999), but some disagreement must arise at some point for the parents to be entitled to reimbursement at the public's expense, *see M.S. v. Hillsborough Twp. Pub. Sch. Dist.*, 793 F. App'x 91, 93 (3d Cir. 2019). A.L.'s parents did not express disagreement with the District's evaluation of A.L., only with the District's reluctance to implement S2C. (*See* ODR2034.)

Because A.L.'s parents did not request an independent evaluation *of A.L.* and did not disagree with the District's evaluation *of A.L.*, they are not entitled to reimbursement for Dr. Robbins's evaluation.

### B.    *Section 504 and ADA Claims*

Plaintiffs also bring claims under Section 504 and the ADA, alleging that the District discriminated against A.L. on the basis of his disability by refusing to implement S2C. The Hearing Officer found that he did not have jurisdiction over the ADA claim but nevertheless concluded that the District's decision not to implement S2C did not violate Section 504 or the ADA, particularly in light of the District's concerns that the method was not peer reviewed and did not represent A.L.'s authentic voice. (ODR0038–40.)

---

Aug. 25, 2021).

Section 504 and ADA claims are governed by the same standard, *see McDonald v. Pa. Dep't of Pub. Welfare*, 62 F.3d 92, 95 (3d Cir. 1995), so the Court will consider them together. To prevail on a claim brought under either statute, plaintiffs must demonstrate that the student "(1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of her disability." *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009). The parties agree that the first two prongs are satisfied; the only dispute is whether, by refusing to allow A.L. to use S2C in school, the District denied A.L. benefits of the program or otherwise subjected to discrimination because of his disability.  (Doc. No. 64-88 at 9.[19])

Plaintiffs argue the District discriminated against A.L. by refusing to allow him to use S2C and claim the District admitted as much by permitting A.L. to "bring a letter board and communication partner to school" as a reasonable accommodation under the ADA in November 2018.  (*Id.* at 11–12.)  The District argues it was not required to implement a method of communication that was not supported by research and that it did not think was effective for A.L. (Doc. No. 63-2 at 16–17.)

As an initial matter, this Court has already determined in the opinion on the cross-motions for summary judgment that Plaintiffs' Section 504 and ADA claims "arise[] out of the District's alleged denial of a FAPE." *J.L.*, 2021 WL 6072815, at *7.  And we have already

---

[19] Plaintiffs did not make any arguments regarding the Section 504 and ADA claims in their briefing on the cross-motions for judgment on the administrative record; they did, however, raise arguments regarding these claims in connection with the cross-motions for summary judgment.  (*See* Doc. No. 64-88.)  Because the Section 504 and ADA claims arise out of a purported denial of a FAPE, the Court declined to consider the merits of the Section 504 and ADA claims on summary judgment and held that we would consider the Section 504 and ADA claims "on appeal from the hearing officer's decision." *J.L.*, 2021 WL 6072815, at *9.  Accordingly, the Court now considers the arguments Plaintiffs raised in their summary judgment briefing to the extent those arguments are based on evidence available in the administrative record.

determined that the District did not deny A.L. a FAPE, *see supra* Section III.A.2.a, so Plaintiffs are not entitled to relief under Section 504 or the ADA.  *See Richard S. v. Wissahickon Sch. Dist.*, 334 F. App'x 508, 509 n.1 (3d Cir. 2009) ("Appellants' § 504 and IDEA claims are factually indistinguishable, and the resolution of the IDEA claim is therefore also dispositive of the § 504 claim."); *Zachary J. v. Colonial Sch. Dist.*, CIVIL ACTION NO. 19-652, 2021 WL 6072815, at \*14 (E.D. Pa. Feb. 24, 2022) ("Plaintiffs failed to establish that Zachary was denied a FAPE.  The administrative record fails to establish that any benefits were denied or that discrimination occurred.  For these reasons, Plaintiffs' Section 504 and ADA claims fail."); *Gwendolynne S. ex rel. Judy S. v. W. Chester Area Sch. Dist.*, No. 19-cv-3844-JMY, 2021 WL 949483, at \*14 (E.D. Pa. Mar. 12, 2021) ("Plaintiffs failed to establish that Gwendolynne was denied a free, appropriate education, [so] the Section 504 and ADA claims fail.").

