IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **J.L., et al.**, <br><br> Plaintiffs, <br><br> v. <br><br> **LOWER MERION SCHOOL DISTRICT**, <br><br> Defendant. | **CIVIL ACTION** <br><br> **NO. 20-1416-KSM** |

## MEMORANDUM

**MARSTON, J.**                                                                                                 **November 19, 2024**

Plaintiffs Jennifer Le Pape ("Mother") and Frederic Le Pape ("Father") (collectively, "Parents"), individually and on behalf of their child, Alexandre Le Pape ("Alex"), and Alex, individually, (collectively, "Plaintiffs") bring intentional discrimination claims under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504") against Defendant Lower Merion School District (the "District").[1]  (Doc. No. 33.)  The Court of Appeals for the Third Circuit reversed this Court's grant of summary judgment in favor of the District on Plaintiffs' ADA intentional discrimination claim and grant of judgment on the administrative record in favor of the District on Plaintiffs' ADA and Section 504 intentional discrimination claims, and it remanded to this Court for further proceedings.  (Doc. No. 107.)

---

[1] In their Amended Complaint, Plaintiffs allege that the District violated the ADA and Section 504 by failing to take appropriate steps to ensure that communications with Alex were as effective as communications with others and failing to provide Alex with the appropriate auxiliary aids and services necessary to afford Alex an equal opportunity to participate in and enjoy the benefit of various school services and programming, including academic programming, guidance counselor services, nursing services, community based programming, extracurricular activities, and unstructured social activities. (Doc. No. 33.)

On remand, the District again moved for summary judgment on Plaintiffs' ADA and Section 504 intentional discrimination claims, arguing that Plaintiffs failed to put forth evidence that the District acted with the deliberate indifference required to establish intentional discrimination and that Plaintiffs have not adequately alleged or adduced evidence to support Parents' associational discrimination claims.[2]  (Doc. No. 61; Doc. No. 73; Doc. No. 111.)  Plaintiffs contend that fact disputes preclude entry of summary judgment.  (Doc. No. 68; Doc. No. 110.)

The Court held oral argument on the District's motion on November 4, 2024.  Following oral argument, the Court denied the District's motion as to Alex's ADA and Section 504 claims.  (Doc. No. 124.)  As to Parents' ADA and Section 504 associational discrimination claims, Plaintiffs conceded no claims existed for Father.  (*See* Doc. No. 123; Oral Arg. Tr. 23:7–10, Nov. 4, 2024.)  The Court reserved judgment as to Mother's ADA and Section 504 associational discrimination claims.  (Doc. No. 123; Doc. No. 124.)  For the reasons that follow, the Court grants the District's motion as to those claims.

I.      **Factual Background**

The Court recites only the facts necessary to resolve the District's motion as to Mother's associational discrimination claims.  Viewing the evidence in the light most favorable to Plaintiffs, the relevant facts are as follows.

Alex, who is now an adult, attended schools in the District beginning in kindergarten in 2006.  (Doc. No. 64-36, Jennifer Le Pape Decl. ¶¶ 3, 14.)  Since he was a child, Alex has had a

---

[2] In its denial of the District's petition for rehearing, the Third Circuit noted that its opinion "explicitly does not foreclose on remand summary judgment consideration of [Plaintiffs'] ADA and Section 504 intentional discrimination claims." Order, Doc. No. 78, *Jennifer Binder Le Pape et al. v. Lower Merion Sch. Dist.*, No. 22-2931 (3d Cir. July 12, 2024).

diagnosis of autism and a speech or language impairment. (*Id.* ¶ 3.) Although he has limited verbal speech abilities, Alex describes himself as a non-speaker. (*Id.* ¶ 15; Doc. No. 64-70, Alex Le Pape Decl. ¶¶ 5, 24.) At Lower Merion High School, Alex spent most of his school days in an autistic support classroom with other autistic students and support aides. (Doc. No. 64-70, Alex Le Pape Decl. ¶ 13.) Throughout his educational career, Alex had an individualized education program ("IEP"), which listed curricular and extracurricular goals and enumerated the special education services Alex would receive to advance those goals. (Doc. No. 64-36, Jennifer Le Pape Decl. ¶ 19.)

