**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **J.L., et al.**, | **CIVIL ACTION** |
| Plaintiffs, | |
| *v.* | **NO. 20-1416-KSM** |
| **LOWER MERION SCHOOL DISTRICT**, | |
| Defendant. | |

**MEMORANDUM**

MARSTON, J.                                                    December 26, 2024

Plaintiffs Jennifer Le Pape ("Mother") and Frederic Le Pape ("Father") (collectively, "Parents"), on behalf of their child, Alexandre Le Pape ("Alex"), and Alex, individually, (collectively, "Plaintiffs") bring intentional discrimination claims under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504") against Defendant Lower Merion School District (the "District"). (Doc. No. 33.)

To support their claims, Plaintiffs intend to use the expert testimony of several medical professionals—including Dr. Barry Prizant, Dr. Wendy Ross, Dr. Manely Ghaffari, and Dr. Anne Robbins—as evidence that Spelling to Communicate ("S2C"), which uses a letterboard and communication partner, is Alex's preferred communication method. (*See* Doc. No. 62-2, Expert Report of Dr. Prizant; Doc. No. 62-3, Expert Report of Dr. Ross; Doc. No. 62-4, Expert Report of Dr. Ghaffari; Doc. No. 62-6, Expert Report of Dr. Robbins.) Plaintiffs intend to present this expert testimony to show that this is a method through which Alex effectively communicates in his own, authentic voice. (*See id.*) Plaintiffs also intend to use the expert testimony of Dr. Amy Laurent, a developmental psychologist and registered occupational

therapist with expertise in developing educational programs and environments for autistic individuals, as evidence of the necessity of trusted communication partners to support autistic individuals in the areas of social communication and emotional regulation. (*See* Doc. No. 62-5, Expert Report of Dr. Laurent.)

The District has moved to preclude the expert reports and testimony of Dr. Prizant, Dr. Ross, Dr. Ghaffari, Dr. Robbins, and Dr. Laurent as irrelevant under Federal Rule of Evidence 401 and inadmissible under the standard outlined in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (Doc. No. 62.) Alternatively, the District has requested a hearing pursuant to Federal Rule of Evidence 104(a) to "decide the preliminary question concerning whether S2C is sufficiently reliable to permit expert opinion concerning its use and allow testimony and evidence purportedly elicited through use of S2C." (*Id.* at 6.) For the reasons discussed below, the District's motion is granted in part and denied in part.

## I.     Background

The Court has set out the facts underlying this case more fully in prior opinions, including most recently in its Memorandum ruling on the District's motion for summary judgment (Doc. No. 125). Because the Court writes primarily for the parties, we do not repeat those facts at length in this Memorandum and, instead, include only a brief overview of the S2C method of communication as used by Alex, Plaintiffs' claims, and the contents of the expert reports that the District seeks to exclude.

### A.     S2C

Alex, who is now an adult, attended schools in the District beginning in kindergarten in 2006. (Doc. No. 64-36, Jennifer Le Pape Decl. ¶¶ 3, 14.) Since he was a child, Alex has had a diagnosis of autism and a speech or language impairment. (*Id.* ¶ 3.) Although he has limited

2

verbal speech abilities, Alex describes himself as a non-speaker. (*Id.* ¶ 15; Doc. No. 64-70, Alex Le Pape Decl. ¶¶ 5, 24.)  At Lower Merion High School, Alex spent most of his school days in an autistic support classroom with other autistic students and support aides.  (Doc. No. 64-70, Alex Le Pape Decl. ¶ 13.)  Throughout his educational career, Alex had an individualized education program ("IEP"), which listed curricular and extracurricular goals and enumerated the special education services Alex would receive to advance those goals.  (Doc. No. 64-36, Jennifer Le Pape Decl. ¶ 19.)

When Alex was in tenth grade (the 2016–2017 school year), his parents grew increasingly concerned that his communication skills had stagnated (*id.* ¶ 21), so they enrolled him in S2C lessons (*id.*; Doc. No. 64-70, Alex Le Pape Decl. ¶ 17).  S2C is a method of communication by which a nonverbal speaker communicates by pointing to letters on a laminated alphabet letterboard held by a communication support person.[1]  (Doc. No. 111 ¶ 48; *see* Doc. No. 64-36, Jennifer Le Pape Decl. ¶¶ 22–23.)  Alex spent the summer of 2017 learning how to use a letterboard, and when he returned to school for eleventh grade (the 2017–2018 school year), the letterboard was his chosen and preferred method of communication.  (*Id.* ¶ 24; Doc. No. 64-70, Alex Le Pape Decl. ¶ 60.)  Alex was placed in regular education classes (history and health) for the first time in his educational career (Doc. No. 64-36, Jennifer Le Pape Decl. ¶ 35; Doc. No. 64-70, Alex Le Pape Decl. ¶ 34), but the District did not allow him to use the letterboard in class.  Without the letterboard, Alex felt like he was "silenced" and could not meaningfully engage in his coursework.  (Doc. No. 64-70, Alex Le Pape Decl. ¶ 35.)

---

[1] The Court uses the terms "communication support person," "communication partner," and "communication regulation partner ('CRP')" interchangeably throughout this Memorandum, as used by the parties in their briefing and the experts in their reports that are the subject of the District's pending motion.

Parents made repeated requests throughout the 2017–2018 and 2018–2019 school years that Alex be permitted to use a letterboard throughout the school day and that the District train a communication support person to assist Alex.  (*See* Doc. Nos. 64-42–64-43; Doc. Nos. 64-46–64-48; Doc. Nos. 64-50–64-62; Doc. No. 64-64.)  But the District denied those requests or, in some instances, permitted Alex to use a letterboard but did not agree to train anyone to act as his communication support person or otherwise permit either Parent to serve as Alex's communication support person.  (*See* Doc No. 64-70, Alex Le Pape Decl. ¶ 20; Doc. Nos. 64-42–64-43; Doc. No. 64-47; Doc. Nos. 64-59–64-60; Doc. No. 64-63; Doc. No. 64-65.)  The District based its decisions on its concerns that S2C was not an evidence-based practice and lacked research to support its efficacy, that they had not observed its efficacy for Alex, and that the S2C training that District employees ultimately received was unsuccessful.  (*See* Doc. No. 111 ¶¶ 54–58, 82–85, 87–103, 124–35, 138–44.)

Ultimately, during the fall of 2018 and at the recommendation of Alex's psychiatrist, Parents pulled Alex from school because they believed he could not safely attend school without the use of a letterboard and communication partner.[2]  (Doc. No. 64-70, Alex Le Pape Decl. ¶¶ 55–57; Doc No. 68-2, Jennifer Le Pape Decl. ¶ 14.)  A few weeks after Alex left school, the District revised Alex's IEP to include a Specially Designed Instruction ("SDI") that allowed Alex to use a letterboard and communication support person in school, but continued to refuse to fund the communication support person.  (*See* Doc. No. 64-69, Alex Le Pape IEP, Nov. 28, 2018 ("If Alex brings a letter board and a communication partner to school, the [Lower Merion] team will allow their use as a reasonable accommodation under [the] ADA."); Doc. No. 64-33.)

---

[2] Alex's psychiatrist, Dr. Ghaffari, stated that Alex was experiencing increasing stress, anxiety, aggression, and self-injurious behaviors during the fall of 2018, such that Alex's continuing attendance at school without the use of a letterboard and communication partner would lead to further deterioration of his mental health and worsening of his aggression and self-injurious behaviors.  (*See* Doc. No. 64-76.)

Unsatisfied with the District's efforts and concerned about their son's mental health, Parents did not send Alex back to school but instead continued homeschooling him through the use of private tutors.  (Doc. No. 64-70, Alex Le Pape Decl. ¶ 57; Doc. No. 61-5, Jennifer Le Pape Dep. 8:5–9:18.)

> B.     **Plaintiffs' ADA and Section 504 Intentional Discrimination Claims**

Plaintiffs bring ADA and Section 504 intentional discrimination claims against the District based on the District's refusal to allow Alex to use a letterboard and to fund a communication support person for Alex at school.  (Doc. No. 33 ¶¶ 134–76.)  They contend that S2C was an effective means of communication for Alex as well as Alex's preferred communication method.  (*Id.*)  Plaintiffs allege that the District violated the ADA and Section 504 by failing to take appropriate steps to ensure that communications with Alex were as effective as communications with others and failing to provide Alex with the appropriate auxiliary aids and services necessary to afford Alex an equal opportunity to participate in and enjoy the benefit of various school services and programming.  (*Id.*)

> C.     **Expert Reports**

In support of their claims, Plaintiffs have produced the expert reports of Dr. Prizant, Dr. Ross, Dr. Ghaffari, and Dr. Robbins opining on the effectiveness of the letterboard and communication support person (S2C) as a means for Alex to communicate (*see* Doc. Nos. 62-2– 62-4; Doc. No. 62-6), and the expert report of Dr. Laurent opining on the pivotal role that trusted communication partners serve to enable autistic individuals to develop in the areas of social communication and emotional regulation (*see* Doc. No. 62-5).  The District has moved to preclude all of these opinions as irrelevant under Federal Rule of Evidence 401 and inadmissible under the standard outlined in Federal Rule of Evidence 702 and *Daubert*, and has alternatively requested a hearing pursuant to Federal Rule of Evidence 104(a) to "decide the preliminary

question concerning whether S2C is sufficiently reliable to permit expert opinion concerning its

use and allow testimony and evidence purportedly elicited through use of S2C." (Doc. No. 62.)

The Court held a *Daubert* hearing on December 2, 2024, at which Dr. Ross and Dr. Robbins

testified. (*See generally* Dec. 2, 2024 Hr'g Tr.)

