IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **J.L., et al.**, <br><br> Plaintiffs, <br><br> *v.* <br><br> **LOWER MERION SCHOOL DISTRICT**, <br><br> Defendant. | **CIVIL ACTION** <br><br> **NO. 20-1416-KSM** |

MEMORANDUM

**MARSTON, J.**                                                                                                              January 6, 2025

Plaintiffs Jennifer Le Pape ("Mother") and Frederic Le Pape ("Father") (collectively, "Parents"), on behalf of their child, Alexandre Le Pape ("Alex"), and Alex, individually, (collectively, "Plaintiffs") bring intentional discrimination claims under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504") against Defendant Lower Merion School District (the "District"), alleging that the District failed to take appropriate steps to ensure that communications with Alex were as effective as communications with others and failed to provide Alex with the appropriate auxiliary aids and services necessary to afford Alex an equal opportunity to participate in and enjoy the benefit of various school services and programming.  (Doc. No. 33.)

This Memorandum addresses the District's objections to certain of Plaintiffs' anticipated expert witnesses as well as the parties' dispute over their proposed jury instructions related to deliberate indifference, which were not otherwise resolved by the Court's recent rulings on the parties' motions *in limine* and the District's motion to preclude expert testimony (Doc. Nos. 170–73).

I.  **Witnesses**

Pursuant to the Court's Fourth Amended Scheduling Order (Doc. No. 122), the District raised objections in its pretrial memorandum to the adequacy of the qualifications of six expert witnesses expected to testify on behalf of Plaintiffs "about what is or is not effective communications" (Doc. No. 156 at 11–12).  The Court resolved the District's objections as to Dr. Wendy Ross, Dr. Anne Robbins, and Dr. Manely Ghaffari in the Court's ruling on the District's motion to preclude expert testimony.  (*See* Doc. Nos. 170–71.)  At the Court's direction during the final pretrial conference, the parties submitted letter briefing on the District's outstanding objections to the adequacy of the qualifications of Plaintiffs' anticipated expert witnesses, Dr. William Young, Dr. Mary Stephens, and Vanessa von Hagen, to opine on the efficacy of the letterboard and communication partner as a means of communication for Alex. (Doc. Nos. 167, 169.)  Dr. Young, Dr. Stephens, and Ms. Von Hagen did not submit expert reports in this case, as Plaintiffs identified these three witnesses pursuant to Federal Rule of Civil Procedure 26(a)(2)(C) as experts who have not been retained or specially employed to provide expert testimony.  (*See* Doc. No. 154 at 5–7, 9–10; Doc. No. 169 at 1.)  The Court considers the adequacy of the qualifications of each of these three expert witnesses in turn.

A.  **Legal Standard**

Federal Rule of Evidence 702 outlines the conditions that must be met for a witness to testify as an expert:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

2

> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. This Rule requires the trial judge to act as a "gatekeeper," ensuring that "any and all expert testimony or evidence is not only relevant, but also reliable." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (cleaned up); *see also Sikkelee v. Precision Airmotive Corp.*, No. 07-cv-00886, 2021 WL 392101, at *2 (M.D. Pa. Feb. 4, 2021) ("A district court exercises more control over experts than over lay witnesses," because "expert evidence can be both powerful and quite misleading" given "the difficulty in evaluating it." (internal quotation omitted)). "*Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999).

To be admissible under Rule 702, expert testimony must satisfy "three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Pineda*, 520 F.3d at 244. These factors are often referred to as "qualification," "reliability," and "fit." *See Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) ("We have explained that Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit."). The party proposing the expert witness must show that each prong—qualification, reliability, and fit—is satisfied by a preponderance of proof. Fed. R. Evid. 702; *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir.

2000); *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743, 744 n.11 (3d Cir. 1994) (explaining that the proponent must make more than a prima facie showing that a technique is reliable); *Ellison v. United States*, 753 F. Supp. 2d 468, 476 (E.D. Pa. 2010) ("The burden is on the proponent of the evidence—here the plaintiff—to establish admissibility by a preponderance of the evidence.").