Even if the Section 504 and ADA claims were not FAPE based, Plaintiffs have nevertheless failed to establish that A.L. was discriminated against on the basis of his disability. The ADA's "effective communications" regulation requires public entities "to ensure that communications with [students] with disabilities are as effective as communications with others."  28 C.F.R. § 35.160(a).  To this end, schools must "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of [the school]."  *Id.* § 35.160(b)(1).  "In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of individuals with disabilities."  *Id.* § 35.160(b)(2).  "'Primary consideration' means that the public entity shall honor the choice of the individual with a disability unless it can demonstrate that another equally effective means of communication is available, or that the request would result in a fundamental alteration . . . ."

*Fairfield (CT) Bd. of Educ.*, 72 IDELR 165, 859 (OCR 2018).  Put differently, although schools are to give primary consideration to the individual's preferred method of communication, they may implement an alternative method so long as "the alternative aid/or service provided [is] effective."  *Chisolm v. McManimon*, 275 F.3d 315, 327 (3d Cir. 2001).

The U.S. Department of Education's Office for Civil Rights's decision in *Fairfield (CT) Bd. of Educ.*, 72 IDELR 165 (OCR 2018), is instructive.  In *Fairfield (CT) Board of Education*, the student–complainant used a facilitated communication method similar to S2C:  her parents would "hold the board mid-air"; she "would point to letters spelling out words"; and occasionally her parents "would 'reset' the board by taking it away briefly, or would reshape the Student's hand."  *Id.* at 857.  The student requested to use the letterboard and a communication partner at school to communicate with her teachers and peers.  *Id.*  The district allowed the student to use the letterboard but "decided that the board should remain stationary" and should not be held in the air by a communication partner.  *Id.* at 858.  The district explained that it wanted the board to remain stationary "to insure that the communication and spelling was actually [the Student's] and not inadvertently the communication partner's."  *Id.*  The district reported that its concern was based on "training, experience, and the lack of research supporting the use of an adult communication partner holding a letterboard."  *Id.*  The Office of Civil Rights concluded that the district's decision barring the student from using a letterboard with a communication partner did not violate the ADA because "the District's denial was grounded in credible concerns that granting the request could constitute a fundamental alteration to the Student's education program."  *Id.* at 859.

The facts here are nearly identical.  The District declined A.L.'s request to use his preferred communication method, S2C, because the method was not research based and the

District had serious concerns that it was not A.L.'s authentic voice. The District also provided A.L. with alternative communication methods, such as typing, which had proven effective and had enabled A.L. to be in a position by his junior year to audit two regular education classes. And the District allowed A.L. to use his letterboard, just without the assistance of a communication partner holding the letterboard. The District is not required to implement a communication that has not been shown effective.[20] *See Hahn ex rel. Barta v. Linn County, Iowa*, 191 F. Supp. 2d 1051, 1064 (N.D. Iowa 2002) ("In light of the court's finding that Mr. Hahn is not communicating through the use of [facilitated communication], [facilitated communication] is not an effective means of communication for Mr. Hahn in particular; therefore, neither federal nor state law requires the defendants to provide it."). The fact that, in November 2018, the District permitted A.L. to use S2C "as a reasonable accommodation under the ADA" does not change this analysis. The District made this change about a month after A.L. had already stopped attending school. (Doc. No. 89 at 33–34.) They "did not want him to be home" because they felt "that him being home was detrimental to him," so they offered this accommodation "as a concession" in an attempt to get him to come back to school—not because they thought it an effective method of communication. (*Id.* at 34 ("[The District felt that] using the spelling to communicate was detrimental but it was more detrimental for him not to be in school.").)

In sum, Plaintiffs' Section 504 and ADA claims arise out of allegations that he was denied access to his education, not to the school; accordingly, his claims arise out of denial of a FAPE. But the District offered A.L. a FAPE, so the claims fail. And even if the claims were not

---

[20] As discussed in detail above, Plaintiffs have not adduced evidence to demonstrate the efficacy of the S2C method, particularly in light of the credible testimony of District staff who observed A.L. using the method and believed that A.L. was being guided or prompted while using the methodology.

FAPE based, they would nevertheless fail because neither Section 504 nor the ADA requires schools to implement an unproven, ineffective means of communication, even if it is the student's preferred method.  Plaintiffs have thus failed to establish their Section 504 and ADA claims, and the Court grants the District's motion for judgment on the administrative record.

## IV.    CONCLUSION

For the reasons above, Plaintiffs' motion for judgment on the administrative record is denied, and the District's motion for judgment on the administrative record is granted.

An appropriate Order follows.