When Alex was in tenth grade (the 2016–2017 school year), his parents grew increasingly concerned that his communication skills had stagnated (*id.* ¶ 21), so they enrolled him in "spelling to communicate"[3] lessons (*id.*; Doc. No. 64-70, Alex Le Pape Decl. ¶ 17). Alex spent the summer of 2017 learning how to use a letterboard, and when he returned to school for eleventh grade (the 2017–2018 school year), the letterboard was his chosen and preferred method of communication. (Doc. No. 64-36, Jennifer Le Pape Decl. ¶ 24; Doc. No. 64-70, Alex Le Pape Decl. ¶ 60.) Alex was placed in regular education classes (history and health) for the first time in

---

[3] Spelling to Communicate ("S2C") is a method of communication by which a nonverbal speaker points to letters on a laminated alphabet letterboard held by a communication support person to communicate. Plaintiffs' medical and educational professionals have opined that the S2C method, while not an evidence-based practice, is an effective means of communication for Alex. (*See* Doc. No. 64-39, Ltr. from Dr. Wm. Young (opinion from neurology, psychiatry, and headache medicine physician that "the letter board and communication partner is effective communication" for Alex); Doc. No. 64-71, Chaplick Decl. (opinion from speech pathologist that "[t]he letter board was a game changer for [Alex]"); Doc. No. 111 ¶¶ 57–58 (testimony from same speech pathologist, Dr. Chaplick, who testified on behalf of Plaintiffs at due process hearing held pursuant to the Individuals with Disabilities Education Act, that S2C is not evidence-based); Doc. No. 64-84, Stephens Decl. (opinion from family practice physician that "[Alex]'s communication using a letterboard and communication partner is effective communication for him"); Doc. No. 64-86, von Hagen Decl. (opinion from Board Certified Behavioral Analysis that "the letter board is effective communication for [Alex]"); *see also* Doc. No. 64-14, Serpentine Dep. 57:14–58:1 (opinion from speech therapist and special education transition coordinator for the District that "many clinicians, myself included, do not believe" that S2C, as a version of the "Rapid Prompt" communication method, "qualifies as evidence-based practice").)

his educational career (Doc. No. 64-36, Jennifer Le Pape Decl. ¶ 35; Doc. No. 64-70, Alex Le Pape Decl. ¶ 34), but the District did not allow him to use the letterboard in class. Without the letterboard, Alex felt like he was "silenced" and could not meaningfully engage in his coursework. (Doc. No. 64-70, Alex Le Pape Decl. ¶ 35.)

In early 2018, the District allowed Alex to use a letterboard in his reading class, but they did not train anyone to act as his communication support person (Doc. No. 64-70, Alex Le Pape Decl. ¶ 20), so Mother served as Alex's communication partner (Doc. No. 68-2, Jennifer Le Pape Decl. ¶ 16). With the District's permission, Mother also served as Alex's communication partner during an extracurricular civil rights program offered by the District. (Doc. No. 64-36, Jennifer Le Pape Decl. ¶ 33; Doc. No. 68-2, Jennifer Le Pape Decl. ¶ 16.)

In April 2018, the District agreed to train a communication support person but cancelled the training before it took place. (Doc. No. 64-59; Doc. No. 64-60.) When the District cancelled the training, Parents requested that one of them be allowed to serve as a communication support person in Alex's reading class for twelfth grade (the 2018–2019 school year) until the District trained a staff member. (Doc. No. 64-62 at 2.) The District initially agreed to this request (Doc. No. 64-63 at 4), so Mother reduced her work schedule[4] to be able to serve as Alex's communication partner in his reading class (Doc. No. 68-2, Jennifer Le Pape Decl. ¶ 17). The District later reneged, but not until after Mother had already committed to a reduced work schedule. (Doc. No. 64-65 at 3; Doc. No. 68-2, Jennifer Le Pape Decl. ¶ 17.)

During the summer before the start of the 2018–2019 school year, Parents requested that Alex's IEP be updated to allow Alex to attend three regular education classes and participate in "[e]xtracurricular activities" such as "Friendship Circle" with a "[t]rained S2C partner." (Doc.