## II.    Legal Standard

Federal Rule of Evidence 702 outlines the conditions that must be met for a witness to

testify as an expert:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[3]  This Rule requires the trial judge to act as a "gatekeeper," ensuring that "any

and all expert testimony or evidence is not only relevant, but also reliable." *Pineda v. Ford*

*Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (cleaned up); *see also Sikkelee v. Precision*

*Airmotive Corp.*, No. 07-cv-00886, 2021 WL 392101, at *2 (M.D. Pa. Feb. 4, 2021) ("A district

court exercises more control over experts than over lay witnesses," because "expert evidence can

---

[3] Rule 702 was amended in December 2023, after the parties submitted their briefing on the District's pending motion. *See* Supreme Court Order, April 24, 2023. Rule 702, as amended, applies to all pending cases "insofar as just and practicable." *Id.* Accordingly, the Court uses the current language of Rule 702.

be both powerful and quite misleading" given "the difficulty in evaluating it." (internal quotation omitted)). "*Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999).

To be admissible under Rule 702, expert testimony must satisfy "three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Pineda*, 520 F.3d at 244. These factors are often referred to as "qualification," "reliability," and "fit." *See Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) ("We have explained that Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit.").

"Qualification requires that the witness possess specialized expertise." *Pineda*, 520 F.3d at 244 (cleaned up). However, the Third Circuit has "interpreted this requirement liberally," *see In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994), and has counseled that "a broad range of knowledge, skills, and training qualify an expert," *id.*; *see Schneider ex rel. Schneider*, 320 F.3d at 404 (same).

Under the reliability prong, an "expert's testimony is admissible so long as the process or technique the expert used in forming the opinion is reliable." *Pineda*, 520 F.3d at 247 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 742). In other words, the proffered testimony "must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation," and the "expert must have good grounds for his or her belief." *Schneider ex rel. Schneider*, 320 F.3d at 404 (cleaned up).

Last, the "expert testimony must fit the issues in the case," meaning the "expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Id.*; *see also Daubert*, 509 U.S. at 591 ("Fit is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes."). While Federal Rule of Evidence 704 permits expert opinions that "embrace[ ] an ultimate issue to be decided by the trier of fact, an expert witness is prohibited from rendering a legal opinion" because "[s]uch testimony . . . would usurp the District Court's pivotal role in explaining the law to the jury." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006). Accordingly, "the District Court must ensure that an expert does not testify as to the governing law of the case." *Id.*

The party proposing the expert witness must show that each prong—qualification, reliability, and fit—is satisfied by a preponderance of proof. Fed. R. Evid. 702; *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000); *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 743 & 744 n.11 (explaining that the proponent must make more than a prima facie showing that a technique is reliable); *Ellison v. United States*, 753 F. Supp. 2d 468, 476 (E.D. Pa. 2010) ("The burden is on the proponent of the evidence—here the plaintiff—to establish admissibility by a preponderance of the evidence."). However, at all times, we must remember that the Rules of Evidence generally "embody a strong preference for admitting any evidence that may assist the trier of fact," and Rule 702 specifically has a "liberal standard of admissibility." *United States v. Downing*, 753 F.2d 1224, 1230 (3d Cir. 1985); *see also Oddi*, 234 F.3d at 156 ("The test is not whether the expert might have done a better job." (cleaned up)).

## III.  Discussion

As an initial matter, the District argues that the testimony of each of Plaintiffs' five contested experts is irrelevant to the "threshold issue" of the case—i.e., "whether [Alex]

8

communicates his own, authentic voice using S2C, the specific methodology Parents requested the District incorporate in [Alex's] IEP and related District programming"—under Federal Rule of Evidence 401.  (Doc. No. 62-1 at 4–5, 10, 12–13, 15–16.)  The District contends that none of these experts "opine on the validity of the S2C methodology, and instead, provide opinions regarding 'letter boards' and 'communication partners.'"  (*Id.* at 5; *see id.* at 10, 12–13, 15–16.)

This is a distinction without a difference for purposes of the expert opinions at issue.  It is undisputed that (1) the S2C method of communication involves Alex forming words by pointing to letters on a laminated letterboard held by a communication partner, and (2) Plaintiffs and the District referred to S2C by both its official name and its components during their extensive back-and-forth discussions and planning regarding incorporating S2C into Alex's school regimen.  (*See, e.g.*, Doc. No. 111 ¶ 48 ("S2C involves the student pointing to letters on a laminated letter board held in mid-air by an adult communication partner); *id.* ¶¶ 106–08, 152; Doc. No. 64-69, Alex Le Pape IEP, Nov. 28, 2018 ("If Alex brings a letter board and a communication partner to school, the [Lower Merion] team will allow their use as a reasonable accommodation under [the] ADA.").)  Accordingly, that the experts at issue opine on the efficacy of Alex's use of a letterboard and communication partner rather than explicitly opining on the efficacy of Alex's use of "S2C"—or, in the case of Dr. Laurent, the efficacy of communication partners for autistic individuals rather than the efficacy of communication partners in the context of S2C—does not render their testimony irrelevant under Rule 401.

Having rejected this general objection, the Court considers the admissibility of each of the five experts' testimony under Federal Rule of Evidence 702 and *Daubert* in turn.

## A.    Dr. Barry Prizant

Dr. Prizant is a speech-language pathologist and psycholinguist who holds a Certificate of Clinical Competence ("CCC-SLP") from the American Speech-Language-Hearing

Association ("ASHA").  (Doc. No. 62-2 at 1.)  Dr. Prizant currently serves as Director of

Childhood Communication Services ("CCS"), "a private practice providing consultation and

evaluation services," which position he has held since 1998.  (*Id.*)  He also serves as a Visiting

Scholar at Brown University, which position he has held since 2014.  (*Id.*)  Dr. Prizant has "close

to 50 years' experience as a clinical scholar, consultant, researcher and program consultant to

children and older persons with Autistic Spectrum Disorders (ASD) and related

neurodevelopmental disabilities and their families."  (*Id.*)  This includes over 20 years in

academia at colleges, universities, and medical schools as a Professor of Communication

Disorders, Associate Professor of Child and Adolescent Psychiatry, and Adjunct Professor in the

Center for Study of Human Development, during which he "developed specialty tracks in autism

and language disabilities" in master's and doctoral programs, as well as six years working as

Founder and Director of the Communication Department at Bradley Children's Psychiatric

Hospital.  (*Id.*)

　　　　In his report, Dr. Prizant opines that "[Alex] is an intentional communicator who is the

author of his messages using a letterboard with support from Communication Regulation

Partners (CRPs)" and "[Alex] expresses complex observations, thoughts, wants, and needs with a

letterboard and CRP."  (*Id.* at 4.)  Dr. Prizant further opines that the use of a letterboard with

support from CRPs "is an evidence-based practice for [Alex] given that he communicates

effectively with different partners across different situations," such that "restricting [Alex's]

access to the use of S2C with a communication regulation partner is inconsistent with and a

violation of current concepts of evidence-based practice – the very nature of communication

support needed for a non-speaking person on the autism spectrum."  (*Id.* at 8, 24–25.)  Dr.

Prizant bases his opinions on his review of "approximately 185 minutes of videos of [Alex]

communicating with a letterboard and CRP;" his own interview with Alex via Zoom; "the documented observations of others who know him well," including Dr. Ross, Dr. Ghaffari, and Dr. Robbins; and "years of experience at a clinical and research level in analyzing communication in non-disabled and disabled populations." (*Id.* at 4, 8.)

The District argues for the exclusion of Dr. Prizant's expert report and testimony because he is not qualified to testify, his report is not reliable, and his testimony will not assist the trier of fact in this case because it does not address S2C. (Doc. No. 62-1 at 10–12.) For the reasons that follow, the Court will grant in part and deny in part the District's motion to preclude Dr. Prizant's expert report and testimony.

### 1.    Qualification

The District argues that Dr. Prizant "is not qualified to testify because he has no expertise in the field of augmentative and alternative communication [('AAC')] . . . nor does his resume reflect experience in a [sic] facilitated communication research or the clinical investigation of authorship in facilitated encounters – which is at the heart of this case." (*Id.* at 10.) Plaintiffs counter that Dr. Prizant is "eminently qualified to opine on [Alex's] communication and communicative intent" based on his "close to 50 years' experience as a clinical scholar, researcher, and program consultant to children and older persons with autism and related neurodevelopmental disabilities and their families" and his "research and clinical interests [that] include understanding language, the communicative characteristics of children with social communicative disabilities including autism, and the relationships between communication disorders and emotional/behavioral disorders." (Doc. No. 67 at 16, 22.)

Dr. Prizant has his Ph.D. in Communication Disorders and Sciences and nearly 50 years of clinical, research, teaching, and consulting experience with communication disorders, including autism, as an ASHA-certified speech pathologist and psycholinguist. (*See* Doc. No.

62-2 at 1–4; *see generally id.* at 37–49, Abbreviated Curriculum Vitae of Dr. Prizant.)  His

extensive research and clinical interests include, among others, "understanding language and

communicative characteristics of children with social-communicative disabilities including

autism, the relationships between communication disorders and emotional/behavioral disorders

in children, and . . . . the use and misuse of evidence-based practice" for individuals with ASD.

(*Id.* at 3.)  Dr. Prizant is the co-author of "the manuals for the *SCERTS Model: A Comprehensive

Educational Approach for Children with Autism Spectrum Disorders* (2006), an

educational/treatment approach currently being implemented in more than a dozen countries."

(*Id.*)

Furthermore, and contrary to the District's assertions, Dr. Prizant's experience includes

"hundreds of consultations for students in various public school districts and private schools"

utilizing AAC systems (*see id.* at 16) and the publication of "more than 130 articles and chapters

on autism, childhood communication disorders, emotional behavioral disorders, and child

development," at least some of which explicitly relate to facilitated communication or other

facilitator-dependent communication methods (*see id.* at 3 ("I also co-authored a chapter titled

Implications of Facilitated Communication for Education and Communication Enhancement

Practices for Persons with Autism in *The Clinical and Social Phenomenon of facilitated

communication* (1993)."); *id.* at 42 (Dr. Prizant's CV lists him as the co-author of "Technical

report on standards of practice for facilitated communication" published in *Journal of the

American Speech-Language-Hearing Association* in 1995)).  The Court thus finds that Dr.

Prizant is qualified to testify as to the efficacy of the letterboard and communication support

person as a means of communication for Alex.