"Qualification requires that the witness possess specialized expertise." *Pineda*, 520 F.3d at 244 (cleaned up). The Third Circuit has "interpreted this requirement liberally," *see In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 741 (3d Cir. 1994), and has counseled that "a broad range of knowledge, skills, and training qualify an expert," *id.*; *see Schneider ex rel. Schneider*, 320 F.3d at 404 (same). While "[a]n 'expert's testimony is not limited to the area in which he or she specializes,' . . . 'the party offering the expert must demonstrate that the expert has the necessary expertise.'" *Keller v. Feasterville Family Health Care Ctr.*, 557 F. Supp. 2d 671, 675 (E.D. Pa. 2008) (quoting *Ferris v. Pa. Fed'n Bhd. of Maint. of Way Emps.*, 154 F. Supp. 2d 736, 743 (E.D. Pa. 2001)); *see Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 322 (3d Cir. 2003) ("An expert may be generally qualified but may lack qualifications to testify outside his area of expertise."). "If the expert testimony falls outside a witness's expertise, the court should exclude it." *Diawara v. United States*, No. 18-cv-3520, 2020 WL 1151162, at *5 (E.D. Pa. Mar. 9, 2020) (quoting *Ferris*, 154 F. Supp. 2d at 743).

**B.     Dr. William Young**

Dr. Young is board-certified in neurology, psychiatry, and headache medicine, and he is the director of the Jefferson Headache Center of Jefferson University Hospitals. (Doc. No. 167 at 1.) Dr. Young has provided both in-patient and out-patient treatment for Alex's migraines since May 2019. (*Id.*) As is relevant to the District's objection, Plaintiffs intend to call Dr. Young to testify that "Alex's communication with the letter board and communication partner is

4

effective communication for Alex" (Doc. No. 167 at 1; *see* Doc. No. 154 at 6), or, "[a]t a minimum," to testify "as to why he deemed Alex's communication with the letter board and communication partner sufficiently reliable for purposes of his medical treatment" (Doc. No. 167 at 1).

The District argues that Dr. Young is not qualified to offer an opinion on the efficacy of the letterboard and communication partner as a means of communication for Alex because he has no education, training, or experience in speech-language pathology or the area of "effective communication." (Doc. No. 169 at 1–2.) The District further contends that Dr. Young's alternative opinion as to why he determined Alex's communication through S2C to be sufficiently reliable for purposes of his medical treatment, which Plaintiffs proposed for the first time in their letter brief, is "irrelevant as to whether the District knowing[ly] violated Alex's rights for deciding not to provide the S2C methodology during the 2017-18 time frame." (*Id.* at 2.) Plaintiffs counter that Dr. Young is qualified to render these opinions based on his "long-standing and continuing patient/physician relationship with Alex," at all times during which Alex has communicated using a letterboard and communication partner, and his "decades of clinical experience, education, training, and skills." (Doc. No. 167 at 1.)

Aside from his interactions with Alex using the letterboard and communication partner, Dr. Young does not appear to have any educational background, training, or clinical, research, or other experience related to speech-language pathology, augmentative and alternative communication ("AAC"), facilitated communication, or other facilitator-dependent communication methods used with minimally verbal or non-verbal autistic individuals like Alex. Accordingly, the Court finds that Plaintiffs have failed to establish by a preponderance of the evidence that Dr. Young has the necessary expertise to opine on the efficacy of Alex's use of a

5

letterboard and communication partner to communicate. *See Diawara*, 2020 WL 1151162, at *6 (excluding expert testimony from plaintiff's treating neurologist on plaintiff's orthopedic injuries, where the neurologist's report failed to explain why his specialties qualified him to opine on orthopedic injuries); *Ferris*, 153 F. Supp. 2d at 744 (concluding that plaintiff's treating physician, who specializes in pain management, is not qualified to testify as to the causation of plaintiff's headaches, insomnia, depression, and sexual dysfunction allegedly suffered as a result of plaintiff's elimination from his position with defendant, because the physician has no expertise in the diagnosis, treatment, or causes of depression and/or anxiety disorder).