---

[4] Mother works at Bain & Company, "a strategy consulting firm." (Doc. No. 61-5, Jennifer Le Pape Dep. 6:19–7:13.)

No. 64-62 at 3.) The District did not revise Alex's IEP over the summer (*see* Doc. No. 64-63 at 4), and in September 2018, the District decided that Alex was not allowed to use the letterboard to communicate at school at all (Doc. No. 64-65 at 2–3).

During the fall of 2018, Alex began experiencing increased anxiety and "could not handle the continued stress of being silenced in school." (Doc. No. 67-70, Alex Le Pape Decl. ¶¶ 46, 51–52.) At the recommendation of Alex's psychiatrist, Parents pulled Alex from school because they believed he could not safely attend school without the use of a letterboard and communication partner. (Doc. No. 64-70, Alex Le Pape Decl. ¶¶ 56–57; Doc No. 68-2, Jennifer Le Pape Decl. ¶ 14.) A few weeks after Alex left school, the District revised Alex's IEP to allow him to use a letterboard and communication support person in school but continued to refuse to fund the communication support person. (*See* Doc. No. 64-69, Alex Le Pape IEP, Nov. 28, 2018 ("If Alex brings a letter board and a communication partner to school, the [Lower Merion] team will allow their use as a reasonable accommodation under [the] ADA.").) The revised IEP did not include a transition plan for Alex to return to school following his more than six-week absence, did not include programming to address his "extreme stress and anxiety," and did not include academic and behavioral goals regarding Alex's regular education classes. (*Id.*) Unsatisfied with the District's efforts and concerned about their son's mental health, Parents did not send Alex back to school. (Doc. No. 67-70, Alex Le Pape Decl. ¶ 57.) Instead, they continued homeschooling him, providing him with tutors who instructed him in English/Language Arts, math, science, and social studies. (Doc. No. 61-5, Jennifer Le Pape Dep. 8:5–9:18.)

When Alex left school, Mother took a leave of absence, during which she had to pay for health insurance, and maintained the same reduced work schedule that she had begun initially

when she expected to serve as Alex's communication partner for the 2018–2019 school year. (Doc. No. 68-2, Jennifer Le Pape Decl. ¶¶ 17–19.)  Since then, Mother has not been able to return to her normal work schedule, which was 90% of a full-time schedule.  (*Id.* ¶¶ 17–19.) Mother's salary has been reduced commensurate with her reduced work schedule.  (*Id.* ¶ 19.)

## II.     Legal Standard

Summary judgment is appropriate when the "materials in the record" show that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.  "[A]t the summary judgment stage the judge's function is not [herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  "[T]he inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be no genuine issue as to any material fact, since the complete

failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23 (internal quotation omitted).

### III. Discussion

The only remaining question before the Court is whether to grant the District's motion for summary judgment as to Mother's claims of associational discrimination under the ADA and Section 504.  The District argues that Plaintiffs failed to plead any associational discrimination claims in the Amended Complaint and, therefore, are foreclosed from bringing such claims at the summary judgment stage.  (Doc. No. 61-1 at 18; Doc. No. 73 at 3–4.)  In the alternative, the District argues that Plaintiffs have failed to set forth facts to establish that the District discriminated against Parents and that Parents suffered a separate and distinct injury as a result of that discrimination.  (*Id.*)  While Plaintiffs have conceded that they have not alleged or offered evidence to support associational discrimination as to Father (*see* Doc. No. 123; Oral Arg. Tr. 23:7–10, Nov. 4, 2024), Plaintiffs contend that there are material fact disputes as to the discrimination and resulting direct injury suffered by Mother that preclude summary judgment on Mother's associational discrimination claims (Doc. No. 68 at 25–27).  The Court addresses the District's arguments in turn.