### 2.    Reliability

The District argues that Dr. Prizant's report is not reliable because "[h]e does not rely on any facts or data; he did not utilize any reliable principles and methods to assess whether S2C is an effective and reliable method for [Alex]; and he did not apply any principles and methods to the facts of this case." (Doc. No. 62-1 at 10.)  More specifically, Dr. Prizant "fails to mention, let alone utilize, any empirical tool available to test whether [Alex] is truly using his authentic voice when using the letterboard, like a double blind test, a message passing test, or an authorship test" and "fails to examine the standard practices for S2C, to the extent that there are any, or even state that he is aware of the standard practices and that they were being followed." (*Id.* at 11.)  In response, Plaintiffs claim that the District can address its contentions about the bases for Dr. Prizant's opinions during cross-examination and that based on his "nearly half century of experience," his interview with Alex, and his video observations—a technique that Dr. Prizant has used "extensively in his professional career"—of Alex, Dr. Prizant can reliably opine on the efficacy of Alex's communication with the letterboard and communication partner. (Doc. No. 67 at 22.)

The District hinges its reliability argument on the reliability factors first outlined in *Daubert* and the Third Circuit's decision in *United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985).[4]  (*See* Doc. No. 62-1 at 10–12; Doc. No. 72 at 3–5.)  These factors, however, are neither

---

[4] These factors are:

> (1) whether the method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Pineda*, 520 F.3d at 247–48.

exhaustive nor applicable in every case. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 741

("We now make clear that a district court should take into account all of the factors listed by

either *Daubert* or *Downing* as well as any others that are relevant."); *see also Kumho Tire*, 526

U.S. at 142 (explaining that *Daubert*'s "list of factors was meant to be helpful, not definitive").

"Ultimately, the purpose of the reliability requirement 'is to make certain an expert, whether

basing testimony upon professional studies or personal experience, employs in the courtroom the

same level of intellectual rigor that characterizes the practice of an expert in the field.'" *Keller v.

Feasterville Family Health Care Ctr.*, 557 F. Supp. 2d 671, 676 (E.D. Pa. 2008) (quoting *Kumho

Tire*, 526 U.S. at 152). And the Court must only determine that an expert uses "good grounds to

reach their conclusions, but not necessarily the best grounds or unflawed methods." *In re Zoloft*,

26 F. Supp. 3d 449, 452 (E.D. Pa. 2014).

Here, the Court finds that Dr. Prizant's opinions rest on "good grounds." Dr. Prizant

partially bases his opinions on the efficacy of S2C for Alex on his observation of "approximately

185 minutes of videos of [Alex] communicating with a letterboard and CRP" as well as his own

interview with Alex using a letterboard and CRP via Zoom. (Doc. No. 62-2 at 4–5.)[5] *See In re

Paoli R.R. Yard PCB Litig.*, 35 F.3d at 748–49; *cf. Plantan v. Smith*, No. 22-cv-407, 2024 WL

3048648, at *9–11 (E.D. Va. June 18, 2024) (excluding expert testimony that facilitated

communication is illegitimate because it suffered from "at least two fatal flaws" as to reliability,

_____

[5] Dr. Prizant also bases his opinions on "the documented observations of others who know [Alex]
well"—i.e., the expert reports of Dr. Ross, Dr. Ghaffari, and Dr. Robbins. (Doc. No. 62-2 at 4, 8.) While
"no support exists in the text or history of the Federal Rules of Evidence, or case law to limit an expert
from reviewing and referring to the opinions of other experts," it is not clear from Dr. Prizant's report or
the parties' briefing that Dr. Prizant or other speech-language pathologists typically rely on the
observations of other members of an individual's care team when assessing the efficacy of a particular
communication technique for that individual. *See Keller*, 557 F. Supp. 2d at 681.

14

one of which was that the proffered expert "had no direct observation or interaction with [the individuals engaging in facilitated communication] before he reached his conclusions").

"[W]hen a trial judge analyzes whether an expert's data is of a type reasonably relied on by experts in the field, he or she should assess whether there are good grounds to rely on this data to draw the conclusion reached by the expert." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 749. As part of this analysis, "the judge can of course take into account the particular expert's opinion that experts reasonably rely on that type of data, as well as the opinions of other experts as to its reliability, . . . [and any] other factors he or she deems relevant." *Id.* at 748. Dr. Prizant asserts that he has "50 years' experience assessing language and communicative intent through the review of communications recorded via video," including as part of his doctoral dissertation and peer-reviewed published research, both of which relied on video analysis of children with autism and other communication disorders. (Doc. No. 62-2 at 4.) Dr. Prizant also developed and published the Communication and Symbolic Behavior Scales-Developmental Profile, "a standardized assessment instrument used extensively by researchers and clinicians . . . for analysis of intentional communication" that incorporates video analysis. (*Id.* at 5, 30.) Given this evidence, the Court finds Dr. Prizant reasonably relied on the videos of Alex and his CRP in rendering his opinions.

The District argues that Dr. Prizant's opinions are nevertheless unreliable because they are not based on any empirical tests that have been used to assess the validity of other facilitator-dependent communication techniques like S2C. (*See* Doc. No. 62-1 at 11–12; Doc. No. 72 at 3–5; *see also* Doc. No. 138-3, Rebuttal to Dr. Barry Prizant's Report by Dr. Howard Shane at 3–5.) Both Dr. Prizant and the District's rebuttal expert, Dr. Howard Shane, acknowledge the lack of

peer-reviewed, empirical research on S2C.[6]  (*See* Doc. No. 62-2 at 9–12; Doc. No. 138-2, Report

on the Effectiveness and Appropriateness of Spelling to Communicate (S2C) as a

Communication Approach for Alexandre Le Pape by Dr. Howard Shane, at 15.)  But, considered

together, the expert reports of Dr. Prizant and Dr. Shane reveal that within the broader scientific

community studying facilitator-dependent communication techniques, there is a dispute as to the

efficacy of empirical tests as a means of evaluating such techniques.  (*Compare* Doc. No. 62-2 at

18–19 (Dr. Prizant suggesting that "clinical trials in unfamiliar and anxiety arousing contexts that

are designed to 'test' the authenticity of communication" may not be as valid as observations of

S2C for individuals "with [the] significant social anxiety and social-communicative challenges

definitive of autism") *with* Doc. No. 138-2 at 20–23 (Dr. Shane explaining that he has

consistently utilized double-blind studies in his own research and clinical experience with

facilitated communication to conclude that the facilitator was the originator of all information,

which results are "entirely consistent with a host of other well-controlled research studies aimed

at answering the question of authorship," while also acknowledging that "proponents of

[facilitated communication] often claim that double blind methods to examine authorship fail

because the methods could be perceived as confrontational and the non-speaking person feels

threatened, is nervous, or they freeze up").)

The Court thus finds that Dr. Prizant's lack of empirical testing as a basis for his opinions

does not warrant preclusion of Dr. Prizant's report and testimony.  *In re Zoloft*, 26 F. Supp. 3d

449, 452 (E.D. Pa. 2014); *contrast id.* at 465 (E.D. Pa. 2014) (excluding expert opinions that "are

only made possible by [the expert's] departure from use of well-established epidemiological

---

[6] That said, Dr. Prizant does briefly reference one peer-reviewed study from 2020, entitled "Eye-tracking reveals agency in assisted autistic communication," which Dr. Prizant describes as "demonstrat[ing] efficacy and authenticity for individuals using a letterboard and CRP."  (Doc. No. 62-2 at 10.)

methods" in a case where the expert is not "simply moving into novel terrain, wherein no methodology has yet been well established" but rather where "[t]here exists a well-established methodology used by scientists in the [the expert's] field of epidemiology, and [the expert] herself has utilized it in her published, peer-reviewed work"). Dr. Prizant's lack of underlying empirical testing data to support his opinions, along with any other weaknesses or inadequacies that the District believes exist with respect to Dr. Prizant's conclusions, can be highlighted through effective cross-examination. *See United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) ("A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination." (internal quotation omitted)); *Keller*, 557 F. Supp. 2d at 679.

Dr. Prizant's qualifications—i.e., his nearly 50 years of "experience at a clinical and research level in analyzing communication in non-disabled and disabled populations," including individuals with ASD [and those using S2C]—also help establish the reliability of his methodology. *See, e.g.*, *Pineda*, 520 F. 3d at 248 (listing "the qualifications of the expert witness testifying based on the methodology" as one of several factors the trial court should consider in evaluating whether a particular methodology is reliable); *Arcuri v. PrimeCare Med. Inc.*, No. 20-cv-05408, 2022 WL 3369725, at *4 (E.D. Pa. Aug. 16, 2022) ("[T]he Third Circuit has held that an expert's opinion may be deemed reliable if it is based on the witness's expertise and knowledge of the subject he is testifying about." (citing *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir. 1997))); *Sec. & Exch. Comm'n v. McDermott*, No. 19-cv-4229, 2022 WL 952895, at *12 (E.D. Pa. Mar. 30, 2022) ("[Expert's] testimony [on customs and standards in the investment advisory industry] rests on her years of experience in the industry, and Courts in this

Circuit have allowed experts to offer testimony [as reliable] based on such experience."); *Keller*, 557 F. Supp. 2d at 677 (finding that proffered medical expert's "qualifications assist in establishing the reliability of his methodology"); *see also Taylor v. Se. Pa. Transp. Auth.*, No. 23-cv-2140, 2024 WL 3205209, at *11–12 (E.D. Pa. June 27, 2024) (finding defendant's strict reliance on the Third Circuit's reliability factors to be "somewhat misplaced" where expert's opinions "do not rest upon technical or scientific knowledge, and as such, the methodology used to formulate those opinions will not consist of a scientific formula or mathematical equation" but instead "are based on his 20 years of experience as a testing administrator and a consultant on regulatory compliance").

The Court need not find that Dr. Prizant's methodology "has the best foundation or is correct," only that is reliable enough to warrant the admissibility of Dr. Prizant's opinions. *See Keller*, 557 F. Supp. 2d at 678–79. For the reasons explained above, the Court finds that Dr. Prizant's methodology is sufficiently reliable to admit Dr. Prizant's opinions.