Dr. Young will not be permitted to opine on the efficacy of the letterboard and communication partner as a communication method for Alex, which includes any testimony about Dr. Young's determination that Alex's communication with a letterboard and communication partner is sufficiently reliable for purposes of his medical treatment of Alex.

### C.    Dr. Mary Stephens

Dr. Stephens is board-certified in family medicine and is the director of Jefferson University Hospitals' Continuing Care Program. (Doc. No. 167 at 1.) She has "extensive experience . . . providing medical services to neurodiverse individuals in medical settings." (*Id.*) Dr. Stephens has been Alex's primary care doctor since Spring 2019, and she has also interacted with Alex "through Alex's contribution to the education of doctors concerning neurodiversity." (*Id.*) As is relevant to the District's objection, Plaintiffs intend to call Dr. Stephens to testify that "Alex's communication with the letter board and communication partner is effective communication for Alex and that his communications on it are his own" (Doc. No. 154 at 7; *see* Doc. No. 167 at 2), or, "[a]t a minimum," to testify "as to why she deemed Alex's communication with the letter board and communication partner sufficiently reliable for purposes of [her] medical treatment" (Doc. No. 167 at 2).

6

As it argues with respect to Dr. Young, the District similarly contends that Dr. Stephens is not qualified to offer an opinion on the efficacy of the letterboard and communication partner as a means of communication for Alex because she has no education, training, or experience in speech-language pathology or the area of "effective communication." (Doc. No. 169 at 1–2.) The District further argues that Dr. Stephens' alternative opinion as to why she determined Alex's communication through S2C to be sufficiently reliable for purposes of her medical treatment, which Plaintiffs again proposed for the first time in their letter brief, is "irrelevant as to whether the District knowing[ly] violated Alex's rights for deciding not to provide the S2C methodology during the 2017-18 time frame." (*Id.* at 2.) Plaintiffs counter that Dr. Stephens is qualified to render these opinions based on her "five-year-long relationship with Alex," at all times during which Alex has communicated using a letterboard and communication partner, and her "extensive clinical experience, education, training, and skills." (Doc. No. 167 at 2.)

Dr. Stephens does not appear to have any educational background, training, or clinical, research, or other experience related to speech-language pathology, AAC, or facilitator-dependent communication techniques. And while Plaintiffs represent that Dr. Stephens has "extensive experience . . . providing medical services to neurodiverse individuals in medical settings," Plaintiffs have not established that this experience includes any clinical, research, or training experience with, or even exposure to, communication techniques—facilitator-dependent or otherwise—for minimally verbal or non-verbal autistic individuals like Alex that could conceivably qualify her to opine on the efficacy of Alex's use of the letterboard and communication partner. *Contrast In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 753–54 (holding that plaintiffs' proffered expert in internal medicine and toxicology, "while arguably a relatively poor clinician and less than fully credible witness," qualifies as an expert to opine on plaintiffs'

7

exposure to the toxic chemicals at issue and the effects of such exposure because she "was on the consulting staff of a hospital"—though neither board-certified nor a practicing physician in internal medicine and toxicology—and "has had extremely broad experience in the field of toxic substances, has written extensively in the field and has consulted for the American Legion Science Panel—a group of experts analyzing scientific issues, such as dioxin poisoning, that affect veterans"). Accordingly, the Court finds that Plaintiffs have failed to establish by a preponderance of the evidence that Dr. Stephens has the necessary expertise to opine on the efficacy of Alex's use of a letterboard and communication partner to communicate. *See Diawara*, 2020 WL 1151162, at *6; *Ferris*, 153 F. Supp. 2d at 744.