#### A. Plaintiffs' Failure to Plead Mother's Associational Discrimination Claims

The District first argues that it is entitled to summary judgment because Plaintiffs failed to plead associational discrimination in their Amended Complaint and cannot now bring any such claims in opposition to the District's motion for summary judgment.  (Doc. No. 61-1 at 18; Doc. No. 73 at 3–4.)  In response, Plaintiffs have not cited to any part of the Amended Complaint that alleges associational discrimination and instead assert Mother's associational claims based on evidence in the record—mainly, evidence of Mother's lost wages as a result of the leave of

absence and reduced work schedule she took to serve as Alex's communication partner while he attended school and after Alex withdrew from school.  (Doc. No. 68 at 25–27.)

As the District contends, the Amended Complaint—despite stating that Parents are bringing the ADA and Section 504 claims individually as well as on Alex's behalf—fails to plead any allegations as to associational discrimination.  (*See* Doc. No. 33.)  During oral argument, Plaintiffs argued that they did not need to plead associational discrimination in the Amended Complaint for Mother's associational discrimination claims to survive summary judgment.  (Oral Arg. Tr. 23:11–21, Nov. 4, 2024.)  The Court disagrees and finds that Plaintiffs' failure to plead Mother's associational discrimination claims in the Amended Complaint warrants summary judgment on those claims in favor of the District.  *See Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 286 n.57 (3d Cir. 2014) ("A plaintiff may not effectively amend its complaint by raising a new theory of standing in response to a motion for summary judgment.  Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.") (cleaned up and internal quotation omitted); *Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.") (internal quotation omitted); *Diodato v. Wells Fargo Ins. Servs., USA, Inc.*, 44 F. Supp. 3d 541, 557 (W.D. Pa. 2014) (granting summary judgment for defendant on plaintiff's breach of contract claim after rejecting plaintiff's attempt to articulate an amended claim in his summary judgment opposition brief, and noting that "[w]ith reliance on *Bell*, district courts within the Third Circuit routinely reject" attempts to amend a complaint in a summary judgment opposition brief).

Furthermore, the Court declines to treat Mother's associational discrimination claims, which Plaintiffs have raised for the first time in their summary judgment opposition brief, as a

8

constructive motion to amend their Amended Complaint to include these claims. *See Taylor v. Sanders*, 536 F. App'x 200, 203 (3d Cir. 2013) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)."); *Carr v. Gillis Associated Indus., Inc.*, 227 F. App'x 172, 176 (3d Cir. 2007) ("District Courts have broad discretion to disallow the addition of new theories of liability at the eleventh hour."); *Dor v. TD Bank*, No. 21-cv-18955, 2023 WL 9017558, at *10 (D.N.J. Dec. 29, 2023) (declining to treat plaintiff's assertion of additional Title VII claims in his opposition to defendants' summary judgment motion as a constructive motion to amend); *cf. Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 490 (7th Cir. 2023) ("[A] district court retains discretion to treat new claims presented for the first time in briefing as a constructive motion to amend. It will rarely be appropriate to do so.").

### B. Plaintiffs' Failure to Adduce Evidence of Mother's Associational Discrimination Claims

Even if Plaintiffs had properly pleaded Mother's associational discrimination claims in the Amended Complaint, the District argues that summary judgment on those claims would nevertheless be appropriate because Plaintiffs have failed to set forth any facts that establish the District discriminated against Mother and, as a result, Mother suffered a direct injury—two of the requisite elements for an associational discrimination claim. (Doc. No. 73 at 3–4.) The Court agrees.

Non-disabled individuals have standing to bring claims under the ADA and Section 504 based on "their relationship or association with individuals who have a known disability." *Doe v. County of Centre*, 242 F.3d 437, 447 (3d Cir. 2001). While the Third Circuit has not articulated a standard for analyzing associational discrimination claims, district courts within the Third Circuit have routinely applied the following four-factor test to assess such claims: the