### 3.    Fit

The District argues that Dr. Prizant's report "fails the fit / helpfulness prong because the opinion does not address S2C." (Doc. No. 62-1 at 12.) The Court has already disposed of this argument and finds that Dr. Prizant's opinions as to the efficacy of Alex's use of a letterboard and communication partner are relevant to this case despite Dr. Prizant's failure to consistently characterize Alex's use of a letterboard and communication partner as "S2C." Accordingly, Dr. Prizant will be allowed to testify as to his expert opinion on the efficacy of Alex's use of the letterboard and communication partner as a communication method.

The Court will, however, preclude Dr. Prizant from offering the two corollary opinions with which he concludes his report—(1) that "restricting [Alex's] access to the use of S2C with a communication regulation partner . . . is also a violation of [Alex's] . . . rights under ADA to

have access to a variety of communication supports, including letter boards, that have already

proven effective for him with multiple CRPs," and (2) that "[a] letter board and communication

partner is effective communication for [Alex] under the ADA" (Doc. No. 62-2 at 25)—as

impermissible legal conclusions. *See Berckeley Inv. Grp., Ltd.*, 455 F.3d 195 at 217 & n.23

("[A]lthough a witness may give an opinion as to an ultimate issue, Rules 701, 702, and 403

'stand ready to exclude opinions phrased in terms of inadequately explored legal criteria.'"

(quoting Fed. R. Evid. 704, Advisory Comm. Notes)); *Taylor*, 2024 WL 3205209, at *6

(determining that expert opinions "about what was permitted under the [Department of

Transportation] regulations and whether [defendant's] conduct in [this] case complied with

them" are "opinions which are impermissible under the case law of this Circuit" (citing

*Berckeley Inv. Grp., Ltd.*, 455 F.3d at 218)).

      Relatedly, the Court will exclude Dr. Prizant from testifying as to his "great concern from

a human rights perspective regarding limiting Alex's ability to effectively communicate" and

opining that the District's "restricting [Alex's] access to the use of S2C with a communication

regulation partner . . . is also a violation of Alex's human rights" (*see* Doc. No. 62-2 at 24–25)

because such testimony not only contains an impermissible legal conclusion but also poses the

risks of unfairly prejudicing and confusing the jury that substantially outweigh the minimal, if

any, probative value of the testimony. *See Schneider ex rel. Estate of Schneider*, 320 F.3d at

404; *Berckeley Inv. Grp., Ltd.*, 455 F.3d 195 at 217 & n.23.

* * *

      In conclusion, Dr. Prizant is permitted to opine on the efficacy of S2C as a means of

communication for Alex.  He is not permitted to testify that S2C is effective communication for

19

Alex under the ADA, or that the District's prohibition of Alex's use of S2C at school is a violation of Alex's ADA or human rights.

###    B.    Dr. Wendy Ross

Dr. Ross is a developmental and behavioral pediatrician.  (*See* Doc. No. 62-3 at 1.)  She is Founder of Autism Inclusion Resources and the Center for Pediatric Development, and since 2019, Dr. Ross has been Director of Jefferson Health's Center for Autism and Neurodiversity. (*Id.* at 2–3.)  Autism Inclusion Resources, which has been incorporated into Jefferson Health's Center for Autism and Neurodiversity, "has created programs and contributed to make museums, sporting venues, airports, and airlines more inclusive environments for persons with neurodiversity, including autism."  (*Id.* at 2.)  As Director of Jefferson Health's Center for Autism and Neurodiversity, Dr. Ross "is developing a model for health care at Jefferson that is autism and neurodiverse friendly."  (*Id.* at 3.)

From approximately 2009 to 2019, Alex was a patient in Dr. Ross's developmental pediatric practice, and since graduating from Dr. Ross's practice, Alex has served as an advisor for Dr. Ross in her work at Jefferson Health, "help[ing] create some of the social stories and materials that prepare individuals to come to the doctor" and presenting at two conferences with Dr. Ross.  (*Id.* at 3–4; Dec. 2, 2024 Hr'g Tr. 30:7–32:1.)  Dr. Ross "helped integrate services [for Alex] across disciplines including with [Alex's] psychiatrist, Manely Ghaffari, [Alex's] speech therapist, Susan Chaplick, and Anne Robbins, a doctoral level neuropsychologist."  (Doc. No. 62-3 at 4–5.)  She also "made recommendations to [Alex's] parents and [the District] about his educational needs."  (*Id.* at 5.)

Dr. Ross offers two opinions in her report based on her "observations and clinical judgment."  (*Id.* at 7–9.)  First, she concludes that "the letter board is effective communication for [Alex]," and, furthermore, "[Alex] needs the letter board to communicate," such that "not

letting him use it to communicate silences [Alex]." (*Id.* at 7.) Second, she concludes that being prohibited from using a letter board and communication partner at school has negatively impacted Alex both psychologically and neurologically. (*Id.* at 8–9.) Specifically, Alex has experienced increased anxiety and migraines and engaged in more self-injurious and aggressive behaviors since the District disallowed his use of a letter board and communication partner, all of which renders him unable to "routinely participate in any educational, social, or leisure activities." (*Id.* at 8.)

The District argues for the exclusion of Dr. Ross's expert report and testimony because she is not qualified and, like Dr. Prizant, "fails to base her testimony on data or reliable principles and methods." (Doc. No. 62-1 at 12.) The District further contends that, if the Court allows Dr. Ross to testify, the Court should preclude her testimony "about any information obtained through 'communicating' with [Alex] through S2C or a related facilitated communication methodology because there is no scientific evidence to support the reliability of S2C." (*Id.* at 13.) For the reasons that follow, the Court will grant in part and deny in part the District's motion to preclude Dr. Ross's expert report and testimony.

### 1. Qualification

The District argues that Dr. Ross "is not qualified to testify about the effectiveness of S2C because "[s]he is a pediatrician" and "is not trained in assessing the accuracy or reliability of methodologies of facilitated communication, including S2C." (*Id.* at 12.) Plaintiffs respond that Dr. Ross does not need any such "training" to qualify to testify about the efficacy of S2C for Alex—nor does the District explain what such training would entail, "highlighting that the methods [the District] suggest[s] are not generally accepted. (Doc. No. 67 at 12–13.) Rather, Dr. Ross is qualified because she "is a highly credentialed and accomplished developmental pediatrician who has focused her professional career on patients with autism who often present

with communication disabilities," she "has known [Alex] for more than a decade," and, "[l]ike any other physician—she routinely makes clinical judgments about patients with whom she observes and communicates." (*Id.* at 13.)

"An 'expert's testimony is not limited to the area in which he or she specializes,' but 'the party offering the expert must demonstrate that the expert has the necessary expertise.'" *Keller*, 557 F. Supp. 2d at 675 (quoting *Ferris v. Pa. Fed'n Bhd. of Maint. of Way Emps.*, 154 F. Supp. 2d 736, 743 (E.D. Pa. 2001)). "If the expert testimony falls outside a witness's expertise, the court should exclude it." *Diawara v. United States*, No. 18-cv-3520, 2020 WL 1151162, at *5 (E.D. Pa. Mar. 9, 2020) (quoting *Ferris*, 154 F. Supp. 2d at 743).

Dr. Ross is a board-certified developmental pediatrician whose report, curriculum vitae, and testimony at the *Daubert* hearing establish her extensive educational, clinical, and research experience in diagnosing children and adolescents with autism and providing them with developmental pediatric care by "integrating their medical, educational, and therapeutic plans." (*See* Dec. 2, 2024 Hr'g Tr. 6:5–13, 10:21–11:4; *see generally* Doc. No. 62-3.) She also has robust experience in the development and integration of autism inclusion resources into community programs. (*See* Doc. No. 62-3 at 2–3; Dec. 2, 2024 Hr'g Tr. 11:5–15:3, 16:12–23, 18:21–20:24.)

As Dr. Ross testified and as her report and curriculum vitae also reflect, Dr. Ross does not have education, training, or clinical or research experience in the fields of speech-language pathology, AAC, or facilitator-dependent communication techniques. (*See* Dec. 2, 2024 Hr'g Tr. 49:21–51:20 (Dr. Ross testifying that she has no formal training in speech-language pathology, has not published any peer-reviewed research in the field of speech-language pathology, and has never taught any speech-language pathology classes); *see generally* Doc. No. 62-3.) Rather, Dr.

Ross has some exposure to those fields incidental to her work as a developmental pediatrician for autistic patients. For example, she completed interdisciplinary rotations with speech-language pathologists while completing her fellowship and working as a pediatrician at Children's Hospital Boston and while working as Director of the Department of Developmental Medicine and Genetics at Albert Einstein Medical Center. (*See* Dec. 2, 2024 Hr'g Tr. 49:21–50:13.) And, in her practice as a developmental pediatrician, Dr. Ross interacts with all members of her patients' care teams, which often include speech-language pathologists, as was the case for Alex. (*See id.* 6:21–7:7; Doc. No. 62-3 at 4–5.) Further, the autism diagnostic evaluations that she conducts on her patients require her to assess patients' communication capabilities to some extent. (*See* Dec. 2, 2024 Hr'g Tr. 43:11-45:1, 49:21–50:10.)

With respect to S2C specifically, Dr. Ross's first exposure to S2C was in 2017 when Alex utilized S2C while meeting with Dr. Ross. (*See* Dec. 2, 2024 Hr'g Tr. 29:19–22.) Dr. Ross had no prior experience communicating with Alex through AAC or any facilitator-dependent communication method, and it is not clear whether Dr. Ross had any prior experience with or exposure to AAC or facilitator-dependent communication techniques from her clinical practice or community inclusion work. (*See id.* 42:9–18.) Since 2017, Dr. Ross has had at least a couple of other patients who have used a letterboard and communication partner to communicate, though it is not clear that any of those other patients have successfully communicated using a letterboard and communication partner.[7] (*See* Dec. 2, 2024 Hr'g Tr. 29:23–30:5, 37:13–38:4 (Dr. Ross testifying that her other patients who utilized a letterboard and communication partner "didn't seem able to communicate things that other people would not have known unless they communicated it" and "didn't seem to have a change in their behavior and demeanor after using

---

[7] The Court is also uncertain whether Dr. Ross's patients had been using the S2C method when attempting to communicate with a letterboard and communication partner.

the board.").)  While not through her own practice, Dr. Ross has also had some exposure to autistic individuals using a letterboard (without a communication partner) to communicate through her work with the Autism Society of America.  (*See* Dec. 2, 2024 Hr'g Tr. 71:14–21 (Dr. Ross testifying that she is aware of two members of the Self-Advocate Board of the Autism Society of America who utilize a letterboard to communicate).)