Dr. Stephens will not be permitted to opine on the efficacy of the letterboard and communication partner as a communication method for Alex, which includes any testimony about Dr. Stephens' determination that Alex's communication with a letterboard and communication partner is sufficiently reliable for purposes of her medical treatment of Alex.

### D.   Vanessa von Hagen

Ms. Vanessa von Hagen is a board-certified behavior analyst, and she served as the lead clinician on Alex's home behavior team for six years, beginning in 2012. (Doc. No. 167 at 2.) In this role, Ms. von Hagen was responsible for "developing Alex's program, analyzing data, and training and supervising the therapists working with Alex," and "communication strategies were a focus of [Alex's] programming." (*Id.*) As is relevant to the District's objection, Plaintiffs intend to call Ms. von Hagen to testify that "Alex's communication with the letter board is effective, that he communicates his wants, needs, and thoughts with it, and that he could not do so without it" (Doc. No. 154 at 11; *see* Doc. No. 167 at 2), or, "[a]t a minimum," to testify "as to why she deemed Alex's communication with the letter board and communication partner sufficiently reliable for purposes of her clinical work with him" (Doc. No. 167 at 2).

8

The District argues that, like Dr. Young and Dr. Stephens, Ms. von Hagen is not qualified to offer an opinion on the efficacy of the letterboard and communication partner as a means of communication for Alex because she has no education, training, or experience in speech-language pathology or the area of "effective communication." (Doc. No. 169 at 1–2.) The District further contends that Ms. von Hagen's alternative opinion as to why she determined Alex's communication through S2C to be sufficiently reliable for purposes of her clinical work, which as with Drs. Young and Stephens, Plaintiffs proposed for the first time in their letter brief, is "irrelevant as to whether the District knowing[ly] violated Alex's rights for deciding not to provide the S2C methodology during the 2017-18 time frame." (*Id.* at 2.) Plaintiffs counter that Ms. von Hagen is qualified to render these opinions based on her six years of working with Alex and his home behavior team, including when Alex started communicating with a letter board and communication partner in 2017, and her "extensive clinical experience . . . concerning communication strategies for persons with autism and her education, training, and skills." (Doc. No. 167 at 2.)

While Ms. von Hagen does not appear to have any education or research experience in the fields of speech-language pathology, AAC, or facilitator-dependent communication techniques, the scope of Ms. von Hagen's "clinical experience . . . concerning communication strategies for persons with autism" is not clear from Plaintiffs' pretrial memorandum or letter brief, Ms. von Hagen's curriculum vitae,[1] or Ms. von Hagen's testimony at the due process hearing. (*See* Doc. No. 154 at 10–11; Doc. No. 167 at 2; Pls.' Tr. Ex. 382, Curriculum Vitae of Vanessa von Hagen; Doc. No. 13-4, Oct. 15, 2019 Due Process Hr'g Tr. 614:24–627:24.) The

---

[1] Ms. von Hagen's curriculum vitae reflects her experience "[d]evelop[ing] functional communication training programming for students with a variety of different modes of communication (vocal, picture exchange communication system, sign language, language devices)" and "[u]s[ing] PECS and ACCs to teach manding [sic] and basic sentences to nonvocal children." (Pls.' Tr. Ex. 382.)

9

Court cannot yet ascertain whether Ms. von Hagen's clinical experience is sufficient to qualify her to opine on the efficacy of Alex's use of a letterboard and communication partner to communicate—i.e., the extent to which Ms. von Hagen has clinical experience in the aforementioned fields and whether such experience constitutes more than mere exposure to those fields incidental to her work as a behavior analyst for autistic children. *Compare In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 753–54 *with Diawara*, 2020 WL 1151162, at *6 *and Ferris*, 153 F. Supp. 2d at 744.