9

plaintiff must establish that (1) she has "a logical and significant association with an individual with disabilities;" (2) "the defendant, a public entity, knew of that association;" (3) the defendant "discriminated against the plaintiff because of that association;" and (4) the plaintiff "suffered a direct injury as a result of the discrimination." *See, e.g.*, *D.C. v. Pittsburgh Pub. Schs.*, 415 F. Supp. 3d 636, 666–67 (W.D. Pa. 2019); *S.K. v. N. Allegheny Sch. Dist.*, 146 F. Supp. 3d 700, 712, 717–20 (W.D. Pa. 2015); *see also R.S. by R.D.S. v. Butler County*, 700 F. App'x 105, 109–10 (3d Cir. 2017) (affirming dismissal of parents' Section 504 and ADA claims because their complaint was "devoid of factual allegations from which [the court] may plausibly infer that the parents were personally excluded from participation in or denied the benefits of a covered activity or subjected to discrimination because of their son's disability" (citing *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1142 (11th Cir. 2014)). Associational discrimination "thus requires a separate and distinct denial of a benefit or service to a non-disabled person; it may not be premised on a derivative benefit or harm based on treatment towards a disabled person." *D.C.*, 415 F. Supp. 3d at 666 (internal quotation omitted).

Plaintiffs argue that Mother sustained direct injuries resulting from the District's discrimination against her in the form of lost wages and health insurance coverage due to her leave of absence and reduced work schedule, which she had to take initially to serve as Alex's communication partner in his reading class and later once Alex could no longer attend school. (Doc. No. 68 at 26–27; Doc. No. 68-2, Jennifer Le Pape Decl. ¶¶ 15–19.) But Mother lost wages and health insurance coverage from her leave of absence and reduced work schedule because of the District's actions toward Alex. Mother first reduced her work schedule to serve as Alex's communication partner in his reading class because the District would not provide a trained communication support person for Alex. (Doc. No. 64-63 at 4; Doc. No. 64-65 at 3; Doc. No.

10

68-2, Jennifer Le Pape Decl. ¶ 17.)  And she later took a leave of absence and continued to maintain a reduced work schedule when Alex could no longer attend school because the District prohibited him from using a letterboard and communication partner.  (Doc. No. 64-70, Alex Le Pape Decl. ¶¶ 56–57; Doc No. 68-2, Jennifer Le Pape Decl. ¶¶ 14, 18–19.)

      Here, Plaintiffs have only offered evidence of Mother's injuries that stem from the District's treatment of Alex, and such derivative injuries cannot serve as the basis of an associational discrimination claim.  *See, e.g.*, *D.M. v. East Allegheny Sch. Dist.*, No. 22-cv-00110, 2023 WL 2139887, at *5–6 (W.D. Pa. Feb. 21, 2023) (dismissing parents' associational discrimination claims based on "their declining health from the stress, taking leave from work under the Family Medical Leave Act, and relocating to another school district for [their daughter] to finish her studies" because these injuries derive from the defendant's actions taken against their daughter—i.e., the defendant's continuous failure to provide sufficient supervision and support for their daughter—and parents have not alleged that they "were denied a separate or distinct benefit"); *D.C.*, 415 F. Supp. 3d at 666–67 (dismissing mother's and grandfather's associational discrimination claims because they allege indirect, derivative emotional and financial injuries that occurred because of the defendant's denial of appropriate behavior support to student rather than "actions directed at" mother and grandfather); *Souders v. Sch. Dist. of Phila.*, No. 18-cv-2167, 2018 WL 5117196, at *5 (E.D. Pa. Oct. 19, 2018) (dismissing parents' associational discrimination claims premised on parents' "alleged emotional and financial injuries, physical and social isolation and loss of consortium [that] derive from [their son's] own exclusion from school" and holding that school does not provide a distinct benefit for parents because "its purpose is to educate students and . . . continue [their] progress toward independence[,]" and "[t]hough many parents . . . may come to view schools as institutions

11

which provide respite from caring for their children and give them some enhanced social and occupational opportunities, those are (unlike daycare) not reasons why parents send their children to school"). Without evidence of any direct injury suffered by Mother as a result of the District's discrimination against her, Plaintiffs cannot, as a matter of law, maintain Mother's associational discrimination claims under the ADA and Section 504. Accordingly, the District is entitled to summary judgment on those claims.

## IV.    Conclusion

For the reasons set forth above, the Court grants the District's motion for summary judgment as to Mother's ADA and Section 504 associational discrimination claims. An appropriate Order follows.