The Court is not convinced that Dr. Ross's exposure to the fields of speech-language pathology and S2C as laid out above constitute any amount of expertise that would qualify her to opine as to the efficacy of S2C as a means of communication for Alex.  *See Diawara*, 2020 WL 1151162, at *6 (excluding expert testimony from plaintiff's treating neurologist on plaintiff's orthopedic injuries, where the neurologist's report failed to explain why his specialties qualified him to opine on orthopedic injuries); *Ferris*, 153 F. Supp. 2d at 744 (concluding that plaintiff's treating physician, who specializes in pain management, is not qualified to testify as to the causation of plaintiff's headaches, insomnia, depression, and sexual dysfunction allegedly suffered because plaintiff was eliminated from his position with defendant, because the physician has no expertise in the diagnosis, treatment, or causes of depression and/or anxiety disorder). And Plaintiffs have not otherwise established that Dr. Ross has researched or has training or experience in communication techniques—facilitator-dependent or otherwise—for minimally verbal or non-verbal autistic individuals like Alex.  *Contrast In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 753–54 (holding that plaintiffs' proffered expert in internal medicine and toxicology, "while arguably a relatively poor clinician and less than fully credible witness," qualifies as an expert to opine on plaintiffs' exposure to the toxic chemicals at issue and the effects of such exposure because she "was on the consulting staff of a hospital"—though neither board-certified nor a practicing physician in internal medicine and toxicology—and "has had extremely broad

24

experience in the field of toxic substances, has written extensively in the field and has consulted for the American Legion Science Panel—a group of experts analyzing scientific issues, such as dioxin poisoning, that affect veterans"). The Court thus finds that Plaintiffs have not proven by a preponderance of the evidence that Dr. Ross is qualified to opine on the efficacy of S2C as a means of communication for Alex.

The Court finds, however, that Dr. Ross is qualified to opine on the psychological and neurological impacts that being prohibited from using a letter board and communication partner at school had on Alex during the course of her treatment of Alex. The Court reaches this conclusion based on Dr. Ross's medical education, extensive clinical and research experience in the field of behavioral and developmental pediatrics, and specific experience treating Alex, including during the time period relevant to this action. (*See* Dec. 2, 2024 Hr'g Tr. 30:7–17, 30:25–31:4; *see generally* Doc. No. 62-3.)

## 2. Reliability

Even if the Court were to find Dr. Ross qualified to opine on the efficacy of S2C as a means of communication for Alex under the Third Circuit's liberal interpretation of the qualification requirement of Rule 702 and *Daubert*, the Court would nevertheless exclude this opinion as unreliable. The District argues that, like Dr. Prizant, Dr. Ross "fails to utilize any testable empirical tools; state a hypothesis; or rely on any peer reviewed standards" and instead, "simply hypothesizes that use of a letterboard yields [Alex's] voice because she saw it for herself during her treatment of [Alex] and other interactions with him." (Doc. No. 62-1 at 12–13.) Plaintiffs counter that Dr. Ross's opinion, based on her observations of Alex's communication, is reliable because Dr. Ross is "a highly trained and skilled developmental pediatrician who exercises clinical judgment based on personal observation every day." (Doc. No. 67 at 13.) As the Court addressed with respect to Dr. Prizant's testimony, the Court is not convinced that Dr.

Ross's lack of empirical testing renders her opinion unreliable, given the dispute among the scientific community as to the efficacy of empirical tests as a means of evaluating facilitator-dependent communication techniques like S2C, as evidenced by the expert reports of Dr. Prizant and Dr. Shane.  However, unlike what they have done with Dr. Prizant, Plaintiffs have not established that Dr. Ross has regularly assessed the efficacy of particular communication techniques utilized by individuals with autism or other communication disorders—let alone how she makes such an assessment.  *See In re Paoli R.R. Yard PCB Litig.*, 3 F.3d at 748–49.  Further, unlike Dr. Prizant, Dr. Ross's qualifications do not bolster the reliability of her methodology, given her limited experience with speech-language pathology, AAC, and other types of facilitator-dependent communication techniques.  *See, e.g.*, *Arcuri*, 2022 WL 3369725, at *4; *Keller*, 557 F. Supp. 2d at 677.

With respect to Dr. Ross's opinion that the District's prohibition of Alex's use of S2C at school negatively impacted Alex psychologically and neurologically, the District argues that while "[Dr.] Ross does not state how she concluded that [Alex] suffered these damages[,] [t]he District believes that she concluded this through 'communicating' with [Alex] through S2C," and the Court should preclude her "testimony about any information obtained through 'communicating' with [Alex] through S2C or a related facilitated communication methodology because there is no scientific evidence to support the reliability of S2C."  (*See* Doc. No. 62-1 at 13.)

As Dr. Ross testified, she formed her opinion on the negative impact of the District's actions on Alex's mental and physical health based on her observations of Alex and information provided by Alex's parents and other members of Alex's care team as part of her treatment of Alex as his developmental pediatrician, all of which is standard information that developmental

pediatricians use to make clinical decisions.  (Dec. 2, 2024 Hr'g Tr. 74:4–25, 76:5–19.)

Together with Dr. Ross's extensive experience as a developmental pediatrician for autistic

children and adolescents, these are "good grounds" for Dr. Ross's opinion.  *See Keller*, 557 F.

Supp. 2d at 677 (finding that physician's opinion regarding a post-autopsy diagnosis of

Alzheimer's disease is reliable because it is based on, among other sources, the decedent's

medical records, the physician's "extensive experience with Alzheimer's patients and his and

others' research and data in the field," and the physician's "vast professional experience,

training, and research regarding Alzheimer's disease," which "assist in establishing the reliability

of his methodology"); *see also* Fed. R. Evid. 703, Advisory Comm. Notes ("Facts or data upon

which expert opinions are based may, under the rule, be derived from . . . .  presentation of data

to the expert outside of court and other than by his own perception. . . .  Thus a physician in his

own practice bases his diagnosis on information from numerous sources and of considerable

variety, including statements by patients and relatives, reports and opinions from nurses,

technicians and other doctors, hospital records, and X rays. . . .  The physician makes life-and-

death decisions in reliance upon them.  His validation, expertly performed and subject to cross-

examination, ought to suffice for judicial purposes.").

      Furthermore, as the Court explains below in response to the District's alternative request

for a hearing under Federal Rule of Evidence 104(a), if the Court were to decide the reliability of

S2C, the Court would squarely invade what the Third Circuit has held to be the province of the

jury as factfinder, i.e., the material factual dispute over "the efficacy of the letter board compared

to other forms of communication."  *See Le Pape v. Lower Merion Sch. Dist.*, 103 F.4th 966, 981

(3d Cir. 2024)  Accordingly, the Court will not preclude Dr. Ross from offering her opinion on

the negative psychological and neurological effects of the District's actions on Alex even if that

opinion was formed based in part on her or others' communications with Alex using S2C, when such patient communications are otherwise a reliable basis for Dr. Ross's opinions as Alex's treating developmental pediatrician.

### 3.  Fit

The District's only argument as to the fit of Dr. Ross's testimony pertains to her opinion as to the efficacy of Alex's use of a letterboard and communication partner as a communication method.  (*See* Doc. No. 62-1 at 12 ("[Dr.] Ross's report is irrelevant to this case because her opinion does not address S2C, the requested methodology by Parents, and instead addresses 'the effectiveness of communication with a letterboard'").)  Because the Court has found this opinion inadmissible under the qualification and reliability prongs, we need not analyze its fit.

As for Dr. Ross's opinion on the psychological and neurological impact of the District's refusal to allow Alex to utilize a letterboard and communication partner in school, the Court finds that it does satisfy the fit requirement of Rule 702 and *Daubert.*  This opinion is relevant to the material issues of the efficacy of S2C for Alex and the efficacy of other communication supports provided by the District to Alex, the District's knowledge when it refused to allow Alex to use S2C at school, and, if applicable, the extent of damages to which the Plaintiffs are entitled.

\* \* \*

In conclusion, Dr. Ross is only permitted to opine on how the District's decision to prohibit Alex from using S2C at school impacted Alex psychologically and neurologically as Alex's treating developmental pediatrician.[8]  She is not permitted to testify as to the efficacy of S2C as a communication method for Alex.

---

[8] The Court acknowledges that there are several pending motions *in limine* that could also impact the admissibility of Dr. Ross's opinions.  The Court will decide those motions separately in a forthcoming opinion.

C.      **Dr. Manely Ghaffari**

Dr. Ghaffari is a child and adolescent psychiatrist whose practice focuses on neurodiverse patients.  (Doc. No. 62-4 at 1.)  Alex has been Dr. Ghaffari's patient since September 2017.  (*Id.*)  Dr. Ghaffari offers two opinions in her report based on her interactions with and clinical treatment of Alex.  (*Id.* at 2–3.)  First, she concludes that "[u]sing a letter board is a clear form of communication for [Alex] and extremely effective in allowing him to express his thoughts and feelings," and, furthermore, "[n]o other form of communication has been effective for him."  (*Id.* at 3.)  Second, she concludes that "[the District's] failure to accommodate [Alex's] use of a letter board has significantly affected his mental and physical health."  (*Id.*)  Specifically, "[Alex's] mental health went from being on a very positive trajectory with decreasing medication doses in 2017 and visits with [Dr. Ghaffari] every 2 to 3 months to increased medications, visits every 2 to 4 weeks, severe anxiety and unmanaged migraines that culminate in ER visits, depressed mood and suicidal thoughts" as well as "an increase in self-injurious behaviors (biting his hand), aggression (pulling hair) and repetitive/stereotypic behaviors."  (*Id.* at 4–5.)