Accordingly, the Court reserves ruling on the adequacy of Ms. von Hagen's qualifications to opine on the efficacy of the letterboard and communication partner as a communication method for Alex—including any testimony about Ms. von Hagen's determination that Alex's communication with a letterboard and communication partner is sufficiently reliable for purposes of her clinical work with Alex—until trial.[2]

In summary, the Court sustains the District's objections to the qualifications of Dr. Young and Dr. Stephens to opine on the efficacy of Alex's use of a letterboard and communication partner to communicate. Dr. Young and Dr. Stephens will not be permitted to opine on the efficacy of the letterboard and communication partner as a communication method for Alex, which includes any testimony about their determinations that Alex's communication with a letterboard and communication partner is sufficiently reliable for purposes of their medical treatment of Alex. The Court reserves ruling on the District's objection to the qualifications of Ms. von Hagen to opine on the efficacy of Alex's use of a letterboard and communication partner to communicate.

---

[2] The Court advises that before calling Ms. Von Hagen as a witness, Plaintiffs should present Ms. Von Hagen on voir dire for the Court to determine whether Ms. Von Hagen's opinion as to the efficacy of the letterboard and communication partner as a means of communication for Alex satisfies the requirements of Rule 702.

## II. Jury Instructions

The parties have submitted proposed jury instructions for the Court's consideration. (*See* Doc. Nos. 151, 153, 155.) The Court has reviewed each side's proposal and to the extent the parties disagree about a given instruction, the relevant arguments. (*See* Doc. Nos. 151, 153, 155, 176, 179.) For the most part, these disputes are resolved by the Court's recent rulings on the parties' motions *in limine* and motions to preclude expert testimony. (Doc. Nos. 170–73.) One dispute not resolved by those rulings, however, involves the parties' differing instructions as to deliberate indifference.

At base, the parties disagree about whether Plaintiffs can prevail on their ADA and Section 504 claims without proving deliberate indifference. Plaintiffs argue that they can establish liability and collect nominal damages without proving the District acted with deliberate indifference because deliberate indifference is relevant only to Plaintiffs' request for compensatory damages. (*See, e.g.*, Doc. No. 153 at 6 ("Plaintiff is *not* required to meet the deliberate indifference standard to prove liability (i.e., that Defendant violated the ADA and Section 504). Plaintiff *is* required to meet the deliberate indifference standard to receive damages.").) In other words, Plaintiffs argue that the jury will consider deliberate indifference *only* after it finds the District otherwise liable under the ADA and/or Section 504 and even then, *only* as part of its deliberation on whether Plaintiff is entitled to compensatory damages. The District disputes this interpretation. It argues that because Plaintiffs only seek monetary damages, they must prove deliberate indifference to prevail on their claims; it is not a secondary consideration. (Doc. No. 155 at 9–11.) The Court agrees with the District.

Although the Third Circuit has not directly addressed this issue, the Eleventh Circuit recently considered—and rejected—an argument nearly identical to the one that Plaintiffs raise

11

here. *See Nix v. Adv. Urology Ins. of Ga., P.C.*, No. 21-10106, 2021 WL 3626763, at *3 (11th Cir. Aug. 17, 2021). In *Nix*, the plaintiff claimed that the defendant health care provider violated her right to effective communication under Section 504 and the Patient Protection and Affordable Care Act. *Id.* at *1. The district court granted summary judgment in favor of the defendant, finding that the plaintiff had failed to put forth any evidence to support a finding that the defendant acted with deliberate indifference. *Id.* On appeal, the plaintiff argued, among other things, that even if she had failed to demonstrate deliberate indifference, summary judgment was inappropriate because she could establish liability and recover nominal damages without such a showing. *Id.* at *2. The Eleventh Circuit disagreed. The court explained that because the plaintiff sought monetary damages, as opposed to injunctive relief, deliberate indifference was "a *necessary element* of her civil rights claim," such that she could not "recover any monetary damages—either compensatory or nominal"—without first demonstrating that the defendant acted with deliberate indifference. *Id.* at *3 (emphasis added).