The District argues for the exclusion of Dr. Ghaffari's report and testimony because she is not qualified and, like Dr. Prizant and Dr. Ross, she "fails to base her testimony on data or reliable principles and methods and instead states that [Alex] must be effectively communicating with letterboards because she observed it during her treatment of him."  (Doc. No. 62-1 at 14.)  The District further contends that, as with Dr. Ross, if the Court allows Dr. Ghaffari to testify, the Court should preclude her testimony "about any information obtained through 'communicating' with [Alex] through S2C because there is no scientific evidence to support the reliability of S2C."  (*Id.* at 14.)  For the reasons that follow, the Court will grant in part and deny in part the District's motion to preclude Dr. Ghaffari's expert report and testimony.

1.    **Qualification**

The District argues that Dr. Ghaffari, as a psychiatrist, "is not qualified to render an opinion because she is not trained in assessing the accuracy or reliability of methodologies of facilitated communication methods, including S2C." (*Id.* at 14.) Plaintiffs counter that Dr. Ghaffari is "eminently well qualified to opine that [Alex's] communication on the letter board is effective based on her personal observation and clinical judgment" and to opine on "[Alex's] diagnosis, course of treatment, prognosis, and the other topics in her report and to rely on communications with her patient—[Alex]—in doing so." (Doc. No. 67 at 16.)

Dr. Ghaffari's report establishes that Dr. Ghaffari is a child and adolescent psychiatrist whose practice focuses on neurodiverse patients, including Alex, who has been Dr. Ghaffari's patient since September 2017. (Doc. No. 62-4 at 1.) Dr. Ghaffari's expertise in treating neurodiverse patients began and grew from her work at the Drexel Autism Center "doing research and diagnostic evaluations." (*Id.*) Plaintiffs contend that Dr. Ghaffari is qualified to opine on the efficacy of S2C for Alex based on her personal observations of Alex and her "clinical judgment." (Doc. No. 67 at 16.)

While Dr. Ghaffari's report and curriculum vitae reflect her clinical and research experience in the broader field of child and adolescent psychiatry as well as the specific field of autistic child and adolescent psychiatry, they do not establish that Dr. Ghaffari has any particular educational background or clinical, research, or other experience related to speech-language pathology, AAC, facilitated communication, or other facilitator-dependent communication methods used with minimally verbal or non-verbal autistic individuals like Alex that would inform her "clinical judgment" as to the efficacy of S2C for Alex. Thus, the Court cannot find that Plaintiffs have met their evidentiary burden to show that Dr. Ghaffari has the necessary

expertise to opine on the efficacy of Alex's use of a letterboard and communication partner to communicate.  *See Diawara*, 2020 WL 1151162, at *6; *Ferris*, 153 F. Supp. 2d at 744.

But, the Court finds that Dr. Ghaffari is qualified to testify about her psychiatric treatment of Alex and to opine on the cause of Alex's declining mental and physical health during the course of her treatment of Alex.  The Court reaches this conclusion based on Dr. Ghaffari's medical education, extensive clinical and research experience in the field of child and adolescent psychiatry, and specific experience treating Alex since September 2017.  (*See generally* Doc. No. 62-4.)

## 2.    Reliability

Because the Court finds that Dr. Ghaffari is not qualified to offer an opinion on the efficacy of Alex's use of S2C as a communication method, the Court need not address the District's argument as to the unreliability of that opinion.  But the Court will address what we interpret as the District's argument regarding the unreliability of Dr. Ghaffari's opinion that "the District's refusal to incorporate S2C in [Alex's] IEP caused and still causes damages for [Alex], including anxiety, among other issues."  As with Dr. Ross, the District contends that "Dr. Ghaffari "arrived at those conclusions through 'communicating' with [Alex] through S2C," and "because there is no scientific evidence to support the reliability of S2C," the Court should preclude Dr. Ghaffari from testifying about "any information obtained through 'communicating' with [Alex] through S2C."  (*See* Doc. No. 62-1 at 14.)

As her report reflects, Dr. Ghaffari formed her opinions on the status and cause of Alex's declining mental and physical health based, at least in part, on speaking with and observing Alex as part of her treatment.  (*See, e.g.*, Doc. No. 62-4 at 4 ("Alex's mental health went from being on a very positive trajectory with decreasing medication doses in 2017 and visits with me every 2 to 3 months to increased medications, visits every 2 to 4 weeks, severe anxiety and unmanaged

migraines that culminate in ER visits, depressed mood and suicidal thoughts.").) Together with Dr. Ghaffari's extensive experience as a psychiatrist treating neurodiverse child and adolescent patients, these are "good grounds" for Dr. Ghaffari's opinions. *See Keller*, 557 F. Supp. 2d at 677; *see also* Fed. R. Evid. 703, Advisory Comm. Notes ("Facts or data upon which expert opinions are based may, under the rule, be derived from three possible sources. The first is the firsthand observation of the witness, with opinions based thereon traditionally allowed. A treating physician affords an example.").

As with Dr. Ross, the Court will not preclude Dr. Ghaffari from offering opinions that were based in part on her communications with Alex using S2C when such patient communications are otherwise a reliable basis for Dr. Ghaffari's opinions as Alex's treating psychiatrist. As the Court explains below in response to the District's alternative request for a hearing under Federal Rule of Evidence 104(a), for the Court to rule on the reliability of S2C at this stage would be to squarely invade what the Third Circuit has held is the province of the jury as factfinder, i.e., the material factual dispute over "the efficacy of the letter board compared to other forms of communication." *See Le Pape*, 103 F.4th at 981.

### 3.    Fit

The District's only argument as to the fit of Dr. Ghaffari's testimony pertains to her opinion as to the efficacy of Alex's use of a letterboard and communication partner as a means of communication. (*See* Doc. No. 62-1 at 13 ("[Dr.] Ghaffari's testimony is irrelevant because it does not address S2C or facilitated communication. Instead, it addresses '[Alex's] use of a letter board.'").) Because the Court excludes this opinion for lack of qualification, the Court need not address the District's arguments on fit.

As for Dr. Ghaffari's opinion on the impact of the District's refusal to allow Alex to utilize a letterboard and communication partner in school, the Court finds this opinion satisfies

the fit requirement of Rule 702 and *Daubert* because, again like Dr. Ross's opinion, it is relevant

to the material issues of the efficacy of S2C for Alex and the efficacy of other communication

supports provided by the District to Alex, the District's knowledge when it refused to allow Alex

to use S2C at school, and, if applicable, the extent of damages to which the Plaintiffs are entitled.

* * *

In sum, Dr. Ghaffari is permitted to opine as Alex's treating psychiatrist on the effect that

the District's decision to prohibit Alex from using S2C at school had on Alex's mental and

physical health.[9]  She is not permitted to testify as to the efficacy of S2C as a communication

method for Alex.

### D.    Dr. Anne Robbins

Dr. Robbins is a child neuropsychologist and Pennsylvania-certified school psychologist

who currently maintains a solo private practice in which she "provide[s] comprehensive

neuropsychological evaluations for students ranging in age from 4 years to 22 years old with a

variety of developmental, neurological, attentional, behavioral, social, and neuropsychologically

complicated medical difficulties."  (Doc. No. 62-6 at 1–2.)  Dr. Robbins has evaluated more than

700 students since starting her practice in 1999, and nearly 50% of her clients have a diagnosis of

ASD.  (Dec. 2, 2024 Hr'g Tr. 84:19–24, 85:3–5; *see also* Doc. No. 62-6 at 2.)  Prior to entering

private practice, Dr. Robbins spent nine years as a medical staff neuropsychologist at Nemours

DuPont Hospital for Children in Wilmington, Delaware.  (*Id.* at 1.)

At Parents' request, Dr. Robbins completed two neuropsychological evaluations of

Alex—once over two testing sessions in February 2018, and again over four testing sessions in

---

[9] The Court acknowledges that there are several pending motions *in limine* that could also impact the admissibility of Dr. Ghaffari's opinions.  The Court will decide those motions separately in a forthcoming opinion.

May and June of 2021—during which Alex used a letterboard and communication partner to respond to a series of questions designed to measure Alex's cognitive, academic, language, and memory functions. (*Id.* at 3–4, 6; *see* Dec. 2, 2024 Hr'g Tr. 86:4–6.) Prior to completing her first evaluation of Alex, and in an effort to glean "more information on [S2C] and [Alex's] communication with a letter board and communication partner" given that she was "unfamiliar with [S2C]," Dr. Robbins spoke with Alex's speech language therapist, watched videos of Alex using the letter board, and observed Alex live using a letter board with a communication partner for approximately an hour. (*Id.* at 4–6.) Between her first and second evaluations, Dr. Robbins observed Alex at school, in both the "Autistic Support" classroom and a regular education history class, for approximately one hour in March 2018. (*Id.* at 24–26.)

Based on "materials reviewed, observations, interviews, [her] interactions with [Alex] and his performance during [the neuropsychological evaluations]," Dr. Robbins offers three opinions in her report. (*Id.* at 6, 23–29.) First, she concludes that "use of the letter board is effective communication for [Alex]."[10] (*Id.* at 6.) Next, she concludes that "[Alex] needs a letter board and communication partner to have equal access to the programs, activities, and services that [the District] offers," and without the use of a letter board and communication partner, "[Alex] did not have equal access to the program[s] and activities that [the District] offers to other students" and "was not able to communicate as effectively as his peers in school." (*Id.* at 23–24, 26.) Last, Dr. Robbins concludes that "[Alex] has lost 5 years of educational benefit

---

[10] Dr. Robbins seems to have reached this conclusion prior to conducting any neuropsychological evaluations of Alex. (*See* Doc. No. 62-6 at 5–6 ("After talking to his speech therapist, watching videos, and observing [Alex] at *Inside Voice* [on one occasion for approximately one hour], I concluded that [Alex's] communication with the letter board was effective and viable communication for him, and I agreed to move forward with an evaluation with [Alex] using a letter board in the assessment.").)

because [the District] did not accommodate his request to use his effective communication in school." (*Id.* at 27–29.)