Plaintiffs argue that we should disregard *Nix*, which is unpublished and from another circuit, because binding Third Circuit precedent shows that "liability and damages are two distinct inquiries, with different legal requirements." (Doc. No. 153 at 6.) In support of this proposition, Plaintiffs cite *Ridgewood Board of Education v. N.E. for M.E.* and *S.H. ex rel. Durrell v. Lower Merion School District*. But a review of those and other published Third Circuit opinions suggests that the correct reading is the one outlined in *Nix*.

In *Ridgewood*, the plaintiff brought claims under the Individuals with Disabilities Education Improvement Act ("IDEA") and Section 504 against his school district. 172 F.3d 238, 246 (3d Cir. 1999), *superseded by statute on other grounds*, IDEA, Pub. L. No. 108–446, 118 Stat. 264, *as recognized in P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727

12

(3d Cir. 2009). The district court granted summary judgment in the school district's favor after finding the plaintiff "had not demonstrated he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school." *Id.* (quotation marks omitted). On appeal, the Third Circuit vacated and remanded, finding that the plaintiff "presented evidence demonstrating that a genuine issue of fact exists." *Id.* As part of that discussion, the court explained that "to establish a violation of [Section 504], a plaintiff must prove that":

> (1) he is "disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school.

*Id.* The court then stated, "a plaintiff need not prove that defendants' discrimination was intentional." *Id.* Other than this one-off assertion, the court did not discuss intentional discrimination or deliberate indifference.

Fourteen years later, the Third Circuit discussed *Ridgewood*'s assertion in *S.H. See* 729 F.3d 248, 261–62 (3d Cir. 2013). In *S.H.*, the Third Circuit considered whether a plaintiff seeking compensatory damages is "required to make a showing of intentional discrimination to prevail on their claims." 729 F.3d at 260. It answered that question in the affirmative, holding "that claims for compensatory damages under § 504 of the RA and § 202 of the ADA . . . require a finding of intentional discrimination." *Id.* at 261. The court then discussed *Ridgewood* and found that the earlier opinion did not alter its current conclusion: "Our statement in *Ridgewood,* that 'a plaintiff need not prove that defendants' discrimination was intentional,' referred only to *liability*, and not damages; it was intended to address the requirements for showing a *violation* of § 504, not the requirements for particular remedies." *Id.* at 262; *cf. id.* at 262 n.21 ("Even if we were to accept Appellants' view of our holding in *Ridgewood*, we would be forced to question its

13

vitality following the Supreme Court's jurisprudence in *Barnes*, 536 U.S. 181, 122 S. Ct. 2097, and *Sandoval*, 532 U.S. 275, 121 S. Ct. 1511.").

Plaintiffs read *S.H.* and its discussion of *Ridgewood* as standing for the proposition that "liability and damages are two distinct inquiries, with different legal requirements." (Doc. No. 153 at 6.) But this reading takes the holdings of those cases too far and is at odds with later published opinions from the Third Circuit. Instead, a more appropriate reading of *S.H.* is that when a plaintiff brings claims for compensatory damages under the ADA and/or Section 504—as opposed to claims for injunctive relief—the plaintiff must prove intentional discrimination to prevail in its case in chief. This is how the Third Circuit has framed the issue in multiple published opinions since *Ridgewood*, including *S.H. See S.H.*, 729 F.3d at 261 ("[C]laims for compensatory damages under § 504 of the RA and § 202 of the ADA . . . require a finding of intentional discrimination." (emphasis added)); *A.G. v. Lower Merion Sch. Dist.*, 542 F. App'x 194, 198–99 (3d Cir. 2013) ("[T]he standard for claims brought under § 504 and the ADA for compensatory damages is deliberate indifference . . . ."). Indeed, in *D.E. v. Central Dauphin School District*, a published opinion issued after *S.H.*, the Third Circuit clarified that when a plaintiff seeks compensatory damages, it is not enough for the plaintiff to satisfy the base elements discussed in *Ridgewood*; the plaintiff must also prove deliberate indifference:

> To establish claims under § 504 of the RA and the ADA, a plaintiff must demonstrate that: (1) he has a disability, or was regarded as having a disability; (2) he was "otherwise qualified" to participate in school activities; and (3) he was "denied the benefits of the program or was otherwise subject to discrimination because of [his] disability." Where, as in the instant case, a plaintiff seeks compensatory damages as a remedy for violations of the RA and the ADA, *it is not enough to demonstrate only that the plaintiff has made out the prima facie case outlined above*. He or she *must* also demonstrate that the aforementioned discrimination was intentional. A showing of deliberate indifference satisfies that standard.

765 F.3d 260, 269 (3d Cir. 2014) (citations omitted) (emphases added); *see also T.F. v. Fox Chapel Area Sch. Dist.*, 589 F. App'x 594, 600–01 (3d Cir. 2014) ("[W]e agree with the District Court that the higher standard for proof for intentional discrimination applies here because Appellants seek compensatory damages in the form of tuition reimbursement."); *M.J.G. v. Sch. Dist. of Phila.*, 774 F. App's 736, 743 (3d Cir. 2019) ("[T]o succeed on both their Title IX and ADA claims, Plaintiffs must show that the School Defendants were deliberately indifferent to MJG's circumstances.").

This interpretation is also consistent with Third Circuit opinions affirming grants of summary judgment where the plaintiffs failed to put forth evidence of deliberate indifference. *See D.E.*, 765 F.3d at 269 n.9 (explaining that although the parties disputed whether the plaintiff had adequately shown that he suffered from a disability, the court did not need to decide that issue because the plaintiff had "not demonstrated that there exists a genuine issue of material fact regarding whether [the defendant] acted with deliberate indifference"); *id.* ("To the extent that D.E. seeks only compensatory damages, the relevance of [the disability issue] solely depends on the outcome of our inquiry into the question of intentional discrimination."); *A.G.*, 542 F. App'x at 198–99 ("Because we have previously concluded that the standard for claims brought under § 504 and the ADA for compensatory damages is deliberate indifference, A.G. must point to evidence in the summary judgment record that creates a genuine issue of material fact as to whether LMSD acted with deliberate indifference when it placed and kept her in special education. . . . Given A.G.'s failure to point to any evidence that would create a genuine dispute as to whether LMSD knew that a harm to A.G.'s federally protected right was substantially likely, we must affirm the District Court's entry of summary judgment in LMSD's favor."); *M.J.G*, 774 F. App'x at 744 ("Because no reasonable juror could find that the School Defendants

were deliberately indifferent . . . the District Court properly granted summary judgment for the School Defendants on MJG's Title IX and ADA claims."). If deliberate indifference were only a secondary consideration, then summary judgment would never be appropriate in such cases because presumably, the plaintiff could proceed to trial and seek nominal damages in the way that Plaintiffs wish to proceed here.

In sum, the binding and persuasive authority all suggest that when a plaintiff brings an ADA and/or Section 504 claims for compensatory damages—like Plaintiffs do here—the plaintiff must prove deliberate indifference to prevail. The Court rejects Plaintiffs' proposed instructions to the extent they suggest otherwise.

### III. Conclusion

For the reasons set forth above, the Court sustains the District's objections to the qualifications of Dr. Young and Dr. Stephens to opine on the efficacy of the letterboard and communication partner as a communication method for Alex, reserves ruling on the District's objection to the qualifications of Ms. von Hagen to offer the same opinion until trial, and adopts the District's proposal and rejects Plaintiffs' proposal with respect to the jury instructions on deliberate indifference. An appropriate Order follows.