The District argues for the exclusion of Dr. Robbins' report and testimony as irrelevant and prejudicial because Dr. Robbins "does not offer an opinion about facilitated communication or S2C." (Doc. No. 62-1 at 16.) "Instead, she offers a psychological evaluation of [Alex] to measure his intelligence in 2021," which "has no bearing on the District's decision to forgo implementing S2C in [Alex's] IEP or any related District programming before [Alex] left the District." (*Id.*) During the *Daubert* hearing, the District clarified that it was further arguing to preclude Dr. Robbins, under Rule 702 and *Daubert*, from "testifying that [S2C] is [Alex's] effective communication [method] and also from testifying about the information that she gained through use of this methodology," i.e., the results of her neuropsychological evaluations of Alex and any conclusions she drew from those results. (*See* Dec. 2, 2024 Hr'g Tr. 102:19–103:9, 142:4–17; *see also* Doc. No. 62-1 at 16.)

For the reasons that follow, the Court will grant the District's motion to preclude Dr. Robbins' expert report and testimony.

### 1.    Qualification

Plaintiffs contend that Dr. Robbins is "eminently qualified to opine that the letter board is effective communication for [Alex]" because she "has now twice evaluated [Alex]" and "has been practicing child clinical neuropsychology for 30 years and is a licensed psychologist and school psychologist in Pennsylvania." (Doc. No. 67 at 25–26.) The Court disagrees.

While Dr. Robbins' report, curriculum vitae, and testimony at the *Daubert* hearing confirm her extensive education, research, and clinical experience in the field of pediatric neuropsychology, as well as her experience conducting neuropsychological examinations of autistic children and young adults (*see* Dec. 2, 2024 Hr'g Tr. 84:8–85:5; *see generally* Doc. No.

62-6), Plaintiffs have failed to establish that this education and experience qualifies Dr. Robbins

to opine as to the efficacy of Alex's use of a letterboard and communication partner.[11]  Like Dr.

Ghaffari, Dr. Robbins does not appear to have any educational background or clinical, research,

or other experience related to speech-language pathology, AAC, facilitated communication, or

other facilitator-dependent communication methods used with minimally verbal or non-verbal

autistic individuals like Alex.  (*See* Dec. 2, 2024 Hr'g Tr. 145:10–146:12, 153:18–154:10; *see*

*generally* Doc. No. 62-6.)  Indeed, Dr. Robbins states in her report that she was not aware of the

S2C method until Alex's parents approached her about conducting a neuropsychological

evaluation of Alex using S2C.  (Doc. No. 62-6 at 4; *see also* Dec. 2, 2024 Hr'g Tr. 153:18–

154:10 ("I'm a neuropsychologist.  I am not a speech therapist.  I am not an expert in Spelling to

Communicate."), 156:3–23 ("I know that there has been some research on this Spelling to

Communicate.  I am not an expert in Spelling to Communicate.  I am an expert in

neuropsychological testing with complicated diverse, multiple disability individuals.  And that's

what I brought to bear in this situation.").)  She has never had other autistic patients use the S2C

method or even communicate using a letterboard or a letterboard and communication partner,

---

[11] The Court does not dispute that Dr. Robbins is qualified to conduct the two neuropsychological evaluations of Alex that she conducted in 2018 and 2021.  However, Dr. Robbins does not offer any independent opinion on those neuropsychological evaluations.  Rather, these evaluations—though seemingly conducted for the purpose of assessing Alex's "cognitive capabilities" (*see* Doc. No. 62-5 at 3– 4)—are solely tied to Dr. Robbins' opinions on the efficacy of Alex's use of a letterboard and communication partner to communicate as partial bases for those opinions.  (*See id.* at 6 ("Based on my . . . assessments, use of the letter board is effective communication for Alex."), 23 ("Based on . . . his performance during standardized test administration, [Alex] needs a letter board and communication partner to have equal access to the programs, activities, and services that Lower Merion School District offers."), 27 (describing the neuropsychological examination results that Alex achieved "[a]fter receiving private instruction using effective communication" as a basis for Dr. Robbins' opinion that "[h]ad [Alex] been able to use his effective communication and been instructed in the general education curriculum, he would have demonstrated progress commensurate with his peers").)  Accordingly, the Court need not conduct an independent analysis of Dr. Robbins' neuropsychological evaluations under Rule 702 and *Daubert*. *Cf. Krys v. Aaron*, 112 F. Supp. 3d 181, 207 (D.N.J. June 12, 2015) ("[I]t is axiomatic that an expert may not present new opinions on topics not timely included or otherwise disclosed in the expert's report.").

though she has evaluated traumatic brain injury patients who have used a letterboard (without the aid of a communication partner) to communicate. (Dec. 2, 2024 Hr'g Tr. 161:22–162:9.) The Court thus finds that Plaintiffs have failed to establish by a preponderance of the evidence that Dr. Robbins has the necessary expertise to opine on the efficacy of Alex's use of S2C to communicate. *Compare In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 753–54 *with Diawara*, 2020 WL 1151162, at *6 *and Ferris*, 153 F. Supp. 2d at 744. And because Dr. Robbins' other opinions regarding Alex's ability to equally access the District's programs, activities, and services and Alex's loss of educational benefit are premised on her preliminary opinion on the efficacy of Alex's use of S2C, Dr. Robbins is precluded from offering those opinions as well.

### E.    Dr. Amy Laurent

Dr. Amy Laurent is a developmental psychologist and registered occupational therapist, whose work focuses on "autism and neurodiversity and the creation of educational programs and environments that facilitate active engagement and learning at home, in schools and throughout the community." (Doc. No. 62-5 at 1.) Alongside Dr. Prizant, Dr. Laurent is the coauthor of the SCERTS Model, an "educational framework" that "provide[s] targeted educational support for autistic individuals aimed at fostering meaningful long-term outcomes, such as the attainment of social communicative competence, the ability to cope successfully with daily stressors, and a high quality of life." (*Id.* at 1–2.) She "frequently lecture[s] and provide[s] training throughout the United States and internationally on The SCERTS Model, and other topics related to therapeutic and educational intervention for children with ASD." (*Id.* at 1.) Dr. Laurent is also the cofounder of Autism Level UP!, "a neurodivergent/neurotypical partnership focused on providing education, accessible resources, practical strategies . . . . to empower autistic individuals to navigate their world . . . [and] make the world a more autism-friendly environment and more accommodating to the neurodiverse." (*Id.* at 1–2.)

Dr. Laurent's report provides background on autism, neurodivergence, and the "social model of disability," which "posits that diversity (e.g., variation in processing, learning, communicating, interacting, motor skills, regulating, etc) is normal and that these differences in and of themselves are not inherently disabling – but rather it is the mismatch between the person's abilities and the qualities of the physical and social environment." (*Id.* at 4–6.) Against this backdrop, Dr. Laurent opines on the importance of trusted communication partners for autistic individuals in the areas of "social communication"—i.e., "the development of spontaneous initiated, functional communication, secure and trusting relationships with others, and an understanding of the expected conventions of different social situations"—and "emotional regulation"—i.e., "the regulation of arousal and emotional states in order to be available for learning and interacting within the social and physical environment, cope with everyday stress, and utilize effective tools and strategies by oneself and in interactions with others to increase active engagement in daily routines." (*Id.* at 2–3, 9–14.)

The District argues for the exclusion of Dr. Laurent's report and testimony under Federal Rule of Evidence 702 and *Daubert* based on Dr. Laurent's lack of qualifications and failure to utilize "any scientific technique or methodology in writing her report, let alone evaluating [Alex]." (Doc. No. 62-1 at 15.) The District further argues that Dr. Laurent's opinions are "entirely irrelevant" under Federal Rule of Evidence 401 because her report "does not address [Alex]" and "even more significantly, she does not address facilitated communication, S2C, or communication in general." (*Id.* at 15.)

For the reasons that follow, the Court will deny the District's motion to preclude Dr. Laurent's expert report and testimony.

### 1.    Qualification

The District argues that Dr. Laurent, as a "psychologist and occupational therapist," "possesses no qualifications to testify about the effectiveness of facilitated communication and why or how it does not yield the 'communication' from the communication partner" and "does not appear to have training in assessing the accuracy or reliability of methodologies of facilitated communication methods, including S2C." (Doc. No. 62-1 at 15.)  Plaintiffs counter that Dr. Laurent, as a developmental psychologist and registered occupational therapist with a master's degree in special education who "has published extensively on social communication, emotional regulation, and transactional support and is a coauthor of The SCERTS Model, an educational framework to provide targeted educational support for autistic individuals," is qualified to "assist the jury in understanding autism and explain to the jury the importance of a trusted communication partner for social communication, emotional regulation, and transactional support." (Doc. No. 67 at 26, 28.)

The District's argument is premised on an inaccurate characterization of Dr. Laurent's anticipated testimony.  Dr. Laurent opines on the importance of trusted communication partners as necessary support for "social communication" and "emotional regulation" for autistic individuals—not "the effectiveness of facilitated communication or why or how it does yield the 'communication' from the communication partner." (*See generally* Doc. No. 62-5.)  Accordingly, the extent of Dr. Laurent's "training in assessing the accuracy or reliability of methodologies of facilitated communication methods, including S2C" is neither a necessary nor relevant qualification for Dr. Laurent's opinion.  Rather, the Court agrees with Plaintiffs that Dr. Laurent's extensive educational, clinical, and research experience in social communication and emotional regulation for individuals with ASD and related disabilities make her qualified to

opine on the significance of trusted communication partners to support autistic individuals in developing social communication and emotional regulation abilities.

With a Ph.D. in Behavioral Science/Developmental Psychology, Dr. Laurent is the coauthor of and has done extensive work related to The SCERTS Model, "an educational framework that is grounded in developmental theory as well as evidence-based research from the fields of human development, neuroscience, education, speech-language pathology, occupational therapy, psychology, and autism," including six years of "consult[ing] and develop[ing] training for participants in the Institute of Education Sciences, U.S. Department of Education Grant entitled: A Randomized Trial of the SCERTS Curriculum for Students with Autism Spectrum Disorder in Early Elementary School Classrooms." (*Id.* at 2–3.) Social communication and emotional regulation are two of the "high priority domains" that comprise this model. (*Id.* at 2.)

For nearly six years, Dr. Laurent has served as Codirector of "Autism Level UP!," a "neurodivergent / neurotypical partnership" that she cofounded and that focuses on "the provision of education, accessible resources, practical strategies and a commitment to consistently incorporating the experiences and perspectives of autistic people" through "consultation, professional development, evaluation and research, mentorship and assessment." (*Id.* at 2–3, 19.) She also worked as an adjunct faculty member for the Communication Disorders Departments at Emerson College and at the University of Rhode Island, where she "developed graduate courses focused on preparing clinicians to meet the needs of children with autism" and, more specifically, "the core social communicative challenges faced by persons with ASD." (*Id.* at 1.) Given this background, the Court finds that Dr. Laurent is well qualified to testify about the role that communication partners play in enabling autistic individuals to develop in the areas of social communication and emotional regulation.

## 2.    Reliability

The District argues that Dr. Laurent "did not utilize any scientific technique or methodology in writing her report, let alone evaluating [Alex]. Rather, her report simply reads like a research paper on autism and why it is important for autistic individuals to be emotionally regulated, which the District does not necessarily dispute." (Doc. No. 62-1 at 15.) Plaintiffs do not make any counterargument other than to assert that Dr. Laurent "does not need to have observed [Alex]" to "provide the peer-reviewed context to assist the jury in understanding the role of [Alex's] communication partners and their importance to his being able to express his thoughts, wants, and needs." (Doc. No. 67 at 28.)

Contrary to the District's argument, the Court finds that Dr. Laurent's opinion is reliable because it is based on her own and other experts' peer-reviewed research on social and emotional development and related developmental challenges for individuals with ASD. *See Pineda*, 520 F.3d at 247 (listing "whether the methodology has been subjected to peer review and publication" as one the factors that courts may take into account when evaluating the reliability of a particular scientific methodology); *Covell v. Bell Sports, Inc.*, No. 09-cv-2470, 2010 WL 11561088, at *2 (E.D. Pa. July 14, 2010) (finding proffered expert testimony to be reliable "in light of the expertise that these [experts] possess, and because their opinions were based on all the available evidence in this case together with widely accepted, peer-reviewed scientific research"); *Keller*, 557 F. Supp. 2d at 677 (determining expert's opinion to be reliable because of its basis on "methods and procedures of science," including "[that expert's] and other experts' research and data in the field"). And, like Dr. Prizant, Dr. Laurent's expertise in the development of social communication and emotional regulation in individuals with ASD bolsters the reliability of her opinion. *See, e.g.*, *Arcuri*, 2022 WL 3369725, at *4; *McDermott*, 2022 WL 952895, at *12; *Keller*, 557 F. Supp. 2d at 677.

41

### 3.    Fit

The District argues that Dr. Laurent's report is "entirely irrelevant" because Dr. Laurent "is not writing the report about [Alex] and provides no opinion that her conclusions apply to [Alex.]" (Doc. No. 62-1 at 15.) Alternatively, the District contends that admission of Dr. Laurent's report "would further prejudice the jury, as it implies that [Alex] may suffer from the issues presented in the report." (*Id.*) Plaintiffs claim that Dr. Laurent's testimony is relevant because Dr. Laurent "will give the jury information it needs to assess [D]efendant's claim that [Alex's] communication on the letter board is not his own, but rather his communication partner's." (Doc. No. 67 at 28.)

Although the District frames its relevancy argument as separate from its Rule 702/*Daubert* argument, the Court addresses the District's argument under the "fit" prong of Rule 702 and *Daubert*. *See United States v. Ford*, 481 F.3d 215, 218 (3d Cir. 2007) (holding that the *Daubert* requirement of relevance "should be evaluated under the standard expressed in Rule 401" (internal citation omitted)). The Court finds that Dr. Laurent's testimony is relevant under Rule 401 and thus satisfies the "fit" prong of Rule 702 and *Daubert* because it provides background information on the deficits in social communication and emotional regulation from which autistic individuals suffer and opines on the importance of communication partners—a critical aspect of the S2C method that Alex claims is his effective communication method—in helping autistic individuals to overcome these deficits. (*See generally* Doc. No. 62-5.) *See Taylor*, 2024 WL 3205209, at *11 (holding that plaintiff "may rely on [expert's] testimony to the extent he provides relevant background on the DOT's regulatory framework for drug testing and discusses customs and practices in the testing industry" as support for plaintiff's claims that his employer violated his First Amendment rights and engaged in religious discrimination against him when they forced him to drink water in violation of his Ramadan fast as part of mandatory

drug testing); *In re Flonase Antitrust Litig.*, 907 F. Supp. 2d 637, 642, 645–46 (E.D. Pa. 2012) (in antitrust action in which defendant asserts that it was protected from antitrust liability under the First Amendment based on its filing of citizen petitions with the FDA regarding plaintiffs' drug application, finding that, contrary to defendant's claims that plaintiffs' proffered expert opinions regarding the FDA's procedure for handling citizen petitions are too "generalized and superficial" to satisfy *Daubert*'s fit requirement, the opinions will assist the jury in determining whether defendant could reasonably expect to succeed in its petitions, which is directly relevant to defendant's First Amendment immunity defense).

There is ample evidence in the record to suggest that Alex suffers from social communication and emotional regulation deficits and utilizes communication partners as part of S2C (*see, e.g.*, Doc. No. 64-70, Alex Le Pape Decl. ¶¶ 10, 15, 18, 34–35; Doc. No. 64-36, Jennifer Le Pape Decl. ¶¶ 5, 15–17, 23–24; Doc. No. 64-13; Doc. No. 64-16; Doc. No. 64-18), such that Dr. Laurent's testimony establishes the relevant context to help the jury understand other witness testimony about these deficiencies and Alex's experience working with communication partners, all of which go to the material factual issue of the efficacy of S2C as a means of communication for Alex. *See Pineda*, 320 F.3d at 404 ("[T]he expert's testimony . . . must assist the trier of fact."); *Ford*, 481 F.3d at 220 (holding that expert's testimony "satisfies the basic relevancy standard in Federal Rule of Evidence 401, as it makes a fact of consequence more probable or less probable than it would be without the evidence"); *Keller*, 557 F. Supp. 2d at 682 (excluding medical expert's testimony about conditions of alcoholism, diabetes, and obesity as irrelevant because "[n]o evidence exists suggesting decedent had such conditions" and "[w]ithout a factual basis suggesting decedent had one of [these] conditions . . . the testimony . . . would not assist the trier of fact"). And because of this existing factual basis, the Court will not

exclude Dr. Laurent's testimony as unfairly prejudicial under Rule 403 because it "implies that [Alex] may suffer from the issues presented in [Dr. Laurent's] report." *See Keller*, 557 F. Supp. 2d at 679; *see also id.* at 680 ("Rule 403 is an unlikely basis for exclusion when the testimony survived the rigors of Rule 702.").

### F.    District's Request for a Hearing Under Fed. R. Evid. 104

In the alternative, the District argues that "if this Court chooses not to exclude the testimony and evidence of Plaintiffs' experts" subject to the District's pending motion to preclude, the Court should hold an evidentiary hearing pursuant to Federal Rule of Evidence 104(a) to "decide the preliminary question concerning whether S2C is sufficiently reliable to permit expert opinion concerning its use and allow testimony and evidence purportedly elicited through use of S2C." (Doc. No. 62-1 at 6, 16.)

The District attempts to recast what the Third Circuit has held to be a disputed issue of material fact for the jury to decide—"the efficacy of the letter board compared to other forms of communication," *see Le Pape*, 103 F.4th at 981—into a preliminary question warranting a determination under Federal Rule of Evidence 104(a)—"whether S2C is sufficiently reliable . . . to allow testimony and evidence purportedly elicited [from Alex] through use of S2C" (*see* Doc. No. 62-1 at 6, 16). If the Court were to make a preliminary determination as to whether Alex's communications through S2C, to use the District's words, are "scientifically . . . valid" and "scientifically reliable" (*see* Doc. No. 72 at 4–5) for purposes of permitting or excluding expert testimony that relies on those communications, the Court would necessarily be deciding whether Alex effectively communicates through S2C, which the Third Circuit described as "the most material fact at issue" for the factfinder in this case. *See Le Pape*, 103 F.45h at 982; *cf. Elcock v. Kmart Corp.*, 233 F.3d 734, 751 n.8 (3d Cir. 2000) ("Although *Daubert* assigns to the district court a preliminary gatekeeping function—requiring the court to act as a specialized fact-finder

44

in determining whether the methodology relied upon by an expert witness is reliable—it does not necessarily follow that the court should be given free rein to employ its assessment of an expert witness's general credibility in making the Rule 702 reliability determination. *To conclude otherwise would be to permit the district court, acting in its capacity as a* Daubert *gatekeeper, to improperly impinge on the province of the ultimate fact-finder*, to whom issues concerning the general credibility of witnesses are ordinarily reserved." (emphasis added) (internal citation omitted)).

Accordingly, the Court denies the District's motion for a hearing pursuant to Federal Rule of Evidence 104(a).[12]

## IV.    Conclusion

For the reasons set forth above, the Court grants in part and denies in part the District's motion to preclude the reports and testimony of Dr. Prizant, Dr. Ross, and Dr. Ghaffari; grants the District's motion to preclude Dr. Robbins' report and testimony; denies the District's motion to preclude Dr. Laurent's report and testimony; and denies the District's motion for a hearing pursuant to Federal Rule of Evidence 104(a).  An appropriate Order follows.

---

[12] As discussed during the final pretrial conference, the Court intends to provide a limiting instruction to the jury regarding expert opinions that rely on Alex's communications through S2C, which will remind the jury that, to the extent any evidence is derived from communications with Alex through S2C, the jury ultimately must determine whether S2C is an effective means of communication for Alex and represents Alex's authentic voice.  The Court directs the parties to meet and confer on the wording of such an instruction and submit a proposed instruction to the Court by December 30, 